UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - x
                              :
JESSICA MOREL,                :   No. 3:09CV1897(RNC)
                              :
            Plaintiff,        :
                              :
        vs                    :
                              :
AMERICAN MEDICAL RESPONSE     :
OF CT, INC.,                  :
                              :   HARTFORD, CONNECTICUT
            Defendant.        :   August 8, 2012
                              :
- - - - - - - - - - - - - - - x
```

JURY TRIAL

VOLUME I

BEFORE:

HON. ROBERT N. CHATIGNY, U.S.D.J.

Darlene A. Warner, RDR-CRR
Official Court Reporter

1   APPEARANCES:

2

3       FOR THE PLAINTIFF:

4           BARBARA E. GARDNER, ESQ
                843 Main Street
5               Suite 1-4
                Manchester, Connecticut 06040
6

7       FOR THE DEFENDANT:

8           JACKSON LEWIS, LLP-HFD
                90 State House Square
9               8th Floor
                Hartford, Connecticut 06103-3708
10          BY:  SALLY WELCH ST. ONGE, ESQ.

11          JACKSON LEWIS, LLP-VA
                Two James Center
12              1021 East Cary Street, Suite 1200
                Richmond, Virginia 23219
13          BY:  JOHN M. BARR, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          TABLE OF CONTENTS

3

4    WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

5

6

7    JESSICA MOREL

8     BY MS. GARDNER:      39

9     BY MR. BARR:                 119

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            9:00 A.M.

2

3            THE COURT:  Good morning.  I understand you're

4    ready for the jury.

5            MR. BARR:  Your Honor, a couple points before

6    the jury.  There's still the outstanding motion in limine

7    about testimony regarding incidents not involving

8    Ms. Morel.

9            And I also ask that the witnesses be excluded.

10           THE COURT:  Okay.  Dealing with the second

11   point, the law guarantees the right to have witnesses

12   excluded, and so anybody who will be testifying in the

13   case is not permitted to attend the trial until after he

14   or she has testified.  The only exception to that is the

15   plaintiff herself and the defendant's representative.

16   Everybody else is required to leave.

17           It's also appropriate to explain that the reason

18   is the judicial process would be harmed if witnesses were

19   permitted to observe the testimony of other witnesses

20   before testifying themselves, and in that regard, the law

21   prefers that witnesses not compare notes with each other

22   or coach each other.  Instead the process depends on

23   people testifying forthrightly without that kind of undue

24   influence.

25           I also want to say, as I do in every case, that

1    it's very important that trial participants, counsel,

2    parties, witnesses, have no contact with the jurors

3    outside the four walls of the courtroom.  This includes

4    eye contact.  It includes any attempt to curry favor with

5    jurors, to pose for jurors, to somehow ingratiate

6    yourselves with the jurors.  The jurors are not to be

7    subjected to that kind of thing, and if I hear about it,

8    I'll take steps to correct it.  That's very important.

9         So if you should happen to encounter a juror

10   outside the courtroom, whether in the hallway, in the

11   atrium, on the sidewalk, you are to have no contact with

12   the juror, you are to avert your eyes, you are not to say

13   hello, nothing.  Nothing of the kind.  You are to behave

14   as though the juror is not there, and that's very

15   important.  Okay?

16             MR. BARR:  Yes, Your Honor.

17             MS. GARDNER:  Yes, Your Honor.

18             THE COURT:  With regard to the motion in limine,

19   I'm familiar with the motion and I think that the

20   defendant is right, that we're not supposed to have

21   testimony about things that the plaintiff was unaware of,

22   and it was my understanding that we were all in agreement,

23   therefore I'm kind of at a loss to understand what the

24   problem is.

25             But I'd like to bring the jury in, I promised

1    them we would start at 9:00 and I don't want to keep them

2    waiting.

3            Not to be heavy handed, but just so you know, in

4    my view, we should treat jurors consistent with the

5    importance of their role and their office.  If Barack

6    Obama was in that room, we wouldn't stand around here

7    chatting keeping him waiting.  Those people occupy the

8    highest office in the third branch of government while

9    they're serving as jurors, and that's how I treat them,

10   and that's how I expect everybody to treat them, with the

11   utmost consideration.  So we're not going to keep them

12   waiting.

13           MR. BARR:  Yes, Your Honor.

14           THE COURT:  In light of what transpired

15   yesterday at jury selection, I intend to instruct the jury

16   generally about the law as part of my preliminary

17   instructions and I'll tell them that you will be making

18   opening statements.  We'll have the opening statements and

19   then we'll take a break.  Okay?

20           If you need to speak with me about anticipated

21   evidentiary issues, we can do that on a break.  So if you

22   anticipate that the next witness is going to be asked

23   questions to which objection likely will be made, please

24   let me know that and we can talk about that on a break and

25   the jury won't be kept waiting while we do that.  Okay?

1        MR. BARR:  Yes, Your Honor.

2        THE COURT:  Thank you.

3            (Whereupon, the jury entered the

4            courtroom.)

5        THE COURT:  Good morning.  Welcome back and

6   thank you again for your jury service.  Please be seated.

7        I want to apologize to you for the late start.

8   I understand and appreciate the importance of starting on

9   time.  We know from experience that jurors are very

10  conscientious and eager to do the best possible job but

11  they don't like to be kept waiting understandably.  We

12  will do all that we can to proceed promptly and avoid any

13  delays because we value your time and we don't want to

14  keep you waiting.  When you're here with us, we want you

15  to be in the courtroom hearing evidence, not waiting,

16  wondering what's going on, and I can assure you that

17  that's a top priority of mine.

18       We will be together for a week or so, and I

19  think you'll find it to be an intense experience.  Those

20  of you who have had jury service I think understand what I

21  mean, but hopefully it will be a good experience for

22  everybody and I will do what I can to help bring that

23  about.

24       At this time I'm going to ask counsel to

25  reintroduce themselves and to once again identify the

1    people seated with them, and we'll start with plaintiff's

2    counsel.

3              MS. GARDNER:  Good morning.  Barbara Gardner

4    representing the plaintiff.  And to my left is the

5    plaintiff, Jessica Morel.

6              MR. BARR:  Good morning, ladies and gentlemen.

7    I'm John Barr here today on behalf of AMR of Connecticut.

8    To my right is Sally St. Onge, my co-counsel, and Dwayne

9    Drouin representing AMR.

10             THE COURT:  Thank you.

11             Would you please stand and be sworn in at this

12   time.

13             THE CLERK:  I'm going to ask you to raise your

14   right hands.

15             (Jurors Sworn or Affirmed.)

16             THE COURT:  Members of the jury, I have some

17   preliminary instructions for you at this time.  As the

18   trial goes along, I will have instructions for you.

19   Whenever I given you instructions on the law, I will try

20   to be as clear as possible.  All of the instructions are

21   equally binding.  As I explained yesterday, as jurors,

22   you're obliged to follow the law, whether you happen to

23   agree with it or not.

24             I'm going to begin by talking a bit about the

25   nature of the claims that you will be considering, and I

1  want to give you a brief statement of the applicable law.

2  Before I do that, let me say a few words about Terri

3  Glynn, our deputy clerk.

4       Terri is responsible for assisting you during

5  your jury service.  If you have any questions or concerns

6  or you need anything, Terri's the person to see.  She'll

7  let me know and we'll do what we can to accommodate you.

8  So please rely on Terri in that regard.

9       Darlene Warner, our court reporter, will be with

10  us throughout the trial and, as you know, it's her

11  responsibility to make a complete record of everything

12  that takes place here.

13       We're providing you with steno pads so that you

14  can take notes too.  You don't have to take any notes at

15  all.  There's no obligation to take notes, but we give you

16  the pads in the event you like to take notes to help you

17  in whatever way note taking helps you.

18       Please understand that as jurors, one of your

19  main functions is to carefully consider the testimony of

20  the witnesses as they testify.  So if you do take notes,

21  as you are free to do, please don't become so absorbed in

22  the note taking process that your attention is diverted

23  from the witness while the witness testifies.  Darlene is

24  responsible for making a complete record.  You don't need

25  to.  Okay?

1          Also let me say, with regard to your notes,

2     they're for your use only.  You're not to show your notes

3     to other members of the jury at any time, even during

4     deliberations, and we will safeguard your privacy.  Terri

5     will collect the steno pads.  She'll have custody of the

6     steno pads.  She won't look inside, nor will I, nor will

7     anybody else.  So you can rest assured that your privacy

8     will be protected.

9          Let me turn then to the nature of the claims.

10          As we discussed at the jury selection yesterday,

11    this is a civil case brought by the plaintiff, Jessica

12    Morel, against her former employer, the defendant,

13    American Medical Response of Connecticut, Inc. or AMR for

14    short.  This case arises out of the plaintiff's employment

15    with AMR.  The plaintiff seeks money damages to compensate

16    for alleged wrongdoing by AMR resulting in emotional

17    distress.

18          The plaintiff makes two claims:

19          She claims that AMR discriminated against her on

20    the basis of her gender in violation of federal and state

21    antidiscrimination statutes by subjecting her to a

22    sexually harassing hostile work environment.  To prove

23    this claim, she must persuade you that the gender based

24    harassment she claims to have experienced was sufficiently

25    severe and pervasive to alter the terms and conditions of

1  her employment.  The plaintiff must prove that she

2  perceived the environment to be hostile and that a

3  reasonable person also would have perceived the

4  environment to be hostile.

5          In considering this claim, you will have to

6  evaluate the totality of the circumstances shown by the

7  evidence, including the frequency of any harassing

8  conduct, the severity of the conduct, whether the conduct

9  was physically threatening, and whether the conduct

10 interfered with the plaintiff's work performance.

11         The plaintiff's burden on this claim is to prove

12 that her workplace was permeated with discriminatory

13 intimidation, ridicule and insult.  Isolated incidents are

14 insufficient unless they are extremely serious.

15         To prevail on this claim, the plaintiff must

16 prove that AMR is responsible for the allegedly hostile

17 work environment because it knew or should have known of

18 the harassment and failed to take prompt and effective

19 steps to remedy the hostile work environment.

20         What about the second claim?  The plaintiff's

21 second claim is that AMR discriminated against her in

22 violation of the same antidiscrimination statutes by

23 retaliating against her for engaging in activity protected

24 by those statutes.  To prove this claim, she must persuade

25 you that she engaged in protected activity; that AMR

1    subsequently took adverse action against her; and that the

2    protected activity was a substantial factor in AMR's

3    decision to take the adverse action.

4         AMR denies the plaintiff's allegations with

5    regard to both claims, and the purpose of this trial is to

6    determine whether the plaintiff can prove these claims,

7    either or both.

8         Again, under our system, everybody has a right

9    of access to court and the plaintiff has exercised that

10   right by filing her complaint in the clerk's office and

11   asking for a jury trial and a trial is being held.

12        You shouldn't attach any significance to the

13   fact that we are having a trial.  Under our system, people

14   are entitled to a trial if they demand one.

15        The plaintiff has the burden here of proving her

16   claims by what is called a preponderance of the evidence.

17   To prove a fact by a preponderance of the evidence is, as

18   I said yesterday, to prove that it is more likely true

19   than not true.

20        Bear in mind, this burden of proof is very

21   different from the one that applies in a criminal case

22   where the prosecution is required to prove the charge

23   beyond a reasonable doubt.  That's a much heavier burden

24   of proof.  Here the burden is to prove that the claim is

25   more likely true than not true.

1          Let me talk about your duties now.

2          It will be your duty as jurors to listen

3     carefully to the evidence as it is presented.  To reach a

4     verdict, you will weigh the facts as you find them based

5     on the evidence presented to you in light of the

6     applicable principles of law.

7          I've just given you a general outline of the

8     law, I'll have more detailed instructions for you as we go

9     along.  Again, you are the sole judges of the facts, but

10    you must follow the law whether you agree with it or not.

11         Your duty to find the facts is extremely

12    important.  Each piece of evidence that is presented here

13    may be thought of as a piece of a puzzle.  At the end of

14    the trial, you will have all of these pieces before you.

15    Working with your fellow jurors, you will carefully

16    consider each piece in an effort to determine what the

17    evidence shows.  After you have done that, you will return

18    a verdict reflecting your view of the evidence.

19         The evidence from which you will find the facts

20    will consist of the testimony of witnesses.  These

21    witnesses will be sworn to testify truthfully and they

22    will be examined in the witness box.  I hope and expect

23    that our microphone will work and you'll be able to hear

24    their testimony very easily without having to strain or

25    work to hear what they're saying, and you will want to pay

1    close attention to what they say.  You will want to

2    observe them because you may find that their demeanor or

3    manner while testifying provides clues to the weight that

4    you should give their testimony.

5         The evidence will also include documents that

6    will be presented to you in the form of exhibits.  Quite a

7    few exhibits have been admitted into the record already

8    and the parties will be able to refer you to those

9    documents as we go along.

10        The evidence may also include stipulations of

11   fact entered into by the parties.  If the parties

12   stipulate or agree that a certain fact is true, the

13   stipulation constitutes evidence and you must accept the

14   agreed upon fact as true even though no other evidence is

15   offered on that point besides the stipulation itself.

16   That's it.  The testimony of the witnesses, the exhibits

17   and any stipulations.  Nothing else is evidence.

18        So in deciding what the facts are, you have to

19   confine your attention to the testimony, the exhibits and

20   any stipulations.  Nothing else is evidence.  What I say

21   is not evidence, what the lawyers say is not evidence.

22   The evidence comes from the witnesses, not from the

23   lawyers or from me.

24        It's possible that some evidence will be

25   admissible only for a certain purpose and not for any

1    other purpose.  Should that happen, I will need to give

2    you what's called a limiting instruction, limiting the use

3    that can be made of that evidence, and should that happen,

4    I'll try to be as clear as possible.

5           It may be that a witness will say something in

6    your presence that you're not permitted to consider and I

7    may be called upon to exclude that and instruct you to

8    ignore that, and if that happens, you're going to have to

9    follow the law.  It's not always easy to do, but it is

10   possible to do.  As I said, the evidence may be likened to

11   pieces of a puzzle.  If you are told to ignore a piece,

12   you need to take it off the table and put it away from you

13   and not think about it, and you can do that, I'm sure.

14          Anything that you hear or see outside the

15   courtroom is not evidence and must be disregarded.  This

16   is very important.  As jurors, it is your duty to decide

17   the case based solely on the evidence presented here

18   inside the four walls of the courtroom in the presence of

19   the parties, counsel, and me.  This is a fundamental rule

20   of due process.  It keeps all of us on the same page, so

21   to speak, which is very important.

22          As I explained yesterday, you must not conduct

23   any independent research about the case or anything

24   touching the case.  You are not allowed to consult

25   dictionaries or other reference materials, search the

1    internet, visit websites, blogs, or use any other means of

2    seeking information about the case or information that

3    might help you decide the case.  Please understand that

4    you're not permitted to seek information from any source

5    outside the confines of the courtroom.  This is

6    fundamental.

7           Bear in mind that if you were to attempt to seek

8    information, you would be committing a fundamental mistake

9    by violating the basic agreement that we're all going to

10   be on the same page at all times and we're not going to

11   step outside and see for ourselves what might be out

12   there.  Were you to do that, it would be very wrong, and I

13   don't want to be heavy handed here, but I should tell you

14   that I have learned of cases in which unfortunately jurors

15   have breached this fundamental rule and as a result

16   verdicts have been overturned and cases have had to be

17   retried, including cases that took several months to try.

18           I understand that we spend so much time with our

19   smart phones and our laptops, it becomes almost a

20   compulsive thing, it seems quite natural to do, but as

21   jurors, you need to resist that, and we will rely on you

22   to do so.

23           Remember, the information that's out there isn't

24   vetted, it may be untrue, it may be exaggerated, it may be

25   incomplete.  It's not vetted like the information must be

1    under the Rules of Evidence here in court.

2            If you have any questions about that, let me

3    know, but I think it's clear.

4            As I mentioned yesterday, until you retire to

5    deliberate, you're not permitted to discuss the case even

6    among yourselves.  Once you retire to deliberate, then you

7    have an opportunity to discuss the case with each other,

8    but you're not permitted to discuss the case while the

9    trial is underway.

10           As I suggested yesterday, if you were to discuss

11   the case, you likely would find yourself expressing

12   opinions, maybe staking out positions before you'd heard

13   everything that you need to know, that is before you heard

14   all the evidence, before counsel had an opportunity to

15   argue to you about what they think the evidence shows, and

16   before I instructed you fully on the law.  Until you've

17   heard the whole thing, you don't want to be expressing

18   opinions, taking positions.  You want to instead maintain

19   an open mind.

20           Sometimes I try cases without the assistance of

21   a jury.  In that case, I'm the fact finder.  I've had the

22   experience many times of forming an impression in my mind

23   about the strength or weakness of the plaintiff's case on

24   day one and then having a very different impression on day

25   two and then another impression on day three.  I've

1    learned it's really important to keep an open mind.

2    Indeed, it's vital that you do so.  Accordingly, please

3    don't discuss the case with each other until you retire to

4    deliberate.

5              In the same vein, it's very important that you

6    not discuss the case with anybody else:  Loved ones at

7    home, coworkers, acquaintances, somebody you bump into on

8    the street or in the grocery store, total strangers on the

9    bus.  You can't discuss it with anybody.

10             As I said yesterday, jurors are like judges and

11   judges are rather isolated in the world.  It comes with

12   the territory.  You have to be in a bit of a bubble in

13   order to do your job properly, and this includes

14   scrupulously refraining from talking about a case

15   entrusted to you until you are released from your

16   responsibility.

17             So if anybody wants to talk with you about your

18   work -- and it's understandable that they would wish to do

19   so -- you need to explain that you just can't.  You'll

20   have time to do that after it's over, but you can't do it

21   until after it's over.  Okay?

22             I've explained to you that you need to be in a

23   bit of a bubble, and I want to assure you that the other

24   trial participants know this.  They know that they are not

25   to have any contact with you outside the courtroom, not

1    even eye contact.  If another trial participant were to

2    have contact with you, that would be highly improper.  As

3    jurors, it's important that you not only do justice, but

4    that you appear to do justice, and we wouldn't want you to

5    be outside the courtroom having contact with one side or

6    the other.  If that happened, a question would naturally

7    be raised about the fairness if that juror and everybody

8    understands that.

9            So when you're outside the courtroom, if you

10   were to see another trial participant, look away.  You

11   don't have eye contact, you don't have conversation, not

12   even "hello, nice day," "too bad it's raining."  Nothing

13   like that.  You have no contact with them, period.

14           I don't think you need to be concerned that

15   anybody is going to have contact with you, but were that

16   to occur, you would need to tell Terri promptly so that I

17   could address it, okay?

18           I've mentioned the importance of maintaining an

19   open mind and I want to be sure to impress upon you the

20   importance of refraining from forming any definite opinion

21   about any of the disputed issues in the case until after

22   you've heard all the evidence and you've heard the

23   arguments of counsel and I've fully instructed you on the

24   law.  There is a natural human tendency we all share to

25   judge too quickly.  There is a natural human tendency we

1    to judge too quickly in terms of what is familiar to us

2    that which is not yet fully known.  And as I mentioned

3    just now, I find myself doing that.  I'm a judge, this is

4    what I do day in, day out, as a way of life, and I've been

5    doing it for going on 19 years, and I've learned the

6    importance of self-discipline when it comes to maintaining

7    an open mind and not forming any definite opinion until

8    you've heard both sides fully.  So please strive to do

9    that.

10            Let me tell you now about how we'll proceed.

11            We're going to begin with opening statements by

12   counsel.  The opening statement gives each side an

13   opportunity to tell you what is in store for you.  That

14   is, it gives the lawyers a chance to tell you who will be

15   here and what they are expected to say.  It's not an

16   opportunity to present argument.  It's not an argument to

17   try to persuade you to find for their side.  It is an

18   introduction to the case, and we'll hear first from

19   plaintiff's counsel.

20            Because the plaintiff has the burden of proof

21   here, plaintiff's counsel will speak first and then we'll

22   hear from defense counsel.

23            After that, we'll take a break, and following

24   the break we'll start with the first witness.

25            As I mentioned, we'll go from 9:00 to 4:30.

1    We'll take an hour at lunch.  We'll take short breaks, mid

2    morning, mid afternoon, about 20 minutes each.  If at any

3    time you need a break, you don't need to suffer in

4    silence.  Raise your hand and we can take a break.  Again,

5    we want you to be happy.  We want you to do your best

6    possible work, and we're going to do whatever we can to

7    assist you in that effort, and that includes accommodating

8    you if you have to take a break, so don't hesitate to

9    signal if that should happen.

10           With regard to the presentation of the evidence,

11   to make this as efficient a process as possible, the

12   lawyers, to their credit, have worked cooperatively to

13   take steps to get the documents into evidence as exhibits

14   right at the very start.  It often happens in trials that

15   the exhibits will be dealt with seriatim, one side will

16   offer an exhibit, the other side will want to look at it,

17   there may be an objection, in which case the Court has to

18   make a ruling, and this takes quite a bit of time before

19   the exhibit comes in or is excluded.  Fortunately the

20   lawyers have worked cooperatively to avoid that, and so

21   all or nearly all of the exhibits, as I understand it, are

22   in evidence as I speak to you.

23           These will be presented to you.  We have screens

24   that may be used.  There are binders that are going to be

25   provided to you.  You will want to leave those binders at

1   your chairs.  They're quite large and quite heavy.  You

2   don't need to carry them around.

3               The exhibits, whether displayed on the screens

4   or in the binders, may be referred to while the witnesses

5   testify, and that's fine.

6               Each witness you will see will be examined first

7   by the lawyer calling the witness, and after that direct

8   examination is completed, the lawyer from the other side

9   will have an opportunity to cross-examine the witness.

10  Following cross-examination, you will no doubt see

11  redirect examination in many instances.  Ideally that

12  would complete the examination of the witness:  Direct,

13  cross-examination and redirect examination ideally would

14  be sufficient to cover what needs to be covered, but

15  that's not always the case and sometimes you will have

16  further examination on cross and further direct

17  examination.  But we will proceed as efficiently as

18  possible to complete the testimony of each witness.

19              Once the plaintiff has offered all her witnesses

20  and exhibits, the plaintiff will rest, and at that point

21  the defendant will have an opportunity to call additional

22  witnesses and offer additional exhibits.  Any witnesses

23  called by the defendant will be subject to the same

24  sequence of examination.

25              When the defendant completes its presentation of

1    witnesses and exhibits, the defendant will rest, and at

2    that time the plaintiff may have rebuttal evidence to

3    offer in the form of witness testimony or other exhibits.

4         Then the evidence will be completed, the record

5    will be closed and the lawyers will have an opportunity to

6    present argument to you.  Closing argument, unlike opening

7    statement, provides counsel with an opportunity to suggest

8    to you what counsel believes your verdict should be based

9    on the evidence that has been presented, and that's a very

10   important stage of the case.  The lawyers have lived with

11   the case, the lawyers know the law, and this gives them a

12   chance to tell you what they think your verdict should be.

13        After the closing argument, I'll give you final

14   instructions on the law that you need to apply and at that

15   point ask you to retire to deliberate.

16        Thank you for your attention.  We'll turn now to

17   the opening statements, and we'll start with plaintiff's

18   counsel.

19        MS. GARDNER:  Thank you, Your Honor.

20        Good morning, ladies and gentlemen.  To begin

21   the case we will be hearing from the plaintiff, Jessica

22   Morel.  Jessica was 21 years old when she got pretty much

23   her first job out of college as an EMT working for the

24   defendant, AMR, posted in the town of Enfield.  She

25   typically worked nights, 7:00 p.m. to 7:00 a.m., and she

1    worked with other EMTs in the town of Enfield.

2          At the start of her employment she worked with a

3    partner.  Later she worked alone in what was called the

4    fly car and would connect with EMTs when she got to a

5    scene, an accident, a home, where ever the ambulance was

6    called.

7          After about a year, she became a paramedic.

8    She'd been going to school while she was working as an

9    EMT, and when she became a paramedic, she started to

10   experience abusive behavior by the male EMTs who worked

11   for the town of Enfield.  The abusive behavior included

12   very bad language directed at Jessica.  So in other words,

13   we're not talking about foul language that is in some

14   workplaces, whether it should be or not, we are talking

15   about bad language directed at the plaintiff while she's

16   at work.

17         We're also talking about physical intimidation.

18   We're talking about humiliation.  We are talking about

19   reckless driving with Jessica in the back of the ambulance

20   for the purpose of scaring her and possibly injuring her,

21   or at least putting her in fear of being injured.

22         Ultimately Jessica's tires were slashed on her

23   personal vehicle while she was at work and her car was

24   parked in the AMR parking lot.

25         This behavior went on while obviously all of

1    these individuals were supposedly working as a team taking

2    care of sick people in crisis.  So imagine being in work

3    and being afraid.  You know, going to a job every day that

4    you love and that you chose because you want to help

5    people, but you're afraid and don't feel safe.

6           Now, Jessica had been complaining for some time

7    to her superiors at AMR.  There are, of course, policies

8    in place at AMR that require that if you have a complaint

9    of sexual harassment or hostile environment that you can

10    complain to the company and there will be an

11    investigation.  Despite Jessica's complaints, which went

12    on for some time, the behavior continued.  Ultimately

13    there was one particular night where Jessica refused to

14    get back on the ambulance with the two individuals who

15    were abusing her and she was suspended for making that

16    choice by AMR.

17           Shortly thereafter, she complained on behalf of

18    a fellow employ who Jessica believed was being harassed

19    for her sexual orientation.  She was once again suspended.

20           So this was sort of a double whammy, because not

21    only was Jessica experiencing this hostile environment,

22    but now when she went to the company expecting that they

23    would assist her and make her environment safe, that was

24    not done.

25           Was anything done?  A letter was written to

1    Enfield by AMR, but there was no follow up, there was no

2    attempt to put Jessica in another situation that might be

3    more safe.

4         The company empowered the employees of Enfield

5    by suspending Jessica and by not taking steps to actually

6    remedy the situation, effective steps.

7         Finally the ultimate complaint mechanism in the

8    company policies is a hotline, and Jessica called the

9    hotline and an investigation was conducted, but it wasn't

10   done by an outside person, it was done by someone within

11   AMR.  Enfield employees were not reviewed and Jessica did

12   not return to work after being told by AMR that they could

13   not justify her place.

14        The defendant, I anticipate, will try to make

15   this about Jessica, that she couldn't get along with

16   anyone, that she created a conflict.  The focus should on

17   the company and their response.  No one should be made to

18   feel afraid at work, and that's why you're here today.

19        Thank you for your attention.

20        MR. BARR:  Good morning, ladies and gentlemen,

21   I'm John Barr, and I'm here on behalf of AMR.  I'm going

22   to apologize right up front, I talk too fast, but what I

23   say doesn't matter.  What the witnesses say matters, what

24   the Judge says matters.  I'm just a lawyer.

25        And what I thought I would do this morning to

1    open up would be to give you -- tell you what the evidence

2    is going to show you and various acronyms and people

3    you're going to hear from and acronyms you're going to

4    hear so when you hear them, you know what it is.

5            And the first acronym you're going to hear is

6    AMR.  That stands for American Medical Response of

7    Connecticut.  What AMR does, what the evidence will show

8    you, is they essentially run ambulance services.  Some of

9    the ambulance services are just transport, somebody's in a

10   long term care facility going to the hospital.  And some

11   of the services which are really relevant for this case

12   are emergency medical transport services, somebody's

13   having a heart attack, they've been shot, there's been an

14   automobile accident.  AMR provides those services.

15           You're going to hear the term ALS.  That stands

16   for advanced life support typically provided by

17   paramedics.  Ms. Morel is a paramedic.  Paramedics are

18   authorized to provide a higher level of emergency care.

19   They can administer certain medications, they can perform

20   certain procedures that individuals are otherwise not

21   authorized to do.  Which leads to the next terms, which is

22   BLS, or basic life support, and this provided by people

23   you've heard referred to as EMTs, emergency medical

24   technicians.  They're authorized to do first aid, CPR,

25   things of that nature.

1    Now, the town of Enfield, you're going to hear a

2    lot about the town of Enfield.  In 2007 what you'll hear

3    and see in the documents, is AMR worked in conjunction

4    with the town of Enfield.  The town of Enfield had their

5    own EMS or emergency medical services team, and they had

6    their own employees, and AMR had its own employees, and

7    they would work together in responding to emergency calls

8    that took place within the town of Enfield.

9    One of the employees you'll hear a lot about in

10   this case is an individual by the name of Scott Schaub.

11   He is I'll an employee of Enfield.  He is not an employee

12   of AMR.

13   And to really sort of simplify things, what the

14   evidence will show you is that rather than send two

15   ambulances to every possible scene in Enfield, in order to

16   be more efficient, Enfield would typically provide the BLS

17   or basic life support ambulance and AMR would provide a

18   paramedic in a fly car.

19   What a fly car would be would be somebody

20   stationed in an automobile, automobile would be stocked

21   with the appropriate medicines and equipment, and if there

22   was a call, let's say a car wreck or something, the BLS

23   ambulance from Enfield would respond and the fly car would

24   respond.  If they just needed basic first aid, the Enfield

25   individuals would take care of it and the AMR employee

1    would leave.  If they needed advanced life support, if it

2    was a terrible injury or something, the AMR individual

3    would provide the advanced life support on the Enfield

4    ambulance, they would drive to the hospital, hopefully the

5    person would be taken care of.  They would then return to

6    the scene, where ever the accident was or the medical

7    incident, and the AMR individual would get back in the fly

8    car, go back to the posting station, the Enfield ambulance

9    would go back to its post and wait for the next call.

10   Now, of course AMR needs to know if there's any

11   problems, and so one of the ways which AMR gave its

12   employees to notify them of problems is something you'll

13   hear a lot about in this case:  Incident reports.

14   Employees were encouraged to file incident reports if

15   there was any problem whatsoever out in the field.

16   Ms. Morel, as you'll hear, was a prolific author

17   of incident reports.  In 2006, 2007, what the evidence

18   will show you, she wrote over 60 incident, quite a number

19   of incident reports.  And you will see these incident

20   reports and they cover a wide variety of topics.

21   One of the topics you'll see they cover is

22   Enfield's not calling AMR in time.  The dispatcher called

23   the Enfield ambulance and not the AMR ambulance.  Why did

24   this matter?  There's a big dispute in 2007 about whether

25   or not Enfield is going to take over the entire ambulance

1    business in Enfield and exclude AMR.  So the question is

2    are jobs at stake?  Enfield's grabbing all the jobs.

3    We're showing up late.  We might lose our jobs if Enfield

4    takes over the business there.

5         You will see a number of incident reports that

6    Ms. Morel authors where she complains about female Enfield

7    employees doing things she don't like, challenging her

8    authority, not acknowledging she's the senior on the

9    scene.  Female employees driving too fast, female Enfield

10   employees being rude to her.

11        You will see she is not shy about quoting

12   conversations in the incident reports that she doesn't

13   like.  She is not shy about saying -- for example, you'll

14   see in one incident report -- that she said somebody spoke

15   to her in a very, and she underlines very, in a very

16   sarcastic manner.  He said something along the lines of,

17   Oh, aren't you going to say hi today?

18        Prior to April 6, 2007, you will not see a

19   single incident report that uses any foul language, that

20   reports any foul language.  You will see one incident

21   report prior to April 6, 2007 where Ms. Morel says a

22   female Enfield employee pushed me on a scene.  You won't

23   see any other incident reports where she reports anything

24   else untoward going on in terms of gender based

25   harassment.

1              What happened on April 6, 2007?  There's a

2    dispute about who's going to pick up the trash.

3    Ms. Morel's in the back of an ambulance, alcohol swabs, IV

4    packages and all sorts of trash that winds up in the back.

5    Ms. Morel doesn't want to pick up the trash, the Enfield

6    employees want her to pick up the trash, and there's a

7    dispute.  And we'll hear a lot about what happens on the

8    night of April 6, 2007.

9              Ms. Morel eventually refuses to pick up the

10   trash and walks off, and you'll hear testimony that this

11   leaves the town of Enfield without the prescribed amount

12   of medical personnel.  There's one less paramedic in

13   Enfield that evening.

14             Ms. Morel writes a three page, single spaced

15   incident report about what happened on the night of April

16   6, and for the first time and the only time while she's an

17   employee of AMR, you will see Ms. Morel complain that foul

18   language was used, and you will see that the language she

19   complained about on the night of April 6, 2007 -- and

20   forgive me, I do not need to insult the dignity of the

21   jury -- you will see she says they called me an asshole

22   and they called me a para-God.  And that's the language

23   she reports on her incident report she writes the next

24   day.

25             You will hear from an individual by the name of

1    Dwayne Drouin.  He's representing AMR in this case.

2            Mr. Drouin at the time, and still is, the lead

3    operations supervisor for AMR covering not only Enfield,

4    because the AMR operation covers the greater Hartford

5    area.  Just to give you some idea of scale, there's about

6    five employees working in Enfield for 45 employees working

7    in Hartford.

8            You will hear that Mr. Drouin sent an email to

9    the Enfield person in charge of the Enfield employees

10   saying basically, don't do this.  Your employees shouldn't

11   be calling our employees bad names.  And you will see

12   after the note gets sent -- it's sent in the middle of

13   April 2007 -- that Ms. Morel no longer complains about

14   foul language that takes place in Enfield.  In fact,

15   you'll see an incident report where she specifically says

16   that there was no repeat of the foul language.  And after

17   this email from Mr. Drouin, you will not see another

18   incident report from Ms. Morel where she says, oh, they

19   drove around too fast with me in the back of the

20   ambulance.

21           There is another incident.  She does report her

22   tires were slashed.  She doesn't know who did it.  She

23   calls the police, the police do an investigation.  AMR

24   offered to let her park her truck inside the bay where the

25   ambulances are usually checked.  AMR, as you'll see,

1    allowed her to park her ambulance in the bay.  They

2    allowed -- they made sure she had communications equipment

3    in case she needed to summon emergency help right away.

4    Ms. Morel suggested remedy for this would be that they pay

5    for her tires.

6           After the tire slashing incident, the next

7    incident that Ms. Morel -- about which Ms. Morel

8    complains, takes place at an ice cream store on the night

9    of May 30, 2007.  What happened was three ambulances with

10   AMR crews were there having ice cream late at night, and

11   AMR supervisor, Chris Chaplin, and you'll hear Chris

12   Chaplin's name in this case, gets a call not from

13   Ms. Morel, gets a call from Kerri Pliska complaining about

14   Ms. Morel.  Kerri Pliska calls Chris Chaplin and says

15   Ms. Morel's verbally abusing me saying things I don't

16   like.

17          You'll hear the evidence that Chris Chaplin,

18   calls Ms. Morel, gets both sides of the story and

19   basically tells, hey, can we just finish off the shift

20   and, you know, we can deal with this later.  Ms. Pliska

21   says she'll do that.  Ms. Morel says she won't do that.

22   You'll hear Ms. Morel says, I don't feel safe with Kerri

23   Pliska as my partner anymore.  Chris Chaplin says, well,

24   what do you mean you don't feel safe?  And Ms. Morel's

25   response is, I don't think Kerri Pliska will accurately

1     document incidents I have.  And because I don't think

2     Kerri Pliska will accurately document incidents, I'm not

3     going to finish my shift tonight.  And so Ms. Morel again

4     gets off the truck, doesn't finish the shift, and again

5     there's one less ambulance providing service to the town

6     of Enfield.

7          You've already heard this term, but there's the

8     ethics hotline.  AMR provides its employees a number of

9     ways to complain.  You've heard about incident reports.  A

10    number of ways to complain about things they think are

11    wrong at the company.  And one of the ways they have is a

12    1-800 number.  I think it's a 1-800 number.

13         And so Ms. Morel does in fact file a complaint

14    with the ethics hotline.  And then you'll hear about Bob

15    Zagami, and you'll hear from Mr. Zagami, he's the regional

16    director of HR.  He conducts an investigation into

17    Ms. Morel's complaints.  And Mr. Zagami interviews the

18    witnesses that Ms. Morel suggests that he interview.  And

19    Mr. Zagami ultimately reaches a conclusion -- there's a

20    side issue about some payment about a stipend or

21    something, but they reimburse her -- that there was no

22    harassment, that Ms. Morel had in fact instigated these

23    incidents, refusing to pick up the trash, and verbally

24    going after Ms. Pliska.

25         And it's absolutely true, he does not talk to

1    the individuals from the town of Enfield for whom she

2    complains.  There's an important date you're going to hear

3    a lot about in the context of this case, July 1, 2007.

4           Couple of different things happen on July 1,

5    2007.  The first thing is the town of Enfield takes over

6    all of the ambulance services in the town of Enfield.

7           There's a thing you'll hear about called the R5

8    license which is something that the State of Connecticut

9    has that you need in order to provide certain level of

10   medical care.

11          AMR had had the R5 license.  You'll hear a lot

12   of testimony about there was a dispute about whether or

13   not Enfield would take the R5 license.  In fact, you'll

14   see a document where Ms. Morel says, I think they're

15   getting after me because they want the R5 license, or

16   words to that effect.  Well, Enfield ultimately takes the

17   R5 license and AMR essentially stops doing business.

18          The other important thing, July 1, 2007, that's

19   the last day Ms. Morel works a shift at AMR.  Ms. Morel

20   goes to medical school.  Ever since she was ten years old,

21   she wanted to go to medical school.  She'd applied to go

22   to medical school prior to July 1, 2007.  On July 1, 2007,

23   her dream since she was 10 comes true and she goes off to

24   medical school.

25          Ms. Morel asked to stay part-time.  She's going

1    to medical school in Erie Pennsylvania, but she asked to

2    still work part-time.  AMR's response is, we could really

3    use you as a full time employee, but they don't terminate

4    her for two years, and the only reason they terminate her

5    in two years, as you'll see later on, is because she

6    doesn't work any shifts for two years.  She never notified

7    AMR that she would like to work any part-time shifts

8    whatsoever.

9        The final term to talk with you about today that

10   you will hear a lot about and you will see is CBA or

11   collective bargaining agreement.  In this case Ms. Morel's

12   employment was governed by a collective bargaining

13   agreement.  And the collective bargaining agreement

14   impacts a number of items in this case.

15       First of all, discipline.  Ms. Morel claims she

16   was suspended.  Ms. Morel was never suspended.  There's

17   technical things that the company has to do in order to

18   suspend somebody.  It has to provide written notice to the

19   union, it has to provide written notice to Ms. Morel.  You

20   won't see a written notice that she was suspended because

21   she was never suspended.

22       The collective bargaining agreement deals with

23   administrative leave.  Individuals who are under

24   investigation can be placed on administrative leave.  The

25   administrative leave, first of all, is not part of

1    progressive discipline, it's not discipline.  In part,

2    because you get paid when you're on administrative leave.

3    And Ms. Morel, when she was on administrative leave, was

4    paid for her full shift.

5          The final thing in the collective bargaining

6    agreement is that it governs the grievance process.  There

7    are no grievances filed by Ms. Morel.  There's no evidence

8    of any grievance filed by Ms. Morel.  Again, grievances

9    have to be in writing, the union submits the grievances.

10   There are no grievances that you will see in this case.

11         So ladies and gentlemen, I want to thank you for

12   your time this morning.  I would urge you to pay attention

13   to what people said then and what they say now, both for

14   Ms. Morel and AMR.  Same standard for both sides.  What

15   did they say then?  What do they say now?

16         Thank you very much.

17         THE COURT:  Thank you.

18         Members of the jury, we'll take our mid morning

19   break now.  We'll be on break for 20 minutes.

20         You can leave your pads at your chairs.

21   Remember, please don't discuss the case and be ready to go

22   in 20 minutes.

23         Thank you.

24             (Whereupon, the jury left the courtroom.)

25         THE COURT:  We'll be in recess.

1          (Whereupon, a recess followed)

2          THE COURT:  Are we all set for the jury?

3          MS. GARDNER:  Yes, Your Honor.

4          MR. BARR:  Yes, Your Honor.

5          THE COURT:  Thank you.

6          (Whereupon, the jury entered the

7          courtroom.)

8          THE COURT:  Thank you everyone.  I do apologize

9     for the cramped conditions in the jury box.  Initially we

10    didn't have those screens and the box was designed

11    accordingly.  Now that we have them, it makes it awfully

12    tough to move around.

13          Please be careful as you go in and out.  I don't

14    want to have anybody trip.  Okay?

15          We're all set to proceed.

16          MS. GARDNER:  Thank you, Your Honor.  I call the

17    plaintiff, Jessica Morel.

18          THE COURT:  All right.

19          THE CLERK:  Before you sit down, I'm going to

20    ask you to raise your right hand.

21

22

23

24

25

1                          JESSICA MOREL,

2              called as a witness, having been first duly

3              sworn or affirmed, was examined and testified as

4              follows:

5

6              THE CLERK:  Would you state your name and spell

7    your last name for the record?

8              THE WITNESS:  I'm Jessica Morel, M-O-R-E-L.

9              THE CLERK:  City and state where you reside.

10             THE WITNESS:  Coventry, Connecticut.

11             THE CLERK:  Thank you, please be seated.

12

13                      DIRECT EXAMINATION

14   BY MS. GARDNER:

15   Q.   Good morning, Ms. Morel, we'll start with a little

16   background information.

17        Where did you grow up?

18   A.   I'm an air force brat, so I grew up all over the

19   United States.

20   Q.   So your dad was in the air force, is that right?

21   A.   Yes, my father was in the air force.

22   Q.   Okay.  You have to speak up.

23        Where did you go to high school?

24   A.   I finished high school in Berlin, Connecticut.

25   Q.   What education did you pursue following high school?

1  A.   Following high school, I went to under grad at the

2  University of Maryland, Baltimore county, and then I came

3  back to Connecticut and went to paramedic school.

4  Q.   What was your degree in from college?

5  A.   My undergraduate was premedical concentration with a

6  masters -- or a bachelors in bio psychology.

7  Q.   Is it true that you wanted to be a doctor since you

8  were ten years old?

9  A.   It is true.

10  Q.   You came back to Connecticut and you became an EMT,

11  is that correct?

12  A.   I did.

13  Q.   And what does that involve in terms of education?

14  A.   EMT is classes in the evenings, some, you know, at

15  the particular place -- it's like a volunteer ambulance

16  you take it at, and it lasts a couple months until you get

17  your certification.  You have to take a national test to

18  be certified.

19  Q.   When did you become employed by AMR?

20  A.   I was hired by AMR I believe in December of 2004, and

21  I didn't finish orientation until January of 2005.

22  Q.   So you began working full-time in January of 2005, is

23  that correct?

24  A.   Yes.

25  Q.   While you were working for AMR, did you continue your

1   education?

2   A.   I did.  I was enrolled at paramedic school in Capital

3   Community College in Hartford before I was hired at AMR.

4   I was about halfway through that program.  And then as

5   soon as I finished that program, I enrolled in a Master's

6   degree.

7   Q.   And where did you enroll in the Master's degree

8   program?

9   A.   My Master's degree was from the Philadelphia College

10  of Osteopathic Medicine in Philadelphia.

11  Q.   Did you also get a medical examiner certificate or

12  degree of some sort?

13  A.   My masters was in forensic medicine, so crime scene

14  analysis and autopsies.

15  Q.   Were you attending school in Philadelphia at the same

16  time you were working at AMR?

17  A.   I was.  I was going to school.  It's sort of a

18  distance program, so you were given study material to

19  study throughout the month, and then you had to go back

20  for a long weekend in Philadelphia to take your classes

21  and tests.  And then the cycle will repeat for a year.

22  Q.   What number of hours were you working per week as an

23  EMT?

24  A.   Seventy to 80.

25  Q.   What shift did you typically work?

1   A.   It varied throughout my employment.  I started on

2   days, and then when I became a paramedic, the night shifts

3   were the ones open more often, so I was eventually

4   permanently assigned to nights.

5   Q.   And what were the hours of the night shift?

6   A.   My shift was 7:00 p.m. to 7:00 a.m.

7   Q.   Tell us about your work as an EMT.  For example, did

8   you work with a partner?

9   A.   As an EMT, I always worked with a partner, yes.  Two

10  EMTs in a truck or an EMT and a paramedic, depending upon

11  the shift that I worked.

12  Q.   And you worked with that partner who was also an

13  employee of AMR, is that right?

14  A.   Correct.

15  Q.   And you were posted in the town of Enfield?

16  A.   Yes.  That was our starting location.

17  Q.   Typically how many calls did you respond to in an

18  evening?

19  A.   As a paramedic or an EMT?

20  Q.   EMT.

21  A.   As an EMT we would do on average 12 to 16 because

22  most of them were transfers between facilities, and then

23  some 911s in that.

24  Q.   And how many different employees of the town of

25  Enfield did you interact with typically on a shift?  Was

1   it every call or did it vary?

2   A.   When I became a paramedic, I interacted with them on

3   every call.  That was my assigned location, so I would

4   respond to them for every call.

5   Q.   How about as an EMT?

6   A.   As an EMT I responded with them when I was working

7   paramedic shifts that were assigned to the town.  So in

8   any shift that I was working in the town, I would respond

9   with Enfield EMS.

10  Q.   So if you were partnered with a paramedic, that's

11  when you would interact with Enfield employees?

12  A.   Correct.

13  Q.   Approximately when did you become a paramedic?

14  A.   In the spring of 2006.  I don't know the exact month.

15  Q.   So you had been working as an EMT from January 2005

16  until the spring of 2006 when you became a paramedic, is

17  that right?

18  A.   Yes.

19  Q.   Let's just talk a little bit about incident reports.

20  What were they in terms of your job duties as both an EMT

21  and a paramedic?

22  A.   As I understand it, when I got hired, incident

23  reports were for anything that happened on a call that you

24  felt the company needed to be made aware of or with

25  patient care that you needed to document.

1     When I first started with the company, I felt that

2     they were supposed to be for very serious incidents.

3     However, when I started working in the town of Enfield, I

4     was told to write up numerous things that weren't

5     necessarily serious, like weren't life or death or weren't

6     an ambulance crash, but violations of protocol and things

7     like that we were asked to document.

8         So I guess my perspective of them changed when I

9     started working at Enfield and the town started debating

10    over who would be in charges, I guess.

11    Q.   Are you referring now to the contract between Enfield

12    and AMR?

13    A.   Correct.

14    Q.   Explain that if you would.

15    A.   The state -- there's license for different regions,

16    and the state designates an EMS provider to have the

17    license for that region.  There's two licenses, a BLS

18    license and an ALS license.

19        So for the town of Enfield, the town itself had the

20    BLS license, and AMR, the private company, had the ALS

21    license.  They could provide the paramedics.

22        I don't know how long they had that contract for.  My

23    understanding was it was for a long time.

24        And then Enfield decided they wanted to have their

25    own paramedics, so there was a conflict over who could

1    provide that care, and they were trying to prove that they

2    could provide the care better than AMR could provide the

3    care, or it was some inner company, little bit political,

4    conflict there.

5    Q.   So who told you to document more things in Enfield?

6    Who at AMR told you that?

7    A.   All the supervisors would tell us to document

8    everything.  But Dwayne Drouin was my immediate

9    supervisor, and he told us any time we said, well, they

10   didn't dispatch us to a call or, oh, they're not following

11   the patient care protocols, then he would say, document

12   it, write it up.

13   Q.   And did you observe other EMTs and paramedics also

14   writing incident reports during this period of time?

15   A.   Yes.  Pretty much everyone was.  Some of us that

16   worked there full-time, the paramedics would interact

17   more, so we would write more.  But everyone was writing

18   them.

19   Q.   Can you talk about your duties as an EMT versus a

20   paramedic?  How did your job change once you became a

21   paramedic?

22   A.   As an EMT you're in charge of basic life support, so

23   CPR.  Somebody breaks an arm, you can splint it, bandage

24   them up and transport them to the hospital.

25        As a paramedic, you're in charge of IVs, cardiac

1  monitoring, you can intubate, which is like artificial

2  respiration for patients.  You have a lot of medications

3  you can give.

4      The other dynamic to that is the paramedic's in

5  charge, so the ultimate responsibility of the patient care

6  falls on the paramedic, so they're the one that is

7  ultimately legally responsible if the care isn't done

8  appropriately for the patient.

9  Q.   So in the spring of '06 when you became a paramedic,

10 did anything change about your work environment?

11 A.   I guess I don't understand the question.

12 Q.   Okay.  You were working in the town of Enfield, is

13 that right?

14 A.   I was.

15 Q.   And you were promoted to be a paramedic because you

16 completed your program, right?

17 A.   Right, right.

18 Q.   So how, if at all, other than your job duties which

19 you've just explained how they changed, what else changed

20 for you in your work?

21 A.   Nothing really besides picking up paramedic shifts

22 instead of EMT shifts.

23 Q.   How was your relationship with your Enfield coworkers

24 after you became a paramedic?

25 A.   It was immediately different with several of them.

1    Most of them, I would say, it didn't change at all.  With

2    several of them, it -- they immediately had a problem with

3    me being the paramedic on a call or being -- my perception

4    was being in charge.  They had a problem with me being in

5    charge.

6    Q.   And who are you talking about specifically?

7    A.   I'm speaking specifically about a gentleman named

8    Matthew Mucci and another named Scott Schaub.

9    Q.   And can you recall an incident at or about the time

10   you became a paramedic where you had that feeling you just

11   described?

12   A.   Yes, actually.  My first call as a paramedic in the

13   town happened to be with those two individuals, and it was

14   a really benign call.  It was a patient didn't want to go

15   to the hospital, but we have to have specific

16   documentation before we're allowed to walk away from

17   somebody to make sure that they don't have a head injury

18   and they can actually make a good decision of whether they

19   should go.

20        So this gentleman didn't want to go and we -- when he

21   came to the house, the Enfield EMS employees, Scott and

22   Matt, were already there filling out the paperwork and

23   talking to the patient.  And as soon as I get on the

24   scene, then I'm the one responsible.  So just my presence,

25   whether I talk to the patient or not, I signed on scene,

1  so I'm responsible.

2       So I asked what they had done and they hadn't gotten

3  any blood pressures or accurate vital signs, and that's a

4  requirement to get refusal paperwork to prove that the

5  patient is stable, you know?

6       And I had asked them if they got a blood pressure,

7  and they said they had gotten a palp blood pressure, which

8  is a partial blood pressure.  It doesn't qualify for

9  documentation purposes for refusal.  So I took another one

10  myself.  And we filled out the paperwork and we left the

11  patient's house.

12       We were putting the equipment back in the ambulance

13  and my partner got back in the truck and Scott Schaub

14  said, I want to talk to you.  And I didn't think anything

15  of it because I was friendly with him prior to that.  So I

16  said, okay, what do you want to talk about?  And he walked

17  up to me and almost pushed me against the ambulance, not

18  physically pushed me, but space wise, kind of backed me up

19  against the ambulance and said, what the fuck is your

20  problem?  Did you go to how to be a dick paramedic school?

21  And he started yelling at me.

22       So I would say that was the first time on my first

23  call in town that I had any sort of confrontation with him

24  really.

25  Q.   Had you worked with Mr. Schaub previously?

1    A.    I had, a lot actually.

2    Q.    Had you in fact been friendly with Mr. Schaub?

3    A.    I had.  I would have considered us friends, yeah.

4    Q.    Describe Mr. Schaub physically.

5    A.    Mr. Schaub is taller than me.  I can't say how much

6    taller than me, but significantly taller than me.  And he

7    is a very broad gentleman, like he's very built.  He has a

8    presence about him.  I don't know if you want to say an

9    alpha male, but he's sort of an alpha male personality.

10   Strong would be my impression of him.

11   Q.    How about Mr. Mucci?  Can you describe him

12   physically?

13   A.    Mr. Mucci is over 6 feet tall and heavier set.  I

14   mean, he's also just a larger stature, but heavier set, so

15   he was over 6 feet and I want to say over 300 pounds.

16   Q.    Did they typically work together, those two males?

17   A.    They did.  They were assigned permanently together

18   and then, of course, they would pick up extra shifts with

19   other people.

20   Q.    So what, if anything, did you do as a result of this

21   encounter with Mr. Schaub?

22   A.    First I was really shocked by it, so I don't think I

23   even said anything to him.  I just kind of looked at him

24   because he yelled at me and then walked away.

25         So I got in the ambulance with my partner and said,

1    did you hear what just went on?  And he said no, he

2    didn't.  And I told him and I said, you know, this is what

3    he just said to me.  I can't believe what he just said to

4    me.

5        So I talked to a supervisor about it and I documented

6    it in one of the incident reports.  And that was kind of

7    the end of that incident.

8    Q.   What was the name of the supervisor you spoke to

9    about it, if you remember?

10   A.   That specific time I don't remember.  It was most

11   likely Dwayne Drouin.

12   Q.   He was your supervisor at the time you became a

13   paramedic?

14   A.   He was.  He would be the first person I would attempt

15   to contact if anything happened.

16   Q.   Explain to me where the supervisors were in relation

17   to you when you were working.

18   A.   It varied.  When I first started as a paramedic, the

19   supervisor was out of the Enfield office, so he was in the

20   town of Enfield unless he had other duties that took him

21   to Hartford or where ever.  But we always had the company

22   Nextel, you could chirp your supervisor and talk to them

23   or you could try and contact them through the office line

24   in Hartford.  So --

25   Q.   And do you recall whether you spoke to a supervisor

1    immediately after this happened or the next day?

2    A.   It was that day.  Time-wise I'm not sure if it was 20

3    minutes or an hour or how long it was.

4    Q.   So is it true that at some points, particularly when

5    you were working the night shift, the supervisor was

6    located in Hartford?

7    A.   Yes.

8    Q.   And was that always when you were on the night shift

9    or that changed?

10   A.   It really varied, because they had part-time

11   supervisors that would do evening shifts, so they would

12   cover part of the night shift.

13       So if a part-time supervisor was on, I think we'd

14   have a supervisor until 11:00 or 12:00.  And then if there

15   wasn't one on, then it would be the Hartford supervisor.

16   It really just kind of varied by day.

17   Q.   Did that behavior with Mr. Schaub continue following

18   that initial incident that you've just described?

19   A.   It did continue.  Initially, you know, I was really

20   surprised by it, and I said, you know, that's really

21   strange, maybe he's giving me a hard time because I'm new,

22   not new to the company but because I'm a new paramedic, so

23   maybe he's just giving me a hard time.

24       So he continued to give me a hard time and sort of be

25   verbally aggressive and uncooperative with me.  Again, for

1 a little bit, I thought, okay, he's giving me a hard time

2 and I should let it go for awhile and the novelty will

3 wear off of it, and it didn't. He just kept going.

4 And I didn't start, probably for a couple of months,

5 starting to take it personally, because then it was

6 clearly not a temporary thing. It wasn't just, you know,

7 we're going to mess with her for awhile and see if we can

8 get her upset or flustered because she's new. It was

9 continuous for about a year and a half.

10 Q. How did this affect your work, if at all?

11 A. It affected my work a lot, actually. You're supposed

12 to work with the EMTs and you're supposed to work

13 together. That's the whole concept of working on the

14 ambulances. You work together to take care of your

15 patients.

16 So he wasn't working with me. As a matter of fact,

17 he was working against me in most cases and intentionally

18 trying to do the opposite of what I'd ask him to do or

19 what I was trying to do myself.

20 So it affected my ability to care for my patients

21 100 percent all the time. And that I guess really

22 bothered me, so --

23 Q. Did you continue to report it to AMR?

24 A. I did. Most the time I would talk to my supervisors

25 about it. I kind of felt like it was a personal problem

1    and I would speak in person more to them about it, because

2    that's more of a one-on-one communication, and I guess

3    that's the way I felt more comfortable.

4        And I almost felt that it would be addressed more or

5    taken more seriously if I made the effort to speak to them

6    in person versus writing it on an incident report because

7    we had so many incident reports that were, oh, they didn't

8    call us for this or they didn't call us for that.  So I

9    kind of felt like to make it stand out and let them know

10   that it was important, that I wasn't just writing another

11   incident report, that I would talk to them in person about

12   it, so --

13   Q.   Who did you speak to besides Dwayne Drouin, if you

14   remember?

15   A.   On several occasions I spoke to Wayne Cabral because

16   he was the part-time supervisor so when he was on I would

17   speak to him.

18       And there were two female part-time supervisors that

19   we would talk to intermittently, if they were on, about

20   it.  And then there were a couple of instances, later on I

21   think we're going to talk about, that I spoke to a

22   different on duty supervisor.

23       But mainly Dwayne was my assigned supervisor, so I

24   spoke to Dwayne about it.

25   Q.   What, if any, response did you get?

1    A.   He almost thought it was funny, I guess, would be the

2    initial response.  Sort of like when Scott first said that

3    to me I thought, okay, well, we'll try and let it go and

4    he'll get over it, sort of a thing.

5        So when he first thought it was funny, I didn't think

6    that that was kind of an abnormal reaction.  You're like,

7    oh, wow, he's acting kind of crazy.

8        And, you know, they continued to sort of take it as a

9    joke as it progressed.  I guess I didn't feel that they

10   really took me seriously when I said anything about it.  I

11   felt like it was a brush off.

12   Q.   What were some of your other complaints that you were

13   sharing with your supervisors during this period of time?

14   You've told us that you were yelled at by Mr. Schaub.

15   What other conduct took place during that time?

16   A.   They started driving really recklessly, which to me

17   is a huge safety issue not only for my patients but for

18   me.  There's a lot of equipment in the back of an

19   ambulance and if you get in an accident, you get hit by

20   the equipment, it kills people.

21       And plus I, a lot of times, can't wear a seatbelt

22   while taking care of the patients.  So while they're doing

23   it, I'm being thrown and I'm having to grab things to

24   prevent falling on my patients or falling into cabinets.

25       So they were driving really recklessly and I believe

1    intentionally.  It was in an effort to harass me, I feel.

2    Q.    What makes you feel that way?

3    A.    They weren't doing it with everybody, and they would

4    look in the mirror and smile or laugh when I would like

5    almost fall.  It was definitely a joke to them.

6    Q.    Did any patients ever complain?

7    A.    I don't know if they formally complained.  They

8    complained to me in the back of the ambulance, and I

9    actually wrote quite a few incident reports about that,

10   that it was endangering the patients, because I figured

11   that's even more serious than it affecting me.  It's more

12   important that it was affecting them.  So I did document

13   that more often on incident reports.

14   Q.    And is that true that this also occurred when there

15   wasn't a patient in the ambulance?

16   A.    It did, yeah.  Every time I was in the ambulance with

17   them.

18   Q.    I think most of us think that ambulances sometimes

19   need to go fast.  Talk about that relative to what you've

20   just told us.

21   A.    They do and they don't.  AMR ambulances have a

22   governing system on them, and if you go over 65, you get

23   these high tones and warnings and you get these violations

24   on your driving record and everything, because they don't

25   want you going over the speed limit.  Legally we're not

1    allowed to violate the rules of the road, the speed limit

2    or anything of that nature, driving recklessly.

3         You know, there's some accommodations made for us to

4    go through lights, but we have to stop and completely

5    clear an intersection.  And if there's an accident, it's

6    the ambulance's fault because, you know, even if we have

7    lights and sirens, if the other car has a green light, you

8    know, we're the ones ultimately going through the red

9    light.

10        So the idea is that once the paramedic or the EMTs

11   are on the call, the patient's getting care, so the risk

12   of driving recklessly is far greater than going the speed

13   limit and having good care while you're being transported

14   to the hospital.

15        So there's, I guess, the people that work in EMS that

16   are adrenaline junkies and do it for the lights and the

17   siren and the speed, but as far as appropriate care and

18   appropriate driving and safety, it's not legal and you're

19   not supposed to, you know, break the speed limit and other

20   driving rules.

21   Q.   So anything else that made you think it was being

22   done intentionally other than what you've already told us?

23   A.   Besides that they weren't doing it to anyone else and

24   that they were laughing about it, no, not really, I guess.

25   Q.   Was there any response from AMR when you complained

1    of that particular type of behavior?

2    A.    There was a response in that they asked my partners

3    to document it as well.  I don't know if they ever said

4    anything to Enfield about it or they certainly didn't do

5    anything about it because, you know, we had to transport

6    in their ambulance so --

7    Q.    Did it continue?

8    A.    It did.  It continued until 2007.

9    Q.    I think you've told us -- how many nights a week did

10   you work?

11   A.    On average about six nights a week.

12   Q.    And how many of those nights did you have to work

13   with Schaub and Mucci?

14   A.    At least four were permanently assigned shifts with

15   them, and then they would pick up overtime the same as I

16   would pick up overtime.  So conceivably, you know, four,

17   up to all seven of my shifts.

18          I wouldn't know until I got to work and was sent on a

19   call if they were working or not.

20   Q.    How often would they engage in this behavior that

21   you've described, either the yelling, the behavior in

22   front of patients and on calls and the reckless driving?

23   A.    With me, they did it every time I interacted with

24   them.

25   Q.    During this time, did you have a partner?

1    A.    I started out with a partner, and Scott Schaub would

2    try to avoid saying anything to me in front of my

3    partners, the majority of the time.  And then I was

4    switched into a fly car, which is me working by myself.

5    And of course, then they didn't have anybody to witness

6    what they were saying to me, so they would say it all the

7    time.

8    Q.    So you told us about the very first time when Scott

9    Schaub yelled at you.  What other conduct did he or Matt

10   Mucci engage in when they would yell at you?

11   A.    Specific wording?

12   Q.    Yeah.  Did they use bad language directed at you?

13   A.    They used bad language all the time, but they started

14   directing it at me.  When I became a paramedic, it was

15   different.  There's a difference between they would swear,

16   everyone in EMS would seem to swear all the time.

17   Q.    What does EMS stand for?

18   A.    Emergency medical services.  Fire, police, EMS, they

19   all tend to swear, it's the second nature.  They swear all

20   the time.  But they were specifically swearing at me and

21   calling me names after I became a paramedic.

22   Q.    And although I know you're uncomfortable saying it,

23   and we don't want to disrespect the courtroom, I am going

24   to ask you to tell us what names you were called during

25   this period of time.

1    A.    Throughout the period of time they would call me a

2    bitch and a cunt and a para-God and an asshole and any

3    of -- a number of terms.  But those four were the most

4    common that they would use in reference to me.

5    Q.    Did you put those words in any written complaints or

6    incident reports that you made to AMR?

7    A.    I didn't initially put them in any incident reports.

8    You know, I did use -- I think I put the word "asshole"

9    because that was the least of the four.  But I don't feel

10   it's professional and I kind of feel that by repeating it,

11   I'm being as unprofessional as they are.  So I felt that

12   putting unprofessional behavior and speaking to my

13   supervisors directly saying that that's what they were

14   saying was sufficient.  Because I kind of feel like saying

15   things like that is going down to their level, repeating

16   it, even.

17        And I -- the -- two of terms, obviously bitch and

18   cunt, I think are so disrespectful that it's definitely --

19   it's really disrespectful for me to say it, let alone

20   someone to say it calling somebody that.

21   Q.    Did you ever just tell them to stop?

22   A.    No, I didn't say "please stop."

23   Q.    Why not?

24   A.    I didn't feel that that would be effective.  It would

25   let them know that they were bothering me and in a sense

1    encourage them more, I guess.  So I tried to pretend like

2    it wasn't -- I would kind of try to tune it out when they

3    were saying it.

4        So it wasn't -- I had something I was supposed to be

5    doing, so I was trying not to be paying attention to them

6    and I was actually supposed to be doing my job, so --

7    Q.   Is it your testimony that you did tell your

8    supervisors that this language was being used towards you?

9    A.   I did.

10   Q.   Drawing your attention to April 2007, which is about

11   a year after you became a paramedic, is that right?

12   A.   Yes.

13   Q.   Was there a particular incident that happened where

14   you refused to get back on the ambulance?

15   A.   There was.

16   Q.   Tell us about that incident.

17   A.   Yeah.  I believe it was about the 6th or the 7th.  I

18   responded to a call in Enfield, just like normal.  I don't

19   think the call itself was anything significant.

20       When we were going up to the hospital, Mr. Schaub was

21   being uncooperative, like he typically is.  He wouldn't

22   give me patient information.  He had the patient's

23   medication list and would refuse to give it to me.  Things

24   like that.  So that when we got to the hospital, he would

25   say, oh, the paramedic doesn't know what the patient's

1    medications are, but I do, and he'd give them the list.

2    Even after specifically asking for it, he wouldn't give it

3    to me.  So he was doing that on the way up to the

4    hospital.

5         They were driving recklessly again.  The patient was

6    complaining.  We were going up to Johnson Memorial

7    Hospital, which is kind of a -- it's a smaller hospital,

8    more rural, and the road leading up to that hospital is

9    much more rough than, say, the highway going to Hartford.

10   So it was definitely a very rough ride.  And the patient

11   was very unhappy with it, but at that point in time, it

12   wasn't out of the norm of what they'd been doing.

13        So we got up to the hospital and I transferred

14   patient care to the nurses and gave my report and

15   documented it.  When I went out to the ambulance when I

16   was done, I passed Matt Mucci and Scott Schaub outside

17   smoking and drinking coffee, what they typically do, and

18   again didn't think anything of it, and I got in the back

19   of the ambulance and sat down and put my gear away and got

20   ready to go.  You know, I was waiting for them to go back

21   to town.  And Scott Schaub walked into the back of the

22   ambulance, as well as Matt Mucci, and they started yelling

23   at me about picking up garbage and who the hell did I

24   think I was, that I was too good to pick up trash.  And

25   they were just yelling at me kind of out of the blue about

1  garbage.

2  Q.   Is this the first time this had happened that

3  evening?

4  A.   This was, yeah.

5  Q.   So what happened next?

6  A.   So I told them it wasn't my job to clean the

7  ambulance.

8  Q.   Whose job is it to clean the ambulance?  How does it

9  typically work in terms of the garbage?

10 A.   The garbage -- like, you go on a call and whoever's

11 in the back taking care of the patient is responsible for

12 taking care of the patient.

13      When you get to the hospital, they transfer the

14 patient and give report to the nurses, write up their

15 written documentation of the call.  And during that time,

16 whoever it is that drove the ambulance is responsible for

17 cleaning up the back and putting all of the gear away, so

18 you're multi-tasking.  One crew member is picking up, one

19 is transferring patient care.

20      So it's whoever drove up to the hospital would be

21 their job to clean up the ambulance while you're doing all

22 your documentation.  And you should be done at around the

23 same time and ready to go.

24 Q.   Have you ever picked up the garbage because it was

25 more convenient or because it just worked out that way?

1    A.    When I drove, I would always clean the back of the

2    ambulance.

3         And even when I was in the back taking care of

4    patients, I made every effort to, you know, I would always

5    take all my garbage and at the very end, like grab it in

6    my hand and flip my glove inside out.  So really there was

7    just one thing to pick up.

8         I'm very conscious about being messy, it's kind of a

9    little OCD personality trait of that.  I'm very clean, so

10   I try not to leave things messy.

11   Q.    So continue.  Schaub was yelling at you to pick up

12   the garbage.  What happened next?

13   A.    Right.  He was yelling at me to pick up the garbage

14   and --

15   Q.    What was Matt Mucci doing?

16   A.    Matt Mucci was standing on my right and Scott Schaub

17   was standing on my left and I was sitting down, because I

18   think I was actually seatbelted in and ready to go.  And

19   they were both standing over me yelling about picking up

20   the truck and the garbage that to me, again, I'm like,

21   what is this about?  I don't really understand why, you

22   know -- it clearly wasn't about the garbage.

23   Q.    One thing we didn't cover earlier, pardon me:  How

24   old were Mr. Schaub and Mr. Mucci roughly?

25   A.    Mr. Mucci was about my age and Scott Schaub, I think

1    he was 38 or 39'ish at the time.

2    Q.   So what was supposed to happen after you dropped off

3    the patient is that you would then be driven back to your

4    fly car by these two gentlemen?

5    A.   Correct.  They'd have to drive me back to my car.

6    Q.   So what happened next?

7    A.   So I called my supervisor on the phone and I said,

8    you know, they're yelling at me over this and, number one,

9    it's their job to do it, but they're also yelling at me

10   about it.  It's not like they said, oh, can you please

11   pick up the garbage or we ran out of time, do you mind

12   throwing that out.  They just came in the ambulance and

13   started yelling at me about garbage.

14        So I called my supervisor and said, they're being

15   aggressive and they're standing over me and threatening me

16   about picking up this garbage.  And he said, well, he was

17   too far away.

18   Q.   And who were you speaking with?

19   A.   First I spoke to -- there's an EMT supervisor in

20   Hartford, and then he put me through to the paramedic

21   supervisor, part-time one that was assigned to Enfield but

22   was out in Putnam because Putnam's part of the Enfield

23   service.  So he was out in Putnam at the time and said he

24   couldn't come in to deal with it because he was 45 minutes

25   away.

1    Q.   What was his name?

2    A.   Scott Thompson.  And he would speak to the Enfield

3    supervisor.

4        So he told me he called Enfield and they agreed that

5    to get this situation over with so that Enfield would get

6    back on the road, that we would agree that I would pick up

7    anything bloody and any needles, which, you know, I pick

8    up the needles anyway because you're supposed to, and then

9    they would pick up anything else.

10   Q.   And you agreed to that?

11   A.   I agreed to that.  I said, okay, you know, I kind of

12   think it's ridiculous, but whatever, I'll accommodate.

13       So the garbage was thrown away.  I don't remember who

14   ended up -- I probably ended up doing it because they were

15   still claiming there was blood on it, and as I recall

16   there wasn't blood.  It doesn't matter.

17       And we -- after we threw it away, Scott Schaub stood

18   over me and again was yelling at me and he said, do you

19   think you can do your job tonight?  I can do this all

20   night.  It's a very long night.  This is just the

21   beginning of the shift, and was basically threatening me.

22       So after he said what he wanted to say, because I

23   didn't respond to him at all, I just kind of didn't answer

24   him, he got in the front of the truck and was driving

25   recklessly again back to Enfield.

1    And eventually they dropped me off at my fly car

2    where I immediately went back to my office and called my

3    supervisor and said, well, he proceeded to continue

4    threatening me and he's going to do it again tonight, like

5    he's clearly going to continue doing this tonight, you

6    know?

7    And his response was, well, document it, I'll talk to

8    the supervisor that's coming on at 11:00, you know, after

9    him.  And he said he'd make sure that supervisor knew what

10   was going on and that I'd just have to wait to see if they

11   did it again, because they couldn't do anything until they

12   did it again.

13   Q.   This was Scott Thompson still?

14   A.   Correct.

15   Q.   What's the next thing that happened that evening?

16   A.   I went on another call with Scott and Matt, and

17   driving up to the hospital was essentially the same.

18   Rough.  And they were inappropriate with the patients.

19   Clearly, clearly justified in their -- feeling justified

20   in their attitude because they were being a little bit

21   more aggressive, but not overly so in front of the patient

22   than they were before.

23   And so we go in, I transfer patient care again, and I

24   come back out to the ambulance again, and it's a repeat of

25   the same thing.

1    Again, they were again sitting outside smoking,

2    talking, drinking coffee and hadn't cleaned up the back of

3    the truck, which was a glove with garbage inside of it.

4    Again it's something really minor, and I had already made

5    sure I threw away the alcohol swabs because that may have

6    had blood on it, and the needles, because that may have

7    had blood on it.

8    So in the process of patient care, I made sure those

9    got thrown away, and they start yelling at me again about

10   picking up my bloody mess and throwing the garbage away.

11   And I didn't respond to them at all.

12   I immediately got on the phone with the supervisor

13   because I thought here we go again.

14   Q.   And who answered the phone this time?

15   A.   This time it was Chris Chaplin.

16   Q.   And he had just started his shift as the supervisor?

17   A.   Correct.  He had recently started it.

18   Q.   What did you tell Mr. Chaplin?

19   A.   I got on the phone and said to him, they're doing it

20   again.  They're yelling at me about the garbage.  And I

21   wasn't too detailed, because they were still sort of

22   standing over me yelling at me, and I felt that saying too

23   much detail would get them yelling more.  If I said my

24   opinion on the matter of what I thought was going on, that

25   they would start yelling at me about my opinion or how I

1    felt.

2          So I just kind of said to him, they're doing it

3    again, can you please come up here.

4    Q.   Describe the ambulance for me and where Mr. Schaub

5    was standing relative to you.

6          First of all, is it a van?

7    A.   It's a big box truck so, yeah, it's kind of like a

8    van.  There's the two doors that open in the back that

9    everyone sees where the stretcher comes in and out, and

10   there's one door on the side, the passenger's side, that

11   opens, you can walk up a couple stairs to where the

12   stretcher sits.  And I was sitting on the bench seat.

13         And so Scott Schaub came in the back doors, he opened

14   the back doors and would come in the back doors, and Matt

15   Mucci came in the side door, so I had each of them

16   standing on either side of me.  Essentially they had me

17   blocked in the truck.

18   Q.   Was Matt Mucci saying anything?

19   A.   He just said, do what he says and get it over with.

20   Don't be difficult.  Just listen to him.  Things like

21   that.

22   Q.   What did Chris Chaplin do, if anything, as a result

23   of your call?

24   A.   Chris Chaplin told me that I should just do whatever

25   they said and get back in service, and I told him that I

1    didn't feel safe being in the ambulance with them and that

2    he needed to come up.  And he refused to come up, said it

3    was inconvenient.  And we lost phone conversation a couple

4    times.

5        So at that point --

6    Q.    Meaning you lost phone contact?

7    A.    Right.  Because the reception is really bad up at

8    Johnson hospital, there's no cell phone towers, so you

9    loose reception.

10       So I was upset I lost reception.  I decided I needed

11   to get away from them and get out of the truck, so I got

12   out of the truck and called a friend who worked at the

13   company as well and said, you know, this is what's going

14   on, what do I do?

15   Q.    It was the middle of the night at this point, is that

16   right?

17   A.    It was.  I think it was close to 1:00 in the morning.

18   I'm not a hundred percent positive on the time.

19       So I called him because he's also a night person and

20   I knew he was going to be awake, and he'd also worked for

21   the company for quite a number of years.  So I figured

22   he'd have a better handle on what to do.

23       And then I used -- asked to use the hospital phone

24   and tried calling Chris Chaplin again on the hospital

25   phone.  In the meantime, I guess, that Enfield had left me

1    up there.  So they had left.

2    Q.    So Schaub and Mucci left in the ambulance?

3    A.    Correct.

4    Q.    And you were now at Johnson Memorial Hospital?

5    A.    I was.

6    Q.    What did Mr. Chaplin say at that point?

7    A.    He was really mad at me for getting out of the

8    ambulance, and he told me to get back in the ambulance.

9    And I said I didn't feel comfortable getting back in the

10   ambulance.  He said I was refusing to follow a direct

11   order.  I told him it didn't matter because they had

12   already left.  And he was pretty mad about that.

13   Q.    Let me just stop you.

14         Did you make it clear to Mr. Chaplin that you were

15   afraid of these two individuals and that's why you weren't

16   getting back on the ambulance?

17   A.    I felt I made it clear, and to the best of my

18   knowledge, he already knew what was going on.  And I made

19   it very clear to Scott Thompson that I was afraid of them.

20   So when I said, I don't feel safe getting back in the

21   ambulance, I thought that was, you know, pretty clear.

22         But eventually he sent another truck up to pick me up

23   and bring me back to the Enfield office where I spoke to

24   him again on the phone.

25   Q.    Did you -- what happened that night?  Did you go

1    home?  Did you finish your shift?

2    A.   I was speaking to him and he said that I was

3    suspended for refusing to follow a direct order.

4    Q.   And --

5    A.   And that I was to go home.  So I said, okay, I'll go

6    home.

7    Q.   What did you do when you got home?

8    A.   When I got home, I wrote an incident report about it.

9    I also -- was it that morning?  Well, I talked to my mom.

10   And then of course I wrote an incident report about it.

11   Q.   Had you been specifically asked to write an incident

12   report about Mr. Chaplin or Mr. Thompson?

13   A.   Yes.  Mr. Thompson had already previously asked me to

14   write a report about it, and I don't remember if Chris --

15   I don't think Chris Chaplin already asked me to write one

16   about it.  But I was already going to write one about the

17   first half of the night, so --

18   Q.   Hopefully everyone is looking at Plaintiff's

19   Exhibit 5.  And Jessica, is that the incident report you

20   wrote that night when you got home?

21   A.   That is, that's it.

22   Q.   And in that report, did you specifically convey that

23   you were feeling threatened?

24   A.   I did.  I'll have to read it for a minute.

25                     (Pause)

1   A.   Okay, second page -- first paragraph, on the bottom,

2   I said, I find the exchange to be highly threatening and

3   verbally assaultive.

4        And then the next paragraph at the bottom I put, I

5   feel that my life and those of the patrons on the road is

6   put in peril with their behavior.

7        And I don't see any specific wording on that page.

8   Q.   I'm just going to go to the last page, last

9   paragraph.

10  A.   Do you want me to read the whole paragraph or --

11  Q.   Just the first line of the last paragraph.

12  A.   "I find this to be a hostile work environment."

13  Q.   Is that the first time that you had been explicit to

14  your supervisors in describing what was occurring as

15  creating a hostile work environment for you?

16  A.   That's not the first time I'd been explicit about it

17  being a hostile work environment.  That's the first time I

18  really made sure I documented it really well.

19  Q.   What, if anything, happened -- well, first of all,

20  let me ask you this:

21       Did Mr. Chaplin tell you that you were to be

22  disciplined that evening?  Did he tell you that?

23  A.   He did.  He told me I was suspended without pay, that

24  I was to go home and I would be contacted the next day by

25  a supervisor.

1    Q.   Did a supervisor contact you the next day?

2    A.   They did.  They told me that I was suspended for an

3    undetermined length of time and that they would contact me

4    for a meeting.  That's what they told me.

5    Q.   Did you have any kind of conversation on the phone --

6    first of all, who were you speaking with?

7    A.   I honestly don't remember who I was speaking with.  I

8    would assume it was Dwayne, but I don't remember.

9    Q.   Did you protest that you were being suspended?

10   A.   I did.  I said, you know, I didn't do anything.  This

11   is the situation.  They said, that's what the meeting is

12   for, or it will be discussed at the meeting so --

13   Q.   So eventually you met with somebody from AMR about

14   what had occurred that evening, is that right?

15   A.   I did, yeah.

16   Q.   And did you bring up at that meeting the fact that

17   you felt you were being harassed?

18   A.   I did, yeah.

19   Q.   What was the response?

20   A.   They seemed more focused on the fact that I got out

21   of the truck and I disobeyed a direct order.  And I told

22   them, you're missing the point of why I got out of the

23   truck.

24        I guess I used the comparison, you know, if they told

25   me to jump off a bridge, I wouldn't make the decision to

1    follow that order because that order is obviously not safe

2    for me.  So I even used that with them.

3         They said, well, it doesn't matter.  You didn't

4    follow a direct order.

5         I said, but the reason why I didn't follow it is what

6    we should be talking about.

7         And they just kind of said, no, it didn't matter, it

8    was that it was the not getting back on the truck when

9    Chris Chaplin told me to that they were going to address.

10   Q.   How long do you believe you were out of work on this

11   suspension?

12   A.   That was close to two weeks.

13        There were a couple meetings that I was called to and

14   that canceled.  And then you know they called me in one

15   time and I already had an appointment so I couldn't make

16   that meeting.  But it was close to two weeks that they had

17   me off the road.

18   Q.   What happened -- eventually you went back to work?

19   A.   Yes.

20   Q.   And were you again in a situation where you were

21   working with Schaub and Mucci?

22   A.   I was in the same situation.  Nothing changed.  They

23   just said, you're not suspended anymore, you can go back

24   to work and resume your shift so --

25   Q.   Do you know at that point whether AMR did anything in

1    response to your complaint, specifically your complaint in

2    Exhibit 5?

3    A.   As far as I'm aware, they didn't do anything,

4    especially since they told me they weren't addressing my

5    concerns, they were just addressing that I wouldn't get

6    back on the ambulance.

7         So as far as I knew, they hadn't done anything.  And

8    as far as I was aware, the behavior had not changed either

9    when I was going on calls, so I had no reason to believe

10   anything was done.

11   Q.   Describe the behavior that would occur in front of

12   patients that was troubling.

13   A.   There was a lot of behavior that occurred in front of

14   patients that was troubling.

15        They would speak over me, disregard me, tell patients

16   not to listen to me.

17        If I would tell them, you know, you explain what

18   you're doing when you're providing patient care, you're

19   explaining why am I starting an IV.  Or a lot of people

20   are like, oh, I'm having chest pain, am I having a heart

21   attack?  And you try to explain to them, well, you know,

22   either it does look like you're having a heart attack or

23   it doesn't.  And they would speak over me and tell the

24   patients that I was wrong and interrupt me and not let me

25   finish what I was saying to them.  They were very

1    problematic in that way.

2        Or if I recommended patient care or requested that a

3    patient be cared for in a certain way with, say if they

4    had a broken arm, and I had asked them to take care of it

5    a certain way, they would refuse and do whatever they

6    would want.

7        Almost they'd do not the appropriate thing in what it

8    seemed to be an attempt to just not do what I asked.  Not

9    really what they thought what I was asking was

10   inappropriate, it's just they were just not going to do

11   what I asked was more the environment of it, I guess.

12   Q.   Did anything change, get worse, get better, after you

13   came back from being suspended?

14   A.   It almost got worse.  They were making comments to me

15   about, oh, where have you been?  We haven't seen you in

16   awhile?  What happened to you?  So they clearly thought it

17   was entertaining that I was suspended.

18       And it almost -- they felt justified in what they did

19   because I was the one that got reprimanded in their eyes,

20   I got reprimanded for not doing what they said.

21       And they got worse and they were more aggressive in

22   front of more people now.  It's like they weren't

23   necessarily hiding it as much, like trying to catch me

24   alone, they were doing it in front of patients more,

25   absolutely, but just in general in public they were doing

1    it more.

2        And then a couple more of the EMTs, male EMTs and

3    paramedics in Enfield, seemed to join in.  And I started

4    having problems that I felt were very personal and

5    dangerous with more of the male employees at Enfield.  It

6    sort of seemed like they were ganging up because, you

7    know, because they felt that I was going to get in trouble

8    for telling them no.

9    Q.   How many women paramedics were there working in the

10   town of Enfield at this time?

11   A.   There were four female paramedics that were

12   full-time.

13   Q.   Did you observe any behavior -- and how many male

14   paramedics, if you know?

15   A.   Twelve maybe.  I'm not 100 percent positive.

16   Q.   Were you ever in a position to observe Schaub and

17   Mucci's treatment of other female paramedics?

18   A.   I was, especially when he was an EMT and I would work

19   with them before I became a paramedic.  And they were

20   perfectly fine with two of the female paramedics, Terry

21   Webb and Kim McCormack, who were older female paramedics.

22   Q.   And how about other female paramedics who were

23   younger?

24   A.   They were aggressive and rude and would call the

25   other female paramedics the same sort of names that they

1    were calling me.

2        One they started to do that with, the other full-time

3    paramedic, and she told her boyfriend and he basically got

4    in their face about it.  So they stopped doing it to her.

5        But they would do it to other female paramedics, even

6    ones that filled in in the area.  If they came in from

7    Hartford to fill a shift, they would be aggressive with

8    the other young females.

9    Q.   Just going back to that night of April 6 to April 7,

10   have you told us everything that Scott Schaub said to you

11   that you found threatening?

12   A.   I believe so.  I mean, besides calling me the same

13   names and then them telling me they could do it all night

14   and that it was a long shift and that sort of thing, yeah,

15   that's it.

16   Q.   Did you document what was said in Plaintiff's

17   Exhibit 5?

18   A.   The one you just showed us?

19   Q.   Yes.

20   A.   I did.  Except for the specific swear words.

21   Q.   About a week, a couple of weeks later, of course

22   you'd been suspended for a few weeks, but turning your

23   attention to Plaintiff's Exhibit 7, it appears that you

24   are back at work and you file another incident report.  Do

25   you recall that?

1    A.   I do.  I mean, not in really great detail, but I

2    recall the incident in general.

3    Q.   And this was on Friday, April 27, is that right?

4    A.   Yes.

5    Q.   And what was your purpose in writing this incident

6    report?

7    A.   My purpose in writing it was to let them know that it

8    was still going on, I guess was -- I would put it in

9    writing again because I felt that I needed to document

10   again that I felt that they were still really harassing me

11   and nothing had changed.  And I felt that it was getting

12   worse so --

13   Q.   Who is Sean Piendel who is one of the recipients on

14   this email, Plaintiff's Exhibit 7?

15   A.   Sean Piendel was a Hartford supervisor above Dwayne.

16   Q.   And who's Kimberly Cummins?

17   A.   Kimberly Cummins was the human resources

18   representative, I guess.

19   Q.   Was this the first time that you had raised your

20   complaints to other individuals besides your supervisors

21   at AMR?

22   A.   I believe it's the first time I copied Kimberly

23   Cummins, the human resources manager, because they were

24   present at my meeting before when I got suspended.

25        And I started sending it to Sean Piendel because

1    obviously I felt it wasn't being dealt with with my

2    immediate supervisors, so I copied their boss on it.

3    Q.    In this email, you notify them that you feel this

4    behavior is sexually motivated, do you see that?

5    A.    Yes.

6    Q.    Why did you write that?

7    A.    Because I seriously felt that they were coming at me

8    because I was a single female, and I definitely feel that

9    it was motivated by my gender.

10        And they weren't doing it to any of the guys.  I had

11   asked around and they were not doing it to any of the men

12   that worked in Enfield.

13   Q.    Is that something you had mentioned before in your

14   verbal complaints when you would speak to supervisors?

15   A.    Yes.  I mean, I had mentioned that, you know, I felt

16   that they were harassing me because I was a young female

17   and I felt they were doing it because they didn't like me

18   being in charge of them.

19        Several of them were significantly older than me.

20   Others I just kind of felt like they felt that, number

21   one, I was a female and I was in charge, and there's a lot

22   of personalities there that don't like that.  And then,

23   you know, I was younger than them, and I think that added

24   a little bit of insult to injury on that one as well.

25        But mainly because I think I was a female and I don't

1    think they wanted to be told what to do by a woman.

2    Q.   Was there any response that you recall, following

3    Plaintiff's Exhibit 7, from AMR?

4    A.   Not to my knowledge, there wasn't any.

5    Q.   And the other thing you say in Plaintiff's Exhibit 7

6    is a reference to the foul language not being repeated as

7    of yet?

8    A.   Right.  They were still harassing me, and it's almost

9    like they were finding other ways to do it.  And at the

10   time it didn't occur to me that maybe that's because they

11   were told not to swear at me anymore, but they were

12   messing with my equipment and really interfering with my

13   patient care.  And it's like they were finding -- to me it

14   felt at the time that they were just adding on additional

15   ways, but maybe they were trying to find a way around

16   saying nasty things but still get their point across.

17   Q.   Were you still feeling threatened and afraid?

18   A.   I did.  I definitely felt I had no way to predict how

19   they were going to act around me, and I was more concerned

20   about how they were going to treat me and what they might

21   do to me on a call versus what I might find when I walked

22   into a medical call.

23        Typically you have to be more concerned about what

24   you're walking into.  And I was more concerned about who

25   was walking in behind me that was supposed to be helping

1    me so --

2    Q.    How were you being affected emotionally, physically,

3    as a result of this situation at work?

4    A.    When I first started as a paramedic, the behavior

5    wasn't bothering me that much, but then progressively it

6    started to get me more stressed out about it.  Because to

7    me, being harassed is disrespectful, and that's a

8    principle that I was really raised to value, is respecting

9    other people.  So to me, it was significant.  It

10   definitely made me very upset.

11        And then the fact that they're interfering with my

12   patient care is also very important to me, and I feel that

13   that's the reason why I'm there.  So I -- that was

14   bothering me as well.

15        So I was essentially getting more and more stressed

16   out about it as time went on.  So it starts out you're

17   stressed when you're going on the call and then you're

18   stressed all the time because you're worried about what

19   happened on the call and then you worry about what's going

20   to happen on the next call.  So your stress level is very

21   high.

22        So I wasn't sleeping very well.  I was playing it

23   over in my head worried about how do you deal with this

24   scenario?  What do you do if they do this?

25        So it's really tense and not sleeping very well.  And

1    then it turned into digestive problems.  I couldn't eat.

2         If I was at work and I tried eating, I would get

3    sick, almost instantly get sick, because I was so kind

4    of -- your stomach's in knots.

5         So I started losing weight and I just wasn't able to

6    eat when I was working so, I mean, not even just working,

7    but outside of work.  I worked six days a week, so I would

8    say that generally my health went down, but I was really,

9    really stressed out.

10   Q.   What, if anything, did you consider doing?  I mean,

11   did you consider leaving?  Asking for a transfer?  What

12   did you do when AMR was not responding?

13   A.   I had all of those thoughts go through your head.

14        I was in school though and I was trying to pay for my

15   tuition, so it's not like I could just leave my job and

16   not have a job.  And then if you got hired at another job,

17   you're kind of low man on the totem pole again so you

18   don't get shifts that you want or things like that.  So I

19   wouldn't have necessarily been able to work the same hours

20   or accommodate my school schedule if I had tried to switch

21   jobs.

22        Not that there's that many jobs in Connecticut for

23   paramedics.  There's a couple of agencies that have jobs,

24   so I'm not even sure if the other agency was hiring at the

25   time.

1      And then I thought, well, I could transfer within the

2   company and ask to be transferred to the Hartford office.

3   And the union policy is if you lose seniority, you go back

4   down, and so it's the same problem with picking up shifts

5   and things of that nature.

6      So it's like I would have been willing to transfer

7   but I didn't want to lose my schedule and the ability to

8   work with my school schedule.

9      So I was like, well, that's not a good one.  And

10  other shifts open up at a time.  And I made the

11  supervisors aware that I was willing to be moved.  I just

12  didn't want to be negatively affected by needing to move

13  or my requesting to move.

14     In a sense I felt like if I requested to move because

15  of them behaving like that, yeah, I got my seniority

16  docked and my shift bid status taken away, then I was

17  being punished for asking to change.

18  Q.   Would you also have been on probation for some period

19  of time if you switched regions?

20  A.   That's what they did to some employees, is if you

21  asked to switch to a different office, they would put you

22  back on a probationary period for six months in which they

23  could fire you for any reason.

24  Q.   Was there ever any specific opening that you inquired

25  about during this period of time?

1  A.   There was an opening that became available in the

2  Vernon/Rockville area.  It was the exact same position, in

3  a fly car as a paramedic responding with the fire

4  department in Rockville and.  I had inquired about taking

5  that position when it came up for application.

6  Q.   And what were you told?

7  A.   I was told that I wasn't allowed to apply to it

8  because I hadn't worked enough shifts in that region,

9  which you can't really work shifts in that region until

10  you get that job.  So kind of --

11  Q.   Is there anything else that happened in May of 2007

12  that you recall involving Mr. Schaub in his car and you

13  being in a different car?

14  A.   I believe it was May.  I think I know you're

15  referring to him cutting me off in his vehicle.

16      Yeah, they would -- we were responding to a call and

17  I was in the fly car, and the green light was going

18  straight.  There was an ambulance coming off a side road.

19  They have a red light, so again, they're supposed to

20  follow traffic rules and stop and, you know, give the flow

21  of traffic the right-of-way and clear the intersection.

22      So, you know, I was coming and I assume he's going to

23  follow the traffic rules.  It's kind of a given.  And,

24  although I did slow down, he completely blew through the

25  light and cut me off causing me to have to swerve the fly

1   car to not hit him.

2       And if I hadn't slowed down, anticipated an issue --

3   I wasn't anticipating him doing that, I was anticipating

4   other traffic getting a little skittish because you have

5   lights and sirens.

6       So he cut me and then waved and smiled and laughed at

7   me as he was going by.  So it was clearly intentional that

8   he was trying to create an issue.  And I didn't hit him

9   but I very easily could have hit him or anybody else.  And

10  it was very close, and again completely inappropriate.

11  Q.   Do you know if you reported that incident to anyone

12  at AMR?

13  A.   I did.  I wrote that incident up.

14  Q.   On May 29, your personal vehicle was parked at the

15  AMR office in Enfield, is that right?

16  A.   It was.

17  Q.   And we're in 2007 still.  Describe to me the AMR

18  office in Enfield.  Where is it located?

19  A.   The AMR office is sort of -- it's like a little mini

20  industrial park.  There was a rock counting business and a

21  truck maintenance business or something.  They're all

22  construction sort of businesses.  And the AMR office is in

23  one of those buildings.

24      So it's not a publicly used area, I guess you would

25  say.  And at night, we are the only company that operates,

1    so it would just be AMR employees that are over there.

2    The general public wouldn't really be in and out of that

3    area.

4    Q.   Is it fenced in at all?

5    A.   It is not fenced in.

6    Q.   Are there any security cameras?

7    A.   No.

8    Q.   So what happened on the evening of May 29, 2007?

9    A.   I was on a call with another Enfield crew and they --

10   the gist of it is they tried to get a group of drunk

11   individuals to throw me out of a house.  Again, just

12   repeating sort of the aggressive behavior.  So they were

13   trying to get, you know, a large number of drunk college

14   kids to pick me up and throw me out of a house.

15   Q.   Tell us who "they" is.

16   A.   This was David Bailey and Michael Hafey.  They were a

17   paramedic and an EMT in Enfield.

18   Q.   Have these individuals ever given you a hard time

19   before when you worked with them?

20   A.   Actually no.  David Bailey and I have different

21   philosophies on patient care, but outside of that, we

22   never really had a problem.  And Michael Hafey I would

23   have considered a friend.

24        Actually he previously worked at AMR and he was my

25   partner for a period of time and we were very friendly.

1    So this was the first time those two had ever done

2    anything so blatantly aggressive and hostile to me, I

3    guess.

4    Q.   What did you do in that situation once you realized

5    that you were in a threatening situation?

6    A.   I -- technically I'm not supposed to walk away

7    because I'm supposed to be in charge of the patient.  But

8    I walked away.  I just said, I'll leave, that's fine, and

9    I walked away and let them take care of the patient.  And

10   I went back to the office and wrote an incident report

11   about it.

12   Q.   Now, let me stop you.

13       Did you get permission from somebody at AMR before

14   you walked away?

15   A.   I did.  I was told to walk away or, shall I say, my

16   partner was told to tell us to leave.  He had called the

17   supervisor because I wasn't walking away from the patient.

18   Q.   And when you got back to the office, did you happen

19   to look at your car?

20   A.   Oh, yeah, my car was fine when I got back to the

21   office.

22       So I got back and was writing an incident report

23   about it with my partner who also wrote an incident report

24   about that particular call.

25       And then we left the office to go photocopy those

1    incident reports so that we had a copy of it before we

2    turned them in.  And during that, maybe it was 10, 15

3    minutes period, my tires were slashed on my car.

4    Q.   Do you know who slashed your tires?

5    A.   I didn't see them directly.  I didn't see who did it.

6         David Bailey and Michael Hafey, the two I just had

7    the conflict with, were at the hospital, so it wasn't

8    them.  It would have been whatever night crew was on in

9    Enfield.  Of course, again I can't prove it was them, but

10   I --

11        MR. BARR:  Your Honor, I'm going to object right

12   now.  It's pure speculation.

13        THE COURT:  Yes.  I'll sustain the objection.

14        MR. BARR:  Thank you.

15   BY MS. GARDNER:

16   Q.   So did you report -- you've already said your tires

17   were slashed, right?

18   A.   Correct.

19   Q.   Any way you could describe?  Was it the sidewall?

20   What did you observe?

21   A.   It was the sidewall of the tires and it was about

22   6 inches or more of a slash through my tires.

23   Q.   How many?

24   A.   Two of them.  Front and a back.

25   Q.   And do you know whether Scott Schaub and Matt Mucci

1    were working that evening?

2    A.    I'm not a hundred percent positive it would have been

3    their shift.

4    Q.    But you didn't see them that evening that you recall?

5    A.    Not that I remember.  I don't remember doing any

6    calls other than that one right before my tires were

7    slashed.  And then I had to deal with getting my car

8    transported to a repair shop.

9    Q.    And you reported this to AMR that your tires had been

10   slashed?

11   A.    I did.

12   Q.    Did you call the police?

13   A.    I did.

14   Q.    The next day -- oh, let me just ask you:  What did

15   AMR do in response to the tires being slashed, if

16   anything?

17   A.    One of the female supervisors came up immediately,

18   and I thought she was very responsive, and she took the

19   pictures and emailed them to, I believe, Dwayne and Sean

20   Piendel.  She took pictures and emailed them out.  She

21   sent them to me, too, because I didn't have the camera at

22   the time.

23   Q.    For some period of time were you allowed to park your

24   car inside?

25   A.    She told me to park my vehicle in the ambulance bay

1    because then it would be behind a locked door.  She told

2    me to do that.

3         And I think I did that for a day or two before I was

4    told I wasn't allowed to anymore.

5    Q.   Who told you you weren't allowed to?

6    A.   I don't remember specifically which supervisor told

7    me I wasn't allowed to.  It wasn't the one that told me I

8    could park there.  It was probably Dwayne, but I don't

9    remember.

10   Q.   The next day there was an incident with a coworker

11   named Kerri Pliska.  Do you recall that incident?

12   A.   I do.

13   Q.   And you were at the start of your shift, is that

14   right?

15   A.   We were.

16   Q.   And what occurred that evening?

17   A.   I had gotten to work and we checked out our truck,

18   nothing major, everyone wanted to go get ice cream.  It

19   was hot out, so we went out, several of the crews went

20   over to the ice cream parlor and got ice cream.  And I was

21   the last one to get mine, so the group had already formed

22   and was talking.  And when I walked up to them, they

23   were -- Kerri Pliska was kind of in the middle of the

24   group telling them that Alyss Langello, another employee

25   of the company, was hitting on her and couldn't keep her

1    hands off all of the women at work and she couldn't

2    understand how anyone could stand to work with her.  And

3    she was going on about, you know, just basically trying to

4    create an issue and get the other employees at AMR to say,

5    oh, yeah, we don't want to work with her, she's gay,

6    she's, you know, she makes us uncomfortable.  So on and so

7    forth.

8    Q.    Who was Alyss Langello?  You said she was a coworker?

9    A.    She was.  She was an EMT at the company.

10   Q.    Had you worked with Alyss?

11   A.    I did.  I worked with her pretty consistently

12   actually.

13   Q.    What period of time?  It was before you started to

14   work out of a fly car?

15   A.    Correct.

16   Q.    You partnered with her?

17   A.    Correct.

18   Q.    Okay.  So what did you say?

19   A.    I said that I wasn't going to tolerate her picking on

20   another employee because she was gay and that she needed

21   to knock it off, and I was really annoyed by it.  So I

22   walked back to the ambulance and sat in the ambulance

23   waiting for her to get back in.  She was my partner that

24   night, so I was waiting for her to get back into the

25   truck.

1    Q.   And did she get back into the truck?

2    A.   No.  She took quite awhile and was talking with one

3    of the other male EMTs, and she was taking a long time, in

4    my opinion, because we were not supposed to be at the ice

5    cream parlor.  It's not a posting location.

6        So I got back out of the truck and walked up to her

7    to tell her that we needed to go.  And she was still

8    standing there with Michael Gerard talking about Alyss

9    again, complaining about her.  And I told the two of them

10    that they needed to stop conspiring against her and to

11    leave her alone.

12    Q.   What happened next?

13    A.   I got back in the truck and waited for her to get in

14    the truck, and she took a little while still.  And when

15    she got back in the truck, she started screaming and

16    yelling at me, calling me a bitch and a liar, telling me

17    that I didn't know when to keep my mouth shut; that I

18    deserved to be harassed; I deserved to have my tires

19    slashed; so on and so forth.

20    Q.   What was your relationship like with Kerri Pliska

21    prior to that evening?  I assumed you'd worked with her

22    before?

23    A.   Right.  We were coworkers, we weren't friends.  We

24    weren't contentious with each other.  She's not a person I

25    had a problem with before.  She's just not somebody I

1    would choose to associate with beyond doing my job.

2    Q.   At some point did you call a supervisor?

3    A.   I did.  When we got back to the office because she

4    was yelling at me the whole time we were driving back to

5    the office.

6         I called the supervisor on duty, which at that time

7    happened to be Chris Chaplin.

8    Q.   And what was your purpose in calling the supervisor?

9    A.   My purpose in calling the supervisor was to let him

10   know the totality of events that happened.

11        I, of course, probably wouldn't have called him if

12   she hadn't started yelling at me.  So the primary

13   motivator of it was she was yelling at me and telling me I

14   deserved to be harassed.  And I didn't feel comfortable

15   working with her.

16        Again, I mean, I'd had my tires slashed the night

17   before, so I would say I was slightly worried at that

18   point about what was going to go on that shift.  And --

19   Q.   Well, tell us what you were picturing might happen.

20   Why did you no longer want to work with Kerri Pliska that

21   evening?

22   A.   Well, when you go in on a call, your partner, the

23   idea is that they are there to watch for your safety as

24   well as theirs and everyone else's on the scene, but when

25   you're involved in patient care, you know, your

1    attention's on other things.  So the partner that's not

2    doing the patient care would be more alert to safety

3    issues that were happening.

4        And I felt that if they -- if Scott and Matt started

5    harassing me or yelling at me or anything else again, by

6    her comments, it sounded like she was going to encourage

7    the behavior.  Or, if anything, she certainly wasn't going

8    to discourage it.

9        And I'm not even sure that she would have called a

10   supervisor or reported it appropriately since, you know,

11   her mindset was that I deserved it anyway so --

12   Q.   So you called Mr. Chaplin.  Did you tell him how this

13   had all started with your sticking up for Ms. Langello?

14   A.   I did.  I told him that, you know, I was sticking up

15   for Alyss and Kerri got mad about it and was reacting and,

16   you know, being aggressive with me because she was mad

17   that I had said that.

18   Q.   Now, had you come up with a solution as to how you

19   could continue to work that evening and not work with

20   Ms. Pliska?

21   A.   I did.  We have a 7:00 to 7:00 crew and an 8:00 to

22   8:00 crew.  Both were paramedic crews with EMTs.  And the

23   EMTs and the paramedic, they were willing to switch

24   partners for the night.

25       So I offered that option.  I said, you know, I

1    already spoke to the other crew that's right here and

2    they're willing to switch partners and then there won't be

3    a problem.  I won't have to work with her but we'll still

4    have two crews on.  And he refused to do that.

5    Q.   How would you describe your relationship with

6    Mr. Chaplin?

7    A.   At that point?  I would say he had some sort of

8    problem with me.

9    Q.   And what gave you have that impression?

10   A.   Based on the way he dealt with the first incident

11   when they were harassing me about the garbage, and then

12   this incident, he told me that I can't play the "I don't

13   feel safe" card with him.  I can't play games with him

14   like before.

15   Q.   Going back to the first evening, did he actually

16   acknowledge that you weren't feeling safe?

17   A.   First incident with the garbage he eventually

18   acknowledged that, you know, I wasn't feeling safe, but

19   that wasn't his primary concern.

20        He said I didn't tell him soon enough or because the

21   supervisor on duty before him didn't tell him, and I

22   didn't tell him soon enough, then I was at fault and I was

23   still in trouble.

24   Q.   And that was documented in your incident report for

25   that evening?

1    A.   It was.

2    Q.   So getting back to May 30 or -- yeah, May 30.  What

3    did Mr. Chaplin tell you?

4    A.   He told me that we couldn't switch partners and that

5    I had to work with her -- with Kerri.  And I told him I

6    didn't feel safe working with her and that if I couldn't

7    switch partners, then, you know, he had to come up with

8    some sort of solution.  And he wasn't willing to do that.

9        So I told him then I was willing to go home, and he

10   told me, fine, you're suspended, go home.

11   Q.   Looking at Plaintiff's Exhibit 8, was this the

12   incident report that you wrote regarding the events of May

13   30?

14   A.   It is.

15   Q.   And do you recall who sent this to?

16   A.   I sent it to Dwayne Drouin, and I'm sure I would have

17   copied, like before, Sean Piendel and Kimberly Cummins,

18   most likely.

19   Q.   And did anyone ever address, to your knowledge, the

20   comments made about Alyss Langello?

21   A.   No.

22   Q.   Did anyone from AMR contact you following your filing

23   of this incident report to do any kind of investigation?

24   A.   No.

25   Q.   You were in fact suspended at that time?

1    A.    I was.

2    Q.    And you recall for how long?

3    A.    That was only I think three days.

4    Q.    Any other incidents that you recall during this

5    period of time between May 30 and July 1, 2007?

6    A.    I don't remember every specific incident.  There were

7    numerous.  So those are the very significant ones that I

8    documented.  But on a daily basis, they were still

9    behaving the same way.

10   Q.    Did you take any steps beyond what you've already

11   reported in your incident reports to complain of the

12   hostile environment?

13   A.    Well, I would call Dwayne or, you know, supervisors

14   that were on when events were happening, but usually I'd

15   talk to Dwayne about it.

16   Q.    And what would Dwayne say, if anything?

17   A.    Usually it was just, we'll write it up.  Or, write it

18   up, we'll talk about it.  Or, just document it.  He didn't

19   appear to be taking it too seriously.

20        One time he told me to play nice in the sandbox was

21   his response to my saying they were harassing me.  He

22   said, oh, just go play nice.

23   Q.    Now, at some point, you called the company hotline,

24   is that right?

25   A.    I did.  After the Kerri Pliska incident when I got

1    suspended a second time.

2    Q.    How did you know about the hotline?

3    A.    I actually spoke to one of the other paramedics who

4    was a union representative, and he told me that there was

5    a hotline that I could call, and I didn't remember that

6    from orientation.  So I went back and looked at the

7    handbook and said, oh, okay, here it is, I'll call it

8    so --

9    Q.    And the handbook is Plaintiff's Exhibit 1.  And you

10   believe in there is information about calling the hotline,

11   is that right?

12   A.    Correct.

13   Q.    And what time of day, if you remember, did you call

14   the hotline?

15   A.    I think it was in the middle of the night.

16   Q.    It's a 24 hour hotline?

17   A.    It is, yeah.

18   Q.    And somebody answered the phone?

19   A.    They did, yes.

20   Q.    And just summarize what you told them.

21   A.    I gave them sort of a brief summary of the fact that,

22   you know, I felt I was being harassed at work and that the

23   supervisors weren't doing anything about it and that they

24   were -- you know, that I was being physically threatened

25   and called names, and that the driving was really reckless

1    and aggressive.  So it was like an overview.

2        And I told them that Alyss was being harassed and I

3    tried to stand up for her and got suspended for it.

4    Q.   And what did this person -- how did that conversation

5    end?

6    A.   Well --

7    Q.   What was your understanding at the time you hung up

8    about what would happen next?

9    A.   That it would go through a process.

10       The hotline, I guess, is a third party organization.

11   So you call them and the individual I was speaking to

12   didn't really know anything about EMS actually, so I had

13   to actually explain a lot of that to him.

14       But he said he would document and forward it through

15   whatever process it was.

16   Q.   And looking at Plaintiff's Exhibit 9, did you get a

17   copy of this at the time it was written?

18   A.   No.

19   Q.   Have you had an opportunity -- well, do you know what

20   it is?  Can you identify it?

21   A.   It looks to be the phone operator's summary of my

22   complaint.

23   Q.   And have you had an opportunity to review this since

24   it was written on June 1?

25   A.   I have.

1    Q.   Is there anything in there that was incorrect?

2    A.   There --

3    Q.   Any details?

4    A.   There's a couple places where they say I was speaking

5    to Dwayne and I was speaking to Chris Chaplin, but beyond

6    that --

7             THE COURT:  Ms. Gardner, would this be a

8    convenient time to break?

9             MS. GARDNER:  Yes, Your Honor.

10            THE COURT:  Members of the jury, we'll break for

11   lunch now.  We'll be on break for one hour.  Please

12   remember not to discuss the case, and you're welcome to

13   leave your pads either at your chair or you can leave them

14   in the jury room, but don't take them with you, okay?  And

15   please be ready to go at 1:30.

16            Thank you.

17               (Whereupon, the jury left the courtroom.)

18            THE COURT:  You may step down.

19            Is there anything we need to take up before the

20   afternoon segment?

21            MR. BARR:  Your Honor, just one very brief

22   question for Your Honor.

23            I actually have my exhibits in binders, and they

24   are available to the jury.  I don't know if the jury knows

25   if they can look at -- they actually don't have to, but if

Your Honor wouldn't mind telling them they certainly have the option if Ms. Gardner wants to use them, that they certainly have the opportunity to look at them if they wish. Because I will not be using the document camera.

And there should be a copy for Your Honor.

THE COURT: Yes. I have mine.

MR. BARR: They are in the jury box. We distributed them this morning. But just to let them know that they can look at them.

THE COURT: Sure.

MR. BARR: Thank you.

THE COURT: You're welcome.

Anything else?

Thank you.

(Whereupon, a recess followed).

MS. GARDNER: Your Honor, just very quickly. Mr. Barr has been kind enough to say Mrs. Morel can be in the courtroom even though she will testify.

MR. BARR: We have no objection to that, Your Honor.

THE COURT: Okay, that's fine.

(Whereupon, the jury entered the courtroom.)

THE COURT: Thank you everyone.

You may find it more convenient when you are

1   exiting and entering the jury box to come around the

2   front, and you should feel free to do that.

3          We're ready to resume.

4   BY MS. GARDNER:

5   Q.   Good afternoon.  Just going back to a few things that

6   I wanted to cover that I didn't cover this morning.  And

7   one of them has to do with something that happened around

8   April 1, 2007.

9          Drawing your attention to that evening, do you

10  remember receiving a phone call on your cell phone?

11  A.   I do.

12  Q.   Set the scene for that evening.  Were you alone?

13  Were you with a partner?

14  A.   I was in a fly car again, so I guess by myself and --

15  Q.   And was it the night shift?

16  A.   It was a night shift, yes.

17  Q.   And where did you usually post when you were in the

18  fly car by yourself?

19  A.   We were to post around the mall area, so we would

20  typically park in the mall parking lot.

21  Q.   And what happened on that evening?

22  A.   I had gotten a call with Scott Schaub and a new

23  employee I'd never met before.  I later found out his name

24  was Gary.

25         We went on a call, and for all intents and purposes,

1    besides the normal driving problems, nothing stood out in

2    my mind about the call.

3         They dropped me back off at my flight car and I

4    stopped at the Mobil station to talk to the attendant

5    because spending all night in your car in the parking

6    lot's kind of boring, so I always take to the Mobil

7    station attendant.

8         So I was in there getting a drink and just talking to

9    him, and I got a call on my cell phone.  And I thought,

10   that's weird, it's a blocked number.  I don't know why

11   anybody would be calling me.  And I typically don't answer

12   numbers I don't recognize or blocked numbers.  I assume

13   it's a sales call or something.

14        But I answered it and it was Gary calling me on my

15   phone to yell at me about leaving his truck a mess and who

16   did I think I was.  And he called me a bitch and a number

17   of other things really quickly.

18        And my response was, I think it's really

19   inappropriate for you to call me on my personal phone, and

20   I just hung up on him.

21        And in the background, of course I heard Scott Schaub

22   saying, you tell her, you know, like egging him on in the

23   background.

24        So I guess I called the supervisor about that later

25   in the morning, because I didn't want to, if they were

1    taking a nap or anything, I didn't want to wake them up.

2    I called them later in the morning and said, this is what

3    they just did, I've never met this guy before, he's being

4    really aggressive.

5    Q.   And did you file an incident report about that?

6    A.   I did.  I filed an incident report about that as

7    well.

8    Q.   One other thing that I wanted to ask you about was

9    any other physical intimidation or contact that you

10   experienced from Scott Schaub, Matt Mucci or any other

11   male employees of Enfield?

12   A.   They were -- when we go to assess a patient, the idea

13   is when the paramedic comes on the call that you're

14   supposed to have access to the patient.  And they would

15   kind of body block me from talking to them.  They would

16   stand in front of me or push me out of the way.  And when

17   we're trying to move the patient around or move equipment,

18   they would intentionally push me around.  They wouldn't

19   hit me with their hands or anything, but they would shove

20   me into walls and things like that to try to hurt me.  And

21   then of course physically blocking me to prevent me from

22   providing care to people.

23   Q.   Did you report this behavior, either in incident

24   reports or verbally or both?

25   A.   More verbally.  At the same time I reported the bad

1  language, I would report things like that.

2      I think in a couple of my incident reports I would

3  have written it in there, but I can't tell you which ones

4  specifically.

5  Q.  So back to when you called the hotline, I think we

6  were looking at Plaintiff's Exhibit 9, and I believe

7  you -- well, was -- is Plaintiff's Exhibit 9 a fairly

8  accurate summary of what you told the person who was on

9  the other end of the phone when you called the hotline?

10 A.  Besides transposing some of the names, it was pretty

11 accurate to what I told them.

12 Q.  And what did you hope to accomplish by calling the

13 hotline?

14 A.  Well, I thought they were going to have somebody on

15 involved.  It was a third party, outside of the company.

16 But I assume that somebody who was impartial and not

17 involved would look into my complaints and there would be

18 an investigation.  And I just like kind of expected that

19 they'd say, oh, yeah, this wasn't handled correctly, and

20 fix it.  That's what I expected.

21 Q.  And what's the next thing that happened after you

22 made this report to the hotline?

23 A.  I was eventually contacted by Bob Zagami.  He's a

24 human resources -- I guess a regional, a regional guy.

25 And he called me on the phone and said he was calling me

1    in response to this complaint and asked me briefly what my

2    version was and said he would be looking into it.

3    Q.   So give us an example of what you told Mr. Zagami

4    that you recall.

5    A.   I told him pretty much everything.  The phone call

6    about calling me a bitch, the night when they're standing

7    over me and yelling at me, I told him about that.  I

8    stressed the incident about Alyss, because I also wanted

9    him to know, you know, it's not just me.  There was

10   another incident and they weren't protecting somebody else

11   as well.  So it wasn't just me.

12        And with him I think I stressed the fact that the

13   supervisors, the way they were acting, because I felt it

14   was his job as their supervisor in a sense, to address how

15   the supervisors handled the situation.

16   Q.   So do you mean that you were complaining about the

17   way your previous complaints had been handled?

18   A.   Correct.

19   Q.   Do you know if Mr. Zagami had any of your incident

20   reports when he was talking to you?

21   A.   I don't believe he did, but I don't know because I

22   submitted them to the company, so he could have pulled

23   them, I don't know.

24   Q.   Did you tell him about the reckless driving?

25   A.   I did.

1    Q.   And did you tell him about the physical intimidation,

2    including the shoving?

3    A.   I did.

4    Q.   And you told him about the language?

5    A.   Yes.

6    Q.   Did you have a follow-up conversation with

7    Mr. Zagami?

8    A.   I tried calling him several times and he wasn't

9    available.  I emailed him a few times asking him, now,

10   telling him I was waiting for a response and when he

11   thought he'd get back to me or when he thought he'd be

12   done with his investigation.  And it was quite awhile

13   before I heard back from him.

14   Q.   Were you at work during this period of time?

15   A.   No.  The first time I spoke with him, I told him that

16   I hadn't picked up any shifts and didn't intend to because

17   I really didn't feel safe working until the problems were

18   addressed.

19   Q.   So let's just set the timeline.

20        You called the hotline on June 1.

21   A.   Okay.

22   Q.   And do you believe that you worked for the rest of

23   June?

24   A.   Right.  I worked until the beginning of July, because

25   that was a new shift bid period.

1    We have -- every six months the company changes and

2    you have to bid by seniority on shifts.  So if somebody

3    wants to change and doesn't want to work nights, wants to

4    go days, that's their opportunity to do it.

5    So I figured I was trying to be cooperative and I

6    figured that I would finish the shift bid and then that

7    would be an easy time for them to move me somewhere else

8    because the whole company was changing their shift

9    assignments at that time.

10   Q.   And so when you called the hotline, you were still

11   working?

12   A.   I was.

13   Q.   And you believe that the last shift you took was

14   somewhere around July 1, is that right?

15   A.   Yeah.  The first week in July I worked until that new

16   shift bid was supposed to start.

17   Q.   And did you request a change in status at about that

18   time?

19   A.   I did.  I requested to go part-time for the new shift

20   bid.

21   Q.   Why did you do that?

22   A.   During the shift bid, full-time employees have to bid

23   on a regular shift, so they would have to bid Thursday,

24   Friday, Saturday, 7:00 to 7:00 overnights, or Monday to

25   Friday, 8:00 to 4:00.  So you were locked in on specific

1    dates.

2         So I requested part-time status because I could kind

3    of pick my shifts.  I wasn't assigned to a specific shift

4    every day of the week.  I could then -- I would work the

5    same hours, but I could pick up, you know, double shifts

6    on Saturday and Sunday and regular shift on Monday.  And

7    that worked a lot better with my school schedule, so I had

8    asked to go part-time.

9    Q.   And I think you testified earlier that you were going

10   to be starting a program maybe at the same time you were

11   finishing a program in Pennsylvania?

12   A.   Right.  Right.  I was starting medical school.

13   Q.   And you had gone to school in Pennsylvania and

14   continued to work at AMR at the same time prior?

15   A.   For the whole year prior I was going to school in

16   Philadelphia and working at AMR.

17   Q.   Would going part-time change anything else in terms

18   of your work status?

19   A.   Not that I'm aware.  If I kept full-time hours, I

20   would have been entitled to insurance and, you know, I

21   would have -- I'm not sure if it really affected

22   seniority.  I don't think it would have, but --

23   Q.   In any case, I'm going to show you Plaintiff's

24   Exhibit 10.  Did you put your request in writing for

25   part-time status?

1    A.   Yes, I did.

2    Q.   And is that your request, Exhibit 10?

3    A.   That is.

4    Q.   Were there other part-time employees at AMR?

5    A.   Yes.  More than 50 percent of the employees are

6    part-time at AMR.

7    Q.   Did you eventually talk to Mr. Zagami about his

8    investigation?

9    A.   I did.  He called me eventually and told me that he

10   looked into the incidents and I instigated them, according

11   to his investigation, so he wasn't going to look into them

12   any further, and he couldn't get ahold of Enfield.  They

13   weren't answering his calls.

14        So as far as he was concerned, his investigation was

15   done with Enfield because he couldn't substantiate what I

16   was saying because they weren't responding to him.  So he

17   told me his investigation was done.

18   Q.   Did he suggest that you come back to work at that

19   point?

20   A.   No, he did not.

21   Q.   Did you speak to anyone else at AMR following your

22   conversation with Mr. Zagami regarding your work status?

23   A.   After my phone conversation with him, I don't know

24   that I did.  During his investigation I did.

25   Q.   What were those conversations and with whom?

1  A.   They had never officially approved my change to

2  part-time status, so I had contacted them to find out if

3  it had been approved and when I would be able to bid on

4  shifts.

5  Q.   Who did you talk to about that?

6  A.   I would just call the main desk, so it was a

7  different person each time.  I called two or three times.

8  I know they have a note from one of the times that I

9  called.

10  Q.   Did you ever get a response to your request to go

11  part-time?

12  A.   No, I never did.

13  Q.   Showing you what's Defendant's Exhibit 71.  Did you

14  write a letter to Mr. Zagami following your phone call

15  with him?

16  A.   I did write a letter to him following the phone call,

17  mainly because I was surprised at the outcome of his

18  investigation, and he told me on the phone.  So I kind of

19  wanted it documented that that was -- because he didn't

20  provide me anything in writing.

21       So that was my attempt to document what he told me.

22  So I repeated it back to him in an email.

23  Q.   Did you receive anything from Mr. Zagami in response

24  to your letter?

25  A.   He sent me a letter back saying that I completely

1    misquoted his conversation with me and just basically that

2    he did a thorough investigation and he found everything

3    unfounded, but he denies the fact that he said that it

4    was -- that Enfield wouldn't cooperate and that I

5    instigated or something like that.

6    Q.    And showing you what's Defendant's Exhibit 72, is

7    that the letter Mr. Zagami sent to you?

8    A.    That is.

9    Q.    So did you return to AMR following your last shift on

10   July 1, 2007?

11   A.    I didn't.

12   Q.    Why didn't you?

13   A.    First they didn't approve my part-time status, so as

14   far as I was aware, I wasn't approved to bid on any

15   shifts.

16        And then typically they would email us the open

17   shifts, and they stopped emailing me the open shifts so

18   that I could, you know, I wouldn't even know when they

19   were open to call and take them.

20        Then after he contacted me about the completion of

21   his investigation basically saying that they didn't find

22   anything and weren't doing anything, I just really didn't

23   feel safe going back because they weren't doing anything.

24   They didn't do anything to change the way I was being

25   treated.

1      So last time I had complained and got suspended, the

2  behavior escalated, so you know, I -- it was my belief,

3  and I still believe, that if I had gone back, they would

4  have gotten even worse because they would have felt more,

5  you know, justified, in doing it.  So I felt I needed for

6  my own safety not to.

7  Q.   Did Mr. Zagami tell you in his letter that the

8  contract between Enfield and AMR had ended on July 1?

9  A.   That's what he said.

10 Q.   Did that give you any comfort that you would no

11 longer have to work with Mr. Schaub or Mr. Mucci?

12 A.   No.  Because they had said before that the contract

13 had ended and you'd show up to work the next day and we

14 were still working in the town and they were still working

15 in the town.  They were providing back-up coverage, which

16 is still covering the town, they just didn't have the

17 stated license to do it.

18 Q.   Did you complain to anyone else outside of AMR about

19 the behavior of the male EMTs from Enfield?

20 A.   I on a couple of occasions tried to speak to the

21 Enfield supervisors, and they didn't -- they just said,

22 okay, we'll look into it, and that was all they said to

23 me.

24     I tried to call the state police the night that they

25 were yelling at me and screaming at me up at the hospital

1    because I -- I was actually really thinking that he was

2    going to hit me next by the way he was posturing and

3    standing over me.  I really thought he was going to take

4    it to another level.  I -- especially the second time.  I

5    really didn't call the first time, I called the second

6    time.

7        And then I called the Coventry police where I live

8    the next morning because I didn't know what to do, so I

9    called them more to find out what I should do in that

10   situation to ask, you know, legally what I could do in

11   that situation.  And the Coventry police took a report

12   from me because they agreed that it should be documented

13   in case something happened.  And I guess that was my

14   concern, that it wasn't really formally documented

15   anywhere.  So if it happened again or I got seriously

16   injured, then somebody of authority would know what was

17   going on.  And that's the conversation I had with the

18   Coventry police chief.

19       And then, you know, I also told him and my mom where

20   I kept all my incident reports because I honestly -- I

21   figured if, number one, if they do hit me, I don't think

22   it's going to be lightly; and number two, if they got in a

23   motor vehicle accident and seriously injured me, I wanted

24   somebody to know -- have documentation outside the company

25   of, you know, what they were doing.  So --

1  Q.    I just want to talk briefly about the two

2  suspensions.

3       Were you -- did you lose pay for any period of time

4  as a result of the suspensions?

5  A.    I did.  I wasn't paid for either of the suspensions.

6  I had to kind of fight to get reimbursed for partial

7  hours.  They reimbursed me for 36 hours when I was

8  scheduled, you know, around 70 hours for both of those

9  time frames.

10      So they partially reimbursed me after I made a really

11  big issue out of it.

12  Q.    Did that reimbursement come after you had had your

13  last shift in July of 2007?

14  A.    Part of it did, yeah.

15  Q.    What would you have had AMR do differently than what

16  they did do in this situation?

17  A.    There's a couple of things they could have done

18  differently.  I guess I would have expected them to be a

19  little more forceful or follow through more --

20           MR. BARR:  Your Honor, we're going to object

21  right now.  They're getting into speculation.

22           THE COURT:  I'll sustain the objection.

23           MR. BARR:  Thank you, Your Honor.

24  BY MS. GARDNER:

25  Q.    Did AMR conduct an investigation following your

1    report that you believed you were subjected to a hostile

2    environment?

3    A.    Did they --

4    Q.    Exhibit 5.  When you filed that incident report on

5    April 7 and said, I believe I am in a hostile environment,

6    did AMR contact you and conduct an investigation?

7    A.    No.

8    Q.    Was it your understanding that that's what would

9    happen?

10   A.    That's what I would have expected when making a

11   complaint, yes.

12   Q.    And what was that based on?

13   A.    My expectation?

14   Q.    Yes.

15   A.    I guess I would expect that to be a common practice.

16   When somebody complains of something of that nature, it

17   would be looked into.

18   Q.    Do you know if that's in the handbook?

19   A.    Yes, that's in the handbook.

20   Q.    Did anyone from AMR call you and investigate your

21   claim a week later that the conduct that you were

22   experiencing was sexually motivated in your opinion?

23   A.    No.

24   Q.    Did anyone call you after your tires were slashed to

25   investigate that incident?

1    A.    No.

2    Q.    Did anyone call you after you complained that Alyss

3    Langello was being harassed by Kerri Pliska?

4    A.    Not to discuss her being harassed, no.

5    Q.    When Bob Zagami called you after you called the

6    hotline, was that the first time that an employee or

7    anyone from AMR or the hotline called to investigate your

8    complaints?

9    A.    Yes.

10   Q.    If you could describe your work environment from

11   April 2006 through July 1, 2007, what terms would you use

12   to describe your work environment during that period of

13   time?

14   A.    Hostile would be the best word to describe it.

15   Unsafe would be another word.  Stressful would be a other

16   word.  Not warm.  It wasn't a good work environment.

17   Q.    Were you eventually terminated by AMR?

18   A.    They sent me a termination letter two years later

19   during a state investigation into my complaints.

20   Q.    Is that the letter that you received, Plaintiff's

21   Exhibit 13?

22   A.    That is.

23              MS. GARDNER:  That's all I have, Your Honor.

24              THE COURT:  Thank you.

25              MR. BARR:  Your Honor, with your permission, we

1    have our exhibits in binders.  May I approach the witness

2    to give her a binder?  And I think we made these

3    available.

4              THE COURT:  Yes.  Members of the jury, there are

5    binders available to you at or near your chairs and you're

6    welcome to open them and look at the documents as they're

7    referred to.

8              It's my understanding that counsel will not be

9    using the screens to display documents but instead will

10   rely on you to look at the copies that you have in your

11   binders.

12

13                    CROSS-EXAMINATION

14   BY MR. BARR:

15   Q.   Good afternoon, Ms. Morel.

16   A.   Hi.

17   Q.   Ms. Morel, you recall that you testified on direct

18   that you were suspended for two weeks after the April 6

19   incident?

20   A.   I said approximately two weeks, yeah.

21   Q.   If you could take a look at Defendant's Exhibit 37,

22   which is tab 37.

23        You see that's an incident report for Thursday,

24   April 12, 2007?

25   A.   Okay.

1   Q.   How would you write an incident report if you were

2   suspended during that time?

3   A.   I'm not sure if I had the dates wrong when I wrote

4   the incident report or not, because I definitely was not

5   working.  I was in Erie, Pennsylvania on that weekend.

6   Q.   Ms. Morel, do you have a financial interest in the

7   outcome of this litigation?

8   A.   I'm sorry?

9   Q.   Do you have a financial interest in the outcome of

10  this litigation?

11          MS. GARDNER:  Objection, Your Honor.

12          THE COURT:  What is the objection?

13          MS. GARDNER:  What is the relevance of that?

14          MR. BARR:  Goes directly to bias, Your Honor.

15          THE COURT:  Overruled.

16  A.   I have a lot of attorney's fees, so I guess you could

17  say I have a financial interest in making sure that those

18  are paid, sure.

19  BY MR. BARR:

20  Q.   You're also seeking compensatory damages, correct?

21  A.   Yes.

22  Q.   And in fact you've submitted a claim for about

23  $200,000 in compensatory damages?

24  A.   Yes.

25  Q.   And punitive damages on top of that?

1    A.    I'm sorry?

2    Q.    On top of that, you also want punitive damages?

3    A.    Yes.

4    Q.    Some of the expenses you think that AMR should pay

5    for would include, for example, your wisdom teeth

6    extraction in June of 2007, isn't that right?

7    A.    I think you have that wrong.

8    Q.    That's not part of your submission that you made?

9    A.    No.

10   Q.    Part of your submission that you made was for dental

11   expenses dated January 2006.

12   A.    If you are claiming that.

13   Q.    I'm asking you.

14   A.    I didn't see a question there, I'm sorry.

15   Q.    I asked you -- I'm sorry, I'll say it again.  My

16   apologies.

17         Part of your submission for the $200,000 included

18   dental expenses from January 31, 2006?

19   A.    Again, I'm sorry, I don't see where that's a

20   question.  You make a statement.

21              MS. GARDNER:  Your Honor, could I request a

22   sidebar conference?

23              THE COURT:  Yes.

24

25   SIDEBAR CONFERENCE, AS FOLLOWS:

1          MS. GARDNER:  Your Honor, I wanted to make an

2    objection.  I didn't want to do it in front of the jury.

3    But I believe that Mr. Barr is reading from Dr. Royston's

4    report, which there was a motion in this case to exclude

5    Dr. Royston's report.

6          And in fact the only time we will get to it, if

7    at all, is if the jury were to find in the plaintiff's

8    favor.

9          So I would have an objection, after having asked

10   to have the report excluded, that Mr. Barr would now be

11   questioning the plaintiff about this report that has been

12   excluded.

13          THE COURT:  Okay.

14          MR. BARR:  Your Honor, receipts that she

15   submitted seeking reimbursement from the company is part

16   of her damages.  I think this is classic bias sort of

17   testimony.  She submitted the receipts.

18          If she wants to withdraw them, that's fine.

19   We'll stop asking the questions.  But until it's

20   withdrawn, I think I'm entitled to ask her what she wants

21   from AMR.

22          I think the jury should hear what she wants.

23          THE COURT:  When you say she submitted

24   receipts --

25          MR. BARR:  She submitted receipts to Dr. Royston

1   that he then used in calculating his damages.

2           THE COURT:  I think that insofar as you have a

3   good faith basis for questioning based on her own

4   submissions as opposed to the work of her representatives,

5   you're on firmer ground.

6           We talked at the final pretrial conference about

7   this report, and I think it was generally understood that

8   errors were made, and I'm not sure that we should be

9   tarring the plaintiff with the errors of her

10  representation.

11          So if you can confine your questioning

12  accordingly, I'll let you proceed.

13          MR. BARR:  Okay.  I'll just ask one or two more

14  questions.

15          THE COURT:  Okay.  But I do think that the

16  defendant is entitled to explore with the witness her

17  motivations, what she's looking for, and I'll allow it.

18          MS. GARDNER:  The problem that I anticipate,

19  Your Honor, is that she may have submitted those receipts

20  after being told to do so by her prior counsel, and it may

21  get into attorney/client privilege information.

22          THE COURT:  Well, I don't know, but this is an

23  intelligent and educated witness and I think some latitude

24  needs to be permitted.

25          MS. GARDNER:  Thank you, Your Honor.

1           (Sidebar conference concluded.)

2

3    BY MR. BARR:

4    Q.    Ms. Morel, did you submit documentation that AMR

5    reimburse you for muffler repairs you had in 2009?

6    A.    I never had -- it's more likely an oil change.

7    Q.    My apologies.  Did you seek documentation that AMR

8    reimburse you for an oil change in 2009?

9    A.    I was informed by my current attorney that I could

10   submit expenses for travel related to going to medical

11   specialists and coming to see my attorney.

12   Q.    So you also submitted then, for example, Easy Pass

13   payments for travel between Erie, Pennsylvania and

14   Hartford?

15   A.    When I had -- when I -- sorry -- when I had to return

16   to meet with lawyers or to see a specialist, medical

17   specialist, yes.

18   Q.    You first saw a lawyer in regard to this case in

19   2009, didn't you?

20   A.    That -- probably.

21   Q.    And you've submitted travel expenses over 2008?

22   A.    Right.  Because I was coming back for -- to see

23   medical specialists in 2008.

24   Q.    And you also submitted air fair expenses, is that

25   correct?

1    A.    Yes.  Same reason.

2    Q.    You've already testified, you worked at Enfield while

3    you worked for AMR?

4    A.    At the Enfield office, yes.

5    Q.    Yes, that's correct.

6          And your general work experience while you're at

7    Enfield from January 2005 until spring of 2006, you

8    generally had a positive working experience at Enfield?

9    A.    I did.  I would say very positive.  I enjoyed my job.

10   Q.    The shifts you actually bid for was to be in Enfield?

11   A.    No.  I was assigned to Enfield.

12   Q.    You didn't bid for shifts under the collective

13   bargaining agreement?

14   A.    I was assigned to Enfield and had to have been on

15   Enfield shifts.

16   Q.    You never resigned from AMR?

17   A.    No.

18   Q.    You were actually comfortable working with Dwayne

19   Drouin, weren't you?

20   A.    Dwayne Drouin, yes.

21   Q.    You were comfortable working with Sean Piendel?

22   A.    I don't know Sean Piendel.

23   Q.    You were comfortable working with Chris Chaplin?

24   A.    No, not particularly.

25   Q.    Well, you were comfortable working with everybody at

1    AMR you worked with, weren't you?

2    A.    Yes.  I had not worked with Chris Chaplin until the

3    issues that arose.

4    Q.    And if AMR had offered you a shift after July 1,

5    2007, you would have taken a shift?

6    A.    If it wasn't in Enfield, yes.

7    Q.    Well, you would have taken it if it had been in

8    Enfield just as long as it wasn't with Mr. Schaub or

9    Mr. Mucci?

10   A.    If I had had to report to Enfield and didn't work in

11   Enfield where Mr. Schaub and Mr. Mucci were working, yes,

12   I would have.

13   Q.    So really your primary concern about Enfield was

14   Mr. Schaub and Mr. Mucci?

15   A.    My primary concern was being harassed in Enfield,

16   mainly by Mr. Schaub and Mr. Mucci, yes.

17   Q.    And after you left AMR in July of 2007, you actually

18   never requested another shift from AMR?

19   A.    I asked for part-time status and I was never

20   responded to on that and never contacted or emailed with

21   the shifts that were available, which is practice of the

22   company.

23   Q.    I'm sorry, I must not be clear with my question.  You

24   never requested a shift from AMR after July 1, 2007, did

25   you?

1   A.   No, I did not.

2   Q.   You never even actually contacted anybody to see if

3   any shifts were available in Hartford, did you?

4   A.   No, I did not.

5   Q.   Take a look, if you would, at AMR Exhibit 6, please.

6   You have it in front of you?

7   A.   I do.

8   Q.   This is an incident report that you wrote?

9   A.   Yes.

10  Q.   And it appears that this incident report concerns

11  Scott Schaub, do you see that?

12  A.   Yes.

13  Q.   And correct me if I'm not reading this correctly, and

14  he -- I assume that's Scott Schaub -- said, quote, if you

15  want me to go get the stretcher, fine, I'll get it.

16  Closed quote.  Do you see that?

17  A.   Yes.

18  Q.   And then say that he walked out after saying that the

19  patient always goes ALS.  Do you see that?

20  A.   Yes.

21  Q.   So you were comfortable on incident reports quoting

22  language that Scott Schaub said to you, correct?

23  A.   Appropriate language, correct.

24  Q.   Is there any incident report that you ever submitted,

25  and I hate to use this word in Court, any incident report

1    you ever submitted that has the word "cunt" in it?

2    A.   No.

3    Q.   Is there any incident report that you ever submitted

4    that has the word "bitch" in it?

5    A.   I'm not sure.  I think there is.  About the phone

6    call.

7    Q.   Take a look, if you would, at AMR Exhibit 12.  Do you

8    have that in front of you?

9    A.   I do.

10    Q.   It appears that this one also concerns Scott Schaub,

11    is that right?

12    It says, both crew members, Adam and Scott, said they

13    were comfortable with the call ALS.  Do you see that?

14    A.   Yes.

15    Q.   Is that Scott Schaub?

16    A.   Yes.

17    Q.   And at the end you say, it's uncalled for to question

18    my care in front of a patient or to argue with me about

19    taking the call.  Do you see that?

20    A.   Yes.

21    Q.   Is there any incident report that you ever filed that

22    says that Scott Schaub, prior to April 6, let's say, 2007,

23    prior to April 6, 2007, which you said that Scott Schaub

24    was physically intimidating you?

25    A.   I'm not sure if I put it in writing at that point yet

1    or no.

2    Q.    Let's go to AMR Exhibit 13, please.  Do you have that

3    in front of you?

4    A.    Yes.

5    Q.    And this is an incident report that you wrote,

6    correct?

7    A.    Yes.

8    Q.    And here you seem to be talking about an Enfield EMT

9    called Keith.  Do you see that?

10   A.    Yes.

11   Q.    It says -- you've asked him for the blood pressure.

12   Quote, I already said it out loud, closed quote.  Do you

13   see that?

14   A.    Yes.

15   Q.    I asked him to repeat it and he yelled it at me.  Do

16   you see that?

17   A.    Yes.

18   Q.    This doesn't involve Scott Schaub, does it?

19   A.    No.

20   Q.    Take a look at the next one, AMR Exhibit 14.

21         Here you say on 11/2/2006, Matt Mucci from Enfield

22   EMS called me on my phone and asked me to step outside.

23   He -- and can you tell me what that word is?  Wants?

24   Wanted?

25   A.    Wanted.

1    Q.   Thank you.

2         He wanted to talk to me.  I came outside at St.

3    Francis Hospital ER and asked him what was going on,

4    paren, he had previously called Chelsea Moule to get my

5    number, closed paren.  He asked me if I was on the call on

6    -- and that's blacked out for patient privacy reasons --

7    Drive.  I responded, quote, it seems you may have been

8    told I was.

9         You see that?

10   A.   Yes.

11   Q.   And then he stated, quote, I have been told you

12   walked into the call without any gear and your hands in

13   your pocket and had to run back to the truck to get your

14   gear, closed quote.  Do you see that?

15   A.   Yes.

16   Q.   Again, there's no mention of any inappropriate

17   language here.

18   A.   No.

19   Q.   Take the next one, AMR Exhibit 15.  And again, this

20   is an incident report that you wrote?

21   A.   Yes.

22   Q.   Here you say at the bottom, Sarah Moore was the EMT

23   and she was completely out of line and did not assist in

24   any patient care on the scene.  All three Enfield

25   employees were violating HIPAA laws and adding to the

1   stress of my patient.  This needs to be addressed.

2        And then that's your signature there?

3   A.   Yes.

4   Q.   Sarah Moore is a female?

5   A.   She is.

6   Q.   Female that works for Enfield?

7   A.   Yes.

8   Q.   And she was completely out of line?

9   A.   I'm sure if I documented she was, she probably was.

10  Q.   Go to AMR Exhibit 17, please.

11       Here at the end you say, Enfield Medic Szymanski was

12  therefore misrepresenting himself to the patient as a

13  paramedic when he did not have the appropriate gear to

14  operate on an ALS level.

15       Do you see that?

16  A.   What number are you on?

17  Q.   I'm sorry, Number 17.  This is an incident report

18  dated December 3, 2006.  Do you have that?

19  A.   Yeah.

20  Q.   And did I quote that language correctly?

21  A.   Yeah, I see where you're talking about.

22  Q.   Take a look at incident report 18.  And this is an

23  incident report from 12/12/2006.

24  A.   Sure.

25  Q.   And it's one that you wrote?

1    A.   Yes.

2    Q.   And here you're talking about, starting with the

3    second line, the fire chief approached myself and medic

4    Karen Zack.  Do you see that?

5    A.   Yes.

6    Q.   Karen Zack a woman?

7    A.   Yes.

8    Q.   She works for Enfield?

9    A.   She does.

10   Q.   And continue on, the fire chief asked who was the

11   senior medic.  She stated that she was but wasn't sure if

12   she was going to be on scene.

13        Do you see that?

14   A.   Yeah.  Third line.

15   Q.   Correct.  And then you go on, I replied that I was

16   the medic in control at the call and that I carried the

17   R5, so he should address his question to me.  Is that

18   correct?

19   A.   Correct.

20   Q.   And then you complained that she interrupted me

21   several times to -- and what word is that?

22   A.   She interrupted me several times to reaffirm that she

23   should be in charge.

24   Q.   Take a look at AMR Exhibit 20.  Do you have it in

25   front of you?

1    A.   I do.

2    Q.   And you'll see on this -- this is an incident report

3    you wrote on December 13, 2006?

4    A.   Yes.

5    Q.   And you actually have incident type here as

6    harassment.  Do you see that?  Up at the top?

7    A.   Yes.

8    Q.   And then you state at 10:40 on 12/14/06 we arrived at

9    7:01 for a -- is that CNA?

10   A.   It's probably CVA.

11   Q.   What does CVA stand for?

12   A.   Cerebral vascular accident or stroke.

13   Q.   As I was walking into the building Matt Mucci yelled

14   at me saying, quote, thanks for saying hi, closed quote.

15   Do you see that?

16   A.   Yes.

17   Q.   And then there's an underline under the word very.

18   Do you mean that to emphasize the word "very"?

19   A.   Yes.

20   Q.   Loud and sarcastic tone.  You see that?

21   A.   Yes.

22   Q.   Given our history, he was simply, are you saying

23   harassing me?

24   A.   Yes.

25   Q.   So you thought it was harassing for somebody saying,

1    thanks for saying hi, in that tone of voice?

2    A.   That wasn't his tone of voice.

3    Q.   Oh, so it was very sarcastic.  I'm sorry.

4         Take a look at AMR Exhibit 22.  And you have that in

5    front of you?

6    A.   I do.

7    Q.   Here you say that, kind of halfway down, Sue Anne

8    then decided she wanted -- and what word is that, I'm

9    sorry?

10   A.   What line are you on?

11   Q.   Halfway down, the line starts from something on scene

12   when I entered, paren, this is a common occurrence, closed

13   paren.  You see that?

14        Sue Anne then decided she wanted --

15   A.   Oh, through to the living room.

16   Q.   Sue Anne then decided she wanted through to the

17   living room, and I stepped back.  She then walked back

18   into the kitchen.  And on her way out, the second time,

19   pushed me.

20   A.   She did.

21   Q.   I'm sorry?

22   A.   I said she did.

23   Q.   So I'm accurately quoting this?

24   A.   Yes.

25   Q.   I exchanged no words with her.  She then proceeded to

1    say something loudly as she walked out the door to my

2    partner.  During the interaction, I was still attempting

3    to hear the patient history being given.

4        Do you see that?

5    A.   Yes.

6    Q.   And then you say due to Sue Anne's attitude, she was

7    also driving at excessive speeds to the hospital and

8    refused to participate in patient care at the facility.

9    Do you see that?

10   A.   Yes.

11   Q.   And again Sue Anne, she's a female?

12   A.   She is.

13   Q.   Female employee of Enfield?

14   A.   Yes.

15   Q.   Take a look at AMR Exhibit 23.  And do you have that

16   in front of you?

17   A.   Yes.

18   Q.   This is an email from MEDX2B.  Do you see that?

19   A.   Yes.

20   Q.   That's your email account?

21   A.   Yes.

22   Q.   And this is an email you sent?

23   A.   Yes.

24   Q.   And, by the way, you sent it to Dwayne Drouin?

25   A.   Yes.

1    Q.   And in the first paragraph here you're talking about

2    Enfield employee by the name of Bailey?

3    A.   Yes.

4    Q.   Another big issue on Saturday is once I got on the

5    scene, Bailey looked at me and said, quote, I'm just going

6    to follow through with my orders then you can take over.

7         Do you see that?

8    A.   Yes.

9              THE COURT:  I'm sorry, where is that, please?

10             MR. BARR:  I'm sorry, Your Honor.  At the end of

11   the first paragraph.  You'll see the line that starts,

12   another bigger issue on Saturday.

13             THE COURT:  Thank you.

14             MR. BARR:  Yes.

15   BY MS. GARDNER:

16   Q.   And then, Ms. Morel, you signed this Jess?

17   A.   Yes.

18   Q.   That's the name you commonly went by?

19   A.   It's one of them.

20   Q.   And you had a little smiley face there?

21   A.   Yes.

22   Q.   Would you take a look at AMR Exhibit 24.  This is an

23   incident report you wrote on March 30 -- sorry, you wrote

24   it March 31, 2007.  Do you see that?

25   A.   Yes.

1    Q.   And here, if you go about halfway down, it says,

2    Medic Szymanski complained that I left the monitor

3    attached to the patient because it made walking more

4    difficult given the nature of the call and the plaintiff's

5    history.   I felt it was only prudent to watch her.

6         Do you see that?

7         Then you go on, we'll skip a line, you can read it if

8    you wish.   To which Szymanski responded with attitude.

9         Do you see that?

10   A.   Yes.

11   Q.   If you take a look at AMR Exhibit No. 25 -- and this

12   is an incident report that you wrote?

13   A.   Yes.

14   Q.   And this is regarding bad driving on the part of

15   Enfield?

16        I'm sorry, if you go to the bottom, it says, the

17   drive to the hospital is also very nauseating.

18   A.   Okay.

19   Q.   On the way back to the hospital to town I felt as

20   though I was very much at risk in the back of the

21   ambulance with the driving, and I felt as though I was

22   going to vomit.

23        Do you see that?

24   A.   Yes.

25   Q.   Do you know if Mr. Drouin ever took any action

1    regarding your complaints about unsafe driving?

2    A.   Not aware that he did, no.

3    Q.   If you take a look at AMR Exhibit 26.  Do you have it

4    in front of you?

5    A.   I do.

6    Q.   Is this an incident report that you wrote?

7    A.   It is.

8    Q.   And again this appears to be March 31, 2007?

9    A.   Okay.

10   Q.   Is that about when you wrote it?

11   A.   That's the date that's on it, yes.

12   Q.   I responded to -- and then the address blanked out --

13   for an ETOH.  Is that priority?

14   A.   I'm sorry, what was the question?

15   Q.   For an ETOH party?  Is that what that word is?

16   A.   That's an intoxicated party.

17   Q.   Upon arrival, Enfield ELS unit Mucci and Moore were

18   on the scene.

19        Is that the Sarah Moore we talked about before?

20   A.   It is.

21   Q.   Attempting to assess the patient upon entering the

22   scene, they looked at me and told me to go get their

23   stretcher.

24        Do you see that?

25   A.   Yes.

1   Q.   I turned to the patient's sister and started asking

2   about why she called.  The patient's demographics, his

3   medical history, et cetera.

4        What's the next -- the next word there?

5            THE COURT:  At this time?

6            MR. BARR:  Thank you, Your Honor.

7   BY MR. BARR:

8   Q.   At this time Mucci looked at Moore and said, quote,

9   what, is she still standing there?  And Moore replied,

10  quote, yeah, I guess she can't do anything, closed quote.

11  They exchanged a few more words and then Moore stormed out

12  toward me saying she'll go get the equipment herself.

13       Do you see that?

14  A.   She said she can't get it herself.

15  Q.   I'm sorry, I misread that.  I'm sorry.

16       Then if you go to the third page of this incident

17  report, the last four lines starts, Ms. Moore continued to

18  slam doors and drive way above the speed limit en route to

19  Johnson.

20       Is that the hospital?

21  A.   Yes.

22  Q.   Due to her anger at my not doing as she told me.

23  This attitude will not be tolerated.

24       So you're talking about Ms. Moore's attitude?

25  A.   Correct.

1    Q.   Take a look at AMR Exhibit 28.  Do you have it in

2    front of you?

3    A.   I do.

4    Q.   This is an incident report you wrote, it appears, on

5    April 1, 2007, is that right?

6    A.   Yes.

7    Q.   I'm sorry, I couldn't hear you.

8    A.   Yes.

9    Q.   Do you need to take a second?

10   A.   Yeah, please.

11                  (Pause)

12   Q.   In this incident report, you say, at 3:39 on Sunday,

13   4/1/07, Gary from Enfield EMS called me from a restricted

14   number on my personal phone.  He stated that I left his

15   truck a mess, to which I responded, quote, okay, closed

16   quote, and he said, quote, what do you mean?  Dot dot dot,

17   closed quote.  At that point I interrupted him and said,

18   quote, I am not going to discuss this with you.  It is

19   inappropriate for you to have called me on my personal

20   phone, closed quote.  And I hung up the phone.

21        Do you see that?

22   A.   Yes.

23   Q.   And you go on to say, not only is it not my job to

24   clean their truck, it is highly inappropriate for him to

25   have called my personal phone to complain.  I did not give

1   him the number.  He also made comments and was harassing

2   me about taking too long to write my own form and give a

3   report at the hospital.  I initially wrote it off as good

4   natured, but in light of his later inappropriate phone

5   call, this employee does not know how to draw the line.

6       Do you see that?

7   A.   Yes.

8   Q.   When you gave him the benefit of the doubt, that was

9   an earlier incident at the hospital?

10  A.   That was during the call, yeah, at the hospital.

11  Q.   That was during the actual, like, call to the

12  hospital, not the phone call that you received?

13  A.   Right.  It was -- yeah.

14  Q.   This is the phone call where you said that Gary

15  called you a bitch?

16  A.   Yes.

17  Q.   And this is the phone call where you've testified

18  that Scott Schaub was in the background egging him on?

19  A.   Yes.

20  Q.   Do you mention Scott Schaub at all in this incident

21  report?

22  A.   I don't.

23  Q.   And do you mention the word "bitch" at all in this

24  incident report?

25  A.   I don't.

1    Q.   Take a look at AMR Exhibit 29.  You'll see this is an

2    incident report from April 5, 2007.

3    A.   Okay.

4    Q.   This is one that you wrote?

5    A.   It is.

6    Q.   And here you say, Adam -- and I'm almost all the way

7    down -- Adam Szymanski and -- is that Mike Hafey?

8    Expressed their verbal disagreement with my care to the

9    something of the charge RN in front of the patient and

10   continued to do so throughout transportation -- transfer

11   of patient care.

12        Do you see that?

13   A.   Yes.

14   Q.   Take a look at AMR Exhibit 30.  Have you ever seen

15   AMR Exhibit 30 before?

16   A.   When it was produced in discovery.

17   Q.   You didn't see -- this is an email.  You didn't see

18   it in 2007?

19   A.   No.

20   Q.   Do you know who Kate Below is?

21   A.   She's a part-time supervisor.

22   Q.   And did you actually call her after Gary called you

23   to complain about the phone call?

24   A.   I'm sure I did.

25   Q.   Did you tell her that Gary had called you a bitch?

1    A.    I did.

2    Q.    Any reason to know why she wouldn't include that in

3    this email?

4    A.    I can't speak to her reasoning.

5    Q.    Take a look at AMR Exhibit 31.  Again, this appears

6    to be an email from Kate Below.  Do you see that?

7    A.    Yes.

8    Q.    And you'll see here that she's reporting on various

9    towns.  And we have the town of Enfield there.  Do you see

10   that?

11   A.    Yes.

12   Q.    And again here she's talking about you receiving a

13   phone call?

14   A.    Yes.

15   Q.    Again, you don't know why she wouldn't include the

16   word "bitch" in her report?

17   A.    Probably because it's inappropriate.

18   Q.    Okay.  If you could take a look at AMR exhibit -- and

19   just hang on with me one second.

20                  (Pause)

21        At AMR Exhibit 99, please.

22        Are you ready?

23   A.    Oh, yes.

24   Q.    AMR Exhibit 99.  These are responses that you made to

25   interrogatories served on you as part of this case?

1    A.    Yes.

2    Q.    And you made these responses under oath?

3          I'm sorry, take a look at the last page of this

4    exhibit, okay?

5          That's your signature there?

6    A.    It is.

7    Q.    And there you were saying, I, Jessica Morel hereby

8    certify that I've reviewed the above interrogatories and

9    responses thereto and they're true and accurate to the

10   best of my knowledge and belief?

11   A.    Yes.

12   Q.    And you dated this July 14, 2010?

13   A.    Yes.

14   Q.    Take a look on page 11, this is interrogatory number

15   ten.

16         Are you ready?

17   A.    Yes.

18   Q.    So you'll see that they were asking for each incident

19   of mistreatment, threatening intimidation or harassment as

20   set forth in paragraph 17 and 18 of your second amended

21   complaint that you claimed you were subjected to.  It

22   asked for the date of each incident, which defendants

23   committed the incident, and describe the specifics of each

24   incident.  Do you see that?

25   A.    Yes.

1    Q.   And in your response, you talk about what you

2    testified about before about how to be a dick paramedic.

3         You talk about on April 7 they called you an asshole

4    and a para-God.

5         You talk about how on the 25 and 27 of April 2007,

6    how they were rude to you.

7         And how June 11, 2007, there was the incident where

8    Scott Schaub cut you off.

9         You go on the next page, you'll see that during the

10   period from April 2006, through and including April 2007,

11   the defendant Schaub had a friend call the plaintiff on

12   her personal cell phone and call her a bitch.

13        Do you see that?

14   A.   Yes.

15   Q.   And on the night that two of your tires were slashed,

16   you talk about that.  Do you see that?

17   A.   Yes.

18   Q.   Anyplace to this answer to interrogatories you filed

19   in 2010 where you used the word "cunt"?

20   A.   No.

21   Q.   Other than saying that Scott Schaub had a friend call

22   you on the cell phone and call you a bitch, do you use the

23   word "bitch" any place in this answer to your

24   interrogatories?

25   A.   No, I don't use that word.

1    Q.   In fact, isn't it true that the very first time you

2    ever put the word "cunt" into writing in relation to this

3    case, was in a affidavit you filed last September?

4    A.   I'm not sure.  It may have been.

5    Q.   And this was an affidavit you filed in order to

6    prevent your case from being dismissed, wasn't it?

7    A.   Yes.  I had to file an affidavit because you tried to

8    have it dismissed.

9    Q.   Can you point us to any other document that you

10   emailed, incident report, anything, prior to this 27th of

11   September 2011 affidavit, which is Exhibit 100, any other

12   document prior to then in which you say that the word

13   "cunt" was directed at you?

14   A.   Not in writing.  I had the discussion with Mr. Drouin

15   and I already testified that I'm not comfortable repeating

16   the language, especially repetitively.

17   Q.   Or even once?

18   A.   Or even once.  I find it really disrespectful.

19   Q.   Well, you state in the affidavit that they not only

20   called you, and I do apologize for the language, but it's

21   what it says, that they not only called you a cunt on an

22   extremely regular basis, but also a bitch, correct?

23   A.   Correct.

24   Q.   And you were comfortable using the word "bitch,"

25   correct?

1    A.   No, I'm not comfortable using the word "bitch," but

2    I'm more comfortable with that than "cunt."

3    Q.   You were comfortable to use the word "bitch" in your

4    answers to interrogatories?

5    A.   I'm more comfortable using that word than the second,

6    yes.

7    Q.   But even in your interrogatories, you don't make any

8    statement that Mr. Schaub called you a bitch?

9    A.   I'm not sure if I did or I didn't.  Again, I don't

10   like to repeat the language, so I say he's unprofessional.

11   Q.   Well, we can just take a look at it one more time.  I

12   certainly don't wish to waste the Court's time to belabor

13   the point.  But if you take a look back at Exhibit 99,

14   page 12?

15   A.   Okay.

16   Q.   And these are interrogatories that you signed under

17   oath.  We've already been through that part of the

18   testimony.

19        And again you'll say that Mr. Schaub had a friend

20   call you and call you a bitch.  Do you see that?

21   A.   Yes.

22   Q.   So you could say the word "bitch" once in this

23   answer, right?

24   A.   Yes.

25   Q.   But you couldn't bring yourself to say it again and

1    say, well, Mr. Schaub actually called me a bitch all the

2    time?

3    A.   Again, I don't repeat things.

4    Q.   I see.

5        Do you remember giving a deposition in this case?

6    A.   I did.

7    Q.   And the deposition took place over the course of two

8    days?

9    A.   It did.

10    Q.   And in this deposition you were asked questions under

11    oath?

12    A.   Yes.

13    Q.   And attorneys for AMR asked you questions?

14    A.   Yes.

15    Q.   And attorneys for individual defendants asked you

16    questions?

17    A.   Yes.

18    Q.   And your own attorney actually had a chance to ask

19    you questions?

20    A.   She did.

21    Q.   In this entire ten hours of testimony, did you ever

22    tell anybody that you'd been called a cunt?

23    A.   I believe I did.

24    Q.   Do you remember in March 2011 in the deposition being

25    asked the following question:

1    Question:  Besides calling you an asshole and a

2    para-God, what other expletives did he use?

3    Answer:  I don't remember specifically.  He used

4    quite a few.

5    Do you remember that question and answer?

6    A.   It sounds like a question you would have asked me.

7    Q.   And do you remember that answer?

8    A.   Sure.  I don't remember it specifically.  It was over

9    a year ago.

10   Q.   Ms. Morel, I'm going to hand you a copy of your

11   deposition.

12        MR. BARR:  May I approach, Your Honor?

13        THE COURT:  Yes.

14   BY MR. BARR:

15   Q.   This is a copy of your deposition from March 9, 2011?

16   A.   There's two volumes so --

17   Q.   There's a February volume as well.  We'll have

18   questions out of there.

19        THE COURT:  Mr. Barr, let me interject a brief

20   explanation for the jury's benefit.

21        MR. BARR:  Of course.

22        THE COURT:  Members of the jury, you may not be

23   familiar with the procedure that is followed in civil

24   cases.

25        The procedure includes the taking of

1    depositions, and that's what's being referred to now, and

2    I want to tell you a little bit about that without

3    delaying the examination just so that you will understand.

4         Under the Rules of Procedure, a party to a case

5    has a right to take the sworn testimony of a witness,

6    including another party, and we call that a deposition.

7    The party taking the deposition, appearing through

8    counsel, has an opportunity to question the witness, much

9    as Mr. Barr is questioning Ms. Morel here.

10        The deposition is conducted in the presence of a

11   reporter like Darlene so that every word is recorded and

12   typically the person being deposed, the witness, will have

13   counsel there to interject objections and to ask follow-up

14   questions.

15        The purpose of the deposition is to enable the

16   requesting party to obtain the witness's testimony with

17   regard to the case and to preserve the witness's testimony

18   for later use, including use at trial.

19        The questions and answers, as recorded by the

20   reporter, can be made into a transcript, and we have a

21   transcript of Ms. Morel's deposition, and that's what

22   Mr. Barr is using.

23        So you can envision a set-up much like this

24   where the lawyer for AMR is asking Ms. Morel questions

25   about her case, a reporter is taking it down, and

1    thereafter a transcript was prepared, and the transcript

2    is available to be used, and indeed is being used at this

3    time.

4              Okay?

5              I should note that after the transcript is

6    produced, the party who gave the deposition, the witness,

7    has an opportunity to review the transcript and make any

8    corrections and signs the transcript -- is given an

9    opportunity to sign the transcript.

10             Okay?

11             MR. BARR:  May I proceed, Your Honor?

12             THE COURT:  Yes.

13   BY MR. BARR:

14   Q.   Ms. Morel, can you turn to page 17 of the volume of

15   the deposition you have in front of you?

16   A.   Okay.

17   Q.   And starting on line 4.  Do you see line 4?

18   A.   Yes.

19   Q.   Down through line 15.  Could you please read that

20   into the record?

21   A.   Question:  Besides calling you an asshole and a

22   para-God, what other expletives did he use?

23             And I responded:  I don't remember specifically.  He

24   used quite a few.

25             So as you're sitting here today, you can't recall any

1    other expletives other than para-God and asshole, correct?

2         And I said:  Those are the ones that I documented at

3    the time.

4         So as you sit here today, can you recall any other

5    expletives other than para-God and asshole?

6         And I said not specifically.  That does not mean they

7    weren't said.

8         He says, that was not the question.

9    Q.   Okay, that's where you can stop reading.

10        I'm going to hand you the deposition transcript from

11   February 2011.

12             THE COURT:  What was the date of the last

13   deposition, please?

14             MR. BARR:  The one she just read from one was

15   March 9, 2011.

16             And the one she's about to read from is February

17   11, 2011.

18             I believe that's right.  Yes February 11, 2011.

19             THE COURT:  So the one you're referencing now

20   was done first?

21             MR. BARR:  Yes.  I should have done it

22   chronologically, I apologize, Your Honor.

23   BY MR. BARR:

24   Q.   Ms. Morel, if you could take a look at page 181, 182

25   of this volume of your deposition.  And specifically, I'm

1    sorry, on page 181.

2    A.    Yes.

3    Q.    Starting with line 12, and ending with line 17, can

4    you please read that answer -- that question and answer

5    for the record?

6    A.    How did they speak to you inappropriately?

7         They would tell me no when I asked them to do things.

8    Mr. Schaub liked to call me a para-God.  He liked to call

9    me a dick.  I know at least once, but I believe on at

10   least several occasions, he called me a bitch, among other

11   things.

12   Q.    If you could take a look -- and I apologize, Your

13   Honor -- go back to the March 9th one.

14        My notes aren't as good as I'd hoped.

15        Take a look at page 449.

16   A.    Okay.

17   Q.    Could you please read, starting with line 17, all the

18   way through line 25 of page 449 into the record?

19   A.    During the course of this deposition we have covered

20   all the incidents of which you have a specific memory of

21   Mr. Schaub and Mr. Mucci yelling at you or swearing at

22   you?

23        Yes.

24        I understand you contend that there's others, you

25   just can't identify specific incidents, is that correct?

1    And I said, correct.

2    Q.   And it's your testimony that at some place in these

3    two volumes of the deposition you said that they used the

4    word "cunt" directed at you?

5    A.   I said I believe I did.  This is quite awhile ago.

6    So --

7    Q.   Do you think that you would have remembered?  When

8    you were saying you didn't remember, do you think you

9    would have remembered that they were calling you a cunt

10   every single day or close to every single day?

11   A.   They called me a cunt and a bitch all of the time.

12   So much so that it became common and I like to tune it

13   out.

14       So I don't specifically remember five years ago every

15   time they used the words.  And I believe that's what I say

16   in my deposition, that I can't recall specific incidents.

17   Q.   Didn't you just read in your deposition that they

18   called you a bitch you said, at least once, and perhaps

19   several times.  Is that different than they called me a

20   bitch all the time?

21   A.   What -- I guess what quantity would I have use if

22   they used it all the time?  Several times?  Multiple

23   times?  I guess I'm not seeing the difference in that.

24   Q.   I'll move on.

25   A.   Okay.

1    Q.   At AMR you would punch in when you started your

2    workday?

3    A.   We would.

4    Q.   Then typically punch out at the end of your shift?

5    A.   We would.

6    Q.   You were an hourly employee?

7    A.   Yes.

8    Q.   You got paid for the hours you worked?

9    A.   Yes.

10             THE COURT:  Mr. Barr, I think we should take our

11   mid afternoon break.

12             MR. BARR:  This would be a good time, Your

13   Honor, thanks.

14             THE COURT:  Members of the jury, we'll take our

15   mid afternoon break now.  We'll be on break for 20

16   minutes.  Please don't discuss the case and please leave

17   your binders there.

18             Again, you should feel free to come around the

19   front, that way you don't need to navigate through that

20   tight space.

21                  (Whereupon, the jury left the courtroom.)

22             THE COURT:  You may step down.

23             I don't know what counsel would like, but it

24   seems to me that juror number 6 is having some difficulty

25   managing the binder.  It's quite heavy and I think she

1    finds it to be quite unwieldy.

2            The only thing I could think of would be perhaps

3    allowing her to put the binder on the chair next to her

4    and ask the other jurors to shift one seat to the left.

5    Maybe that would facilitate her review of the evidence.

6            MR. BARR:  Your Honor, we would have no

7    objection to that, but I wouldn't want to do a special

8    favor for the juror.  But as a suggestion, we could divide

9    her binder into several binders.

10           THE COURT:  That makes sense.

11           MR. BARR:  If that would be okay with

12   plaintiff's counsel.

13           THE COURT:  I think that would be a reasonable

14   accommodation for this juror, and I think that's a good

15   suggestion.

16           MR. BARR:  We'll take care of that during the

17   break.  I don't want to touch hers, because it may have

18   notes on it and I think we have a spare we could put

19   together.

20           THE COURT:  Very good, thank you.

21           MR. BARR:  Thank you, Your Honor.

22               (Whereupon, a recess followed)

23           THE COURT:  I think we're ready for the jury.

24           Do you have the binders?

25           MR. BARR:  We put them back over there, Your

1    Honor, yes.

2                    (Whereupon, the jury entered the

3                    courtroom.)

4              THE COURT:  Thank you, members of the jury,

5    we're ready to resume.

6              MR. BARR:  May I Your Honor?

7    BY MR. BARR:

8    Q.   Ms. Morel, before we took our break, we were talking

9    about the fact that you punched in and out of work every

10   day.

11   A.   Yes.

12   Q.   You claimed during your direct testimony that during

13   the time period you were a paramedic, you were working six

14   to seven days a week?

15   A.   Yes.

16   Q.   And you were saying you were working 70 hours a week

17   or so?

18   A.   Average, probably.

19   Q.   You're sure you're not exaggerating that?

20   A.   I don't believe so, no.

21   Q.   Are you aware that your time records for

22   November 2006 showed you worked an average of four days a

23   week?

24   A.   No.

25   Q.   Are you aware your time records for December 2006

1    showed you worked a average of four days a week?

2    A.   Are you looking at the schedules or at the overtime

3    as well?

4    Q.   I'm looking at overtime, yes.  They show you worked

5    four days a week.

6    A.   I guess I'd ask you to show me because my salary for

7    the year is different.

8    Q.   Are you aware that January of 2007 you worked an

9    average of four days a week, according to your time

10   records?

11   A.   No.

12   Q.   How about for February and March, 2007?  Are you

13   aware that for those months your time records showed you

14   worked an average of four days a week?

15   A.   No.

16   Q.   You're claiming in this suit that you were subjected

17   to harassment while at AMR, correct?

18   A.   Correct.

19   Q.   But you're not saying that Dwayne Drouin harassed

20   you?

21   A.   No.

22   Q.   And you're not saying that Chris Chaplin harassed

23   you?

24   A.   In a way he did, yes.

25   Q.   Because of your gender?

1    A.    I can't speak to his motivation.

2    Q.    Are you claiming that Bob Zagami harassed you?

3    A.    No, he did not.

4    Q.    And Sean Piendel, you're not claiming he harassed

5    you?

6    A.    No, he did not.

7    Q.    You stated in your direct testimony that there were

8    four female paramedics in Enfield?

9    A.    Full-time.

10   Q.    And you meant Enfield paramedics?

11   A.    Yes.

12   Q.    Because there were also Enfield female medics,

13   correct?

14   A.    Not during my employment there.

15   Q.    Towards the end Karen Zack was?

16   A.    Towards the end she was.

17   Q.    And you said two of the four, were you one of the

18   four full time female paramedics assigned to Enfield?

19   A.    Yes.

20   Q.    And two of the four you said you weren't aware of any

21   incidents involving them?

22   A.    Not to my knowledge.

23   Q.    And the other one would be a woman by the name of

24   Jennifer Starky?

25   A.    Yes.

1    Q.    And you knew of one incident involving her?

2    A.    Yes.

3    Q.    You testified during your direct that Mr. Drouin, to

4    the best of your knowledge, never followed up on any of

5    your incident reports?

6    A.    Correct.

7    Q.    Do you recall the one email you looked at where you

8    had the smiley face?

9    A.    Yes.

10   Q.    Mr. Drouin did follow up to that email, didn't he?

11   A.    I don't know.  Did he?

12   Q.    Do you remember seeing an email from him?

13   A.    To me?

14   Q.    Yes.

15   A.    No, I do not.

16   Q.    Do you remember receiving an email from Mr. Drouin

17   dated December 13, 2006?

18   A.    I don't remember any email specifically from six

19   years ago, no.

20   Q.    Do you remember getting an email from Mr. Drouin in

21   December 2006 in which he said, I heard you had problems

22   at JMH?  Does that ring a bell to you?

23   A.    That's the same thing, it's six years ago, I don't

24   remember anything specific about emails.

25   Q.    So you don't remember your response where you stated

1    that there were no problems to your knowledge?

2    A.   Again, I don't remember what you're talking about.

3    Q.   How about Monday, April 2, 2007?  Do you remember

4    Mr. Drouin emailing you April 2, 2007?

5    A.   No.  If you'd like to show me the emails, I can

6    probably speak to them, but I don't remember any emails

7    from him.

8    Q.   Well, do you remember an email about this time where

9    he said he appreciated your incident reports?

10   A.   No, I don't remember that either.

11   Q.   Do you remember an email about this time where he

12   asked you for more details about your incident reports?

13   A.   Again, I don't remember any of his emails so --

14   Q.   Do you remember an email back to him that you wrote

15   saying that you were getting a ton of attitude from

16   Enfield employees?

17        Does that ring a bell to an email you sent to him?

18   A.   It sounds similar.

19   Q.   You told him the employees included Sarah Moore, Matt

20   Mucci, Adam Szymanski and Gary.  Does that ring a bell?

21   A.   Again, I don't remember the emails, so I'd have to

22   see them.

23   Q.   And well, do you remember sending an email in which

24   you said you thought you were getting attitude because of

25   a Town of Enfield meeting?  Does that ring a bell?

1    A.    I remember sending a handful of emails, and I

2    remember incident reports.  I remember talking to him on

3    the phone.  I don't remember specifics of any particular

4    one unless you were to put it in front of me, no.

5    Q.    So you don't remember if Mr. Drouin wrote back that

6    same day?

7    A.    I think we established that.  I don't remember a

8    chain of emails.

9    Q.    You don't remember that he told you that he wasn't

10   done dealing with Enfield yet?

11   A.    No.  I don't remember him saying that.

12   Q.    And you don't remember that he told you that a

13   meeting with Enfield hadn't gone very well.  That doesn't

14   ring a bell for you?

15   A.    I'm sorry, are you saying you have the emails?  Can I

16   see them?

17   Q.    My question was:  Do you remember that email?

18   A.    No, I don't remember that email.

19   Q.    If you could take a look, please, at AMR Exhibit No.

20   35.  Do you have that in front of you?

21   A.    I do.

22   Q.    We actually looked at this as a plaintiff's document

23   during your direct examination, correct?

24   A.    Probably.

25   Q.    This is your incident report regarding the incident

1   on April 6, 2007, correct?

2   A.   Yes.

3   Q.   And all four pages of it constitute your incident

4   report?

5   A.   They do.

6   Q.   You wrote this essentially the day after the

7   incident?

8   A.   Yes.

9   Q.   Take a look at the bottom of page 1.  You'll see you

10  state, in the background Mr. Schaub was swearing and

11  making comments as well as saying things to the crew of

12  AMR 392, Terry Webb and Kerri Pliska.  Do you see that?

13  A.   Yes.

14  Q.   So during the first incident on the night of April 6,

15  there was another AMR crew present?

16  A.   For part of it.

17  Q.   You go on to relay about how there's the deal that

18  you testified about where you'll pick up the bloody trash,

19  correct?

20  A.   Yes.

21  Q.   Then on the second page of AMR Exhibit35, towards the

22  top you state, I threw out the gloves and Scott Schaub got

23  in the back and inspected everything else for blood and

24  then threw it away when he found none.  Do you see that?

25  A.   Yes.

1    Q.   So he threw away some of the trash and you threw away

2    some of the trash?

3    A.   If that's what I wrote, yes.

4    Q.   He then stood about a foot away from me when I was

5    seated on the bench above me, and he said something to the

6    effect of, quote, do you think you could do your job the

7    rest of the night, closed quote, with much sarcasm in his

8    tone.  Is that what you wrote?

9    A.   Yes.

10   Q.   And you're saying that that's part of the harassment,

11   correct?

12   A.   Yes.

13   Q.   And you go on, I responded to him, quote, I'm not

14   going to discuss this with you, closed quote, to which he

15   replied, quote, we still have a lot of our shift left.

16   And this can be a very long night.  I have no problem

17   doing this over and over again, closed quote.  Do you see

18   that?

19   A.   Yes.

20   Q.   And then you go on to state, you state in the next

21   paragraph that the ride was very rough.

22        You go on to state that, upon returning to the

23   office, I notified supervisor Thompson of the threatening

24   behavior.  Do you see that in the third paragraph?

25   A.   Yes.

1  Q.   And the verbal confrontations.  Mr. Schaub continued

2  after I'd spoken to him, and we'd agreed on a compromise.

3  Do you see that?

4  A.   Yes.

5  Q.   Can you take a look at AMR Exhibit 32?

6       Email appears to be from Scott Thompson to Dwayne

7  Drouin, Chris Chaplin and Chris Handle.  Do you see that?

8  A.   Yes.

9  Q.   Prior to this had you ever seen this before?

10  A.   No.

11  Q.   Any idea why Scott Thompson on on the night of April

12  6, 2007 would not mention the threatening behavior you had

13  described to him?

14  A.   I have no idea why he didn't mention it.

15  Q.   Take a look at AMR Exhibit 34.  Again this is an

16  email from Scott Thompson to Dwayne Drouin and Sean

17  Piendel.  See that?

18  A.   Yes.

19  Q.   And again you didn't see this until this litigation?

20  A.   Correct.

21  Q.   And this is dated April 7, 2007.  Do you see that?

22  A.   Yes.

23  Q.   Couple things in this email.

24       First of all, again, any explanation as to why the

25  day after the incident Scott Thompson doesn't mention all

1    of the threatening behavior you said that you told him

2    about?

3    A.   I have no idea why he doesn't mention it.

4    Q.   Turn back to AMR Exhibit 35.

5        As I recall in your direct testimony you said that

6    when you spoke to Mr. Chaplin, you made it very clear to

7    him the first time you spoke to him that you felt that you

8    were being threatened?

9    A.   I believe I did, yes.

10   Q.   Would you take a look at the top of the third page of

11   Exhibit 35, and probably, let's see, one, two, three,

12   four, five -- like seven or eight lines down -- where it

13   starts, supervisor Chaplin, in the middle of the line.  Do

14   you see that?

15       Line starts out, again, it turned the truck off,

16   period, supervisor Chaplin.

17   A.   You're on the second page?

18   Q.   I'm sorry?

19   A.   You're on the second page?

20   Q.   I'm sorry, I'm on the third page.  My fault, I

21   apologize.

22           THE COURT:  Nine lines down?

23           MR. BARR:  That's right, Your Honor.

24   A.   Okay.

25

1  BY MR. BARR:

2  Q.   You state here, supervisor Chaplin raised me on the

3  Nextel.  I explained the situation other than the

4  threatening behavior because they were still exerting the

5  physical presence at the time and I felt it would cause

6  further confrontation after already being threatened and

7  still feeling so at the time.

8      So is your testimony correct, that at the time you

9  felt threatened?  Or is your statement the day after

10 correct, that you told him you didn't feel threatened?

11 A.   I told him they're doing it again, which is repeating

12 the threatening behavior, which I told Scott Thompson

13 about, which he told me he told Christopher Chaplin about.

14     So I had no reason to believe he didn't understand

15 what I meant when I said they're doing it again.

16 Q.   When you earlier testified on direct, I told him

17 about the threatening behavior, what you really told him

18 was, quote, they're doing it again, closed quote?

19 A.   Right.  That's me telling him that they're

20 threatening me again.

21 Q.   Take a look at the bottom of the -- the last

22 paragraph on this third page of Exhibit 35.  You state

23 while 392 was en route to Johnson -- that's where you were

24 waiting to be picked up?

25 A.   Yes.

1    Q.   Supervisor Chaplin became aware of the threatening

2    behavior of Enfield EMS and called me back.  Do you see

3    that?

4    A.   Yes.

5    Q.   And you go on to state that essentially supervisor

6    Chaplin told you that he understood that you felt

7    threatened but that he was going to discipline you anyway?

8    A.   Yes.

9    Q.   Take a look at AMR Exhibit 34.  On the second page of

10   AMR Exhibit 34, continuation of the email chain, and

11   you'll see at the bottom, this is an email from Chris

12   Chaplin to Dwayne Drouin, Sean Piendel and Kimberly

13   Cummins.  Do you see that?

14   A.   Yes.

15   Q.   And again you didn't see this until this litigation,

16   correct?

17   A.   Correct.

18   Q.   And do you have any reason to know why Chris Chaplin

19   wouldn't describe any part of this conversation where you

20   said he acknowledged you felt you were being intimidated?

21   A.   Why would he repeat it if he didn't behave

22   appropriately to it?

23   Q.   Other than that, do you have any other reason?

24   A.   I can't speak to the rest of his reasoning, no.

25   Q.   And this is the incident report where you say that

1    these gentlemen called you, excuse my language, an asshole

2    and a para-God.

3    A.    Among other things, yes.

4    Q.    Is para-God a gender specific expletive?

5    A.    No, it is not.

6    Q.    What does para-God mean in your understanding?

7    A.    Para-God is a term that people use when they don't

8    like paramedics and they feel that paramedics think

9    they're infallible, close to God, because they have

10   people's lives in their hands.  So it's a derogatory term

11   towards paramedics.

12   Q.    In your opinion, is the word or the term "asshole,"

13   is that gender specific?

14   A.    No, it is not.

15   Q.    You state in Exhibit 35 that the Enfield crews have

16   been harassing, you, correct?

17   A.    Yes.

18   Q.    So that would include the instances previously where

19   female medics had questioned your authority?

20   A.    No.  There's a difference between the conflict

21   between the town and the R5 and harassing me directly.  I

22   think there's a distinct difference between the two.

23   Q.    Okay.  So this would include the time, for example,

24   when the female medic pushed you?

25   A.    I don't believe she was harassing me, no.

1  Q.  Oh, when the male medic pushed you he was harassing

2  you, but when the female medic pushed you, it's not?

3  A.  She's not a medic, she's an EMT, and she did it once

4  and not again.  I would assume that harassment is

5  repetitive behavior.

6  Q.  Oh, that's right.  Because you thought that Matt

7  Mucci harassed you by saying, thanks for saying hi, right?

8  A.  He was.

9  Q.  Does the harassing behavior include driving too fast?

10  A.  Yes.

11  Q.  So when Sarah Moore drove too fast, that was

12  harassing?

13  A.  In a way, yes.

14  Q.  So that was --

15  A.  That wasn't based on my gender, no.

16  Q.  Now, the actual disputes about cleaning up your

17  truck, this only went on for about a week, correct?

18  A.  About the garbage?

19  Q.  Right.  Start about a week before.

20  A.  I guess that's when it started.  I'm still not sure

21  why they were making that a issue.

22  Q.  Take a look at AMR Exhibit 37.  Do you have that in

23  front of you?

24  A.  Yeah.

25  Q.  We looked at this before.  This is an incident report

1    you wrote?

2    A.    It is.

3    Q.    Part of this incident report you're complaining about

4    a female Enfield employee who doesn't give you a full

5    report, is that correct?

6    A.    Yes.

7    Q.    You go on to state that an AMR medic by the name of

8    Fritch was being harassed by Enfield about picking up

9    their truck.  Do you see that?

10   A.    Yes.

11   Q.    And is Fritch a man or a woman?

12   A.    He's a man.

13   Q.    In fact, don't his tires wind up being vandalized?

14   A.    That's up for debate.

15            THE COURT:  I missed the question, I'm sorry.

16   BY MR. BARR:

17   Q.    Didn't his tires wind up being vandalized?

18   A.    I said that's up for debate.

19   Q.    Did you ever report that his tires were vandalized?

20   A.    His tires?

21   Q.    Yes.

22   A.    I report that he said they were.

23   Q.    If you could go on to the second page of Exhibit 37.

24   Here you talk about a -- you had issues on that Friday

25   evening with medic Szymanski?

1   A.   Yes.

2   Q.   Did he challenge your decision on pain management?

3   A.   Yes.

4   Q.   Take a look at AMR Exhibit 40.  The very -- this is

5   an email that you sent to Sean Piendel and Kimberly

6   Cummins?

7   A.   Yes.

8   Q.   And Mr. Drouin?  And you said this appears April 27,

9   2007?

10  A.   Correct.

11  Q.   It states here they have not repeated their earlier

12  display of foul language.  Do you see that?

13  A.   Yes.

14  Q.   I assume you mean F-O-U-L?

15  A.   Correct.

16  Q.   Not chicken language.

17  A.   Not the bird, that's correct.

18  Q.   Take a look at AMR Exhibit 48.  Do you have that in

19  front of you?

20  A.   Yes.

21  Q.   This series of incidents reports you wrote appears in

22  May of 2007?

23  A.   Yes.

24  Q.   None of these incident reports mention foul language?

25  A.   I would have to read through them all but --

1  Q.   You're not aware sitting here right now about any of

2  these?

3  A.   I don't remember them containing that.

4  Q.   You state in incident report number 8 -- this is on

5  the third page of AMR Exhibit 48 in the middle --

6  A.   Yes.

7  Q.   You state at 19:10 on May 12, 2007, medic five was

8  dispatched to -- hidden address -- for a head injury.

9  They canceled AMR 392 en route and stated to dispatch that

10  it was a BLS transport to Johnson Memorial Hospital.  I

11  was at Subway on Route 190 and witnessed them driving

12  lights and sirens at an excessively high rate of speed

13  towards the hospital.  Do you see that?

14  A.   Yes.

15  Q.   This driving at a high rate of speed when you weren't

16  in the ambulance, that wasn't harassing, was it?

17  A.   No, they weren't harassing me if I wasn't in the

18  ambulance.

19  Q.   Take a look at incident report number one -- and this

20  is going to be on page 4 of the exhibit.

21        THE COURT:  Which exhibit, please?

22        MR. BARR:  I'm sorry, Your Honor, still

23  Exhibit 48.  I apologize.

24        THE WITNESS:  You're talking about 11 or 10?

25        MR. BARR:  I'm sorry, I believe it's Exhibit 11.

1          THE COURT:  Incident 11 on the second to the

2     last page of the exhibit?

3          MR. BARR:  Yes, that's right, Your Honor.

4          THE COURT:  Thank you.

5     BY MR. BARR:

6     Q.   And this involves again Adam Szymanski?

7     A.   Yes.

8     Q.   And you checked with -- and a Jeremy Russell?

9     A.   Yes.

10    Q.   And you're complaining that they argued with you?

11    A.   Yes.

12    Q.   And they started to yell at you to leave?

13    A.   Yes.

14    Q.   And then you complain in the last paragraph that

15    these two individuals are apparently unaware of the trauma

16    protocols and their jobs during an MCI?

17    A.   Yes.

18    Q.   Take a look then at the very first page of

19    Exhibit 48.  And this is numbered incident number 12,

20    correct?

21    A.   Yes.

22    Q.   And this concerns the Kerri Pliska incident at the

23    ice cream store, correct?

24    A.   It does.

25    Q.   And you state on the third line, in the middle of the

1   third line, Kerri Pliska started a conversation in front

2   of said crews about Alyss Langello surrounding her

3   starting rumors about liking Kerri, et cetera.  Kerri

4   state that there was no motivation for that.

5        So that's what Kerri Pliska said that set you off?

6   A.   No.  Kerri Pliska was saying that Alyss was starting

7   rumors, like what Alyss was saying that she liked Kerri

8   and that she couldn't keep her hands off the other women,

9   and things like that.

10  Q.   So here in this incident report, did you write this

11  in 2007?

12  A.   I did.

13  Q.   And there's nothing in here about Kerri saying, can't

14  keep her hands off other women, is there?

15  A.   I didn't write it there, no.

16  Q.   And this is what set you off with Kerri, correct?

17  A.   I wouldn't say it set me off.  I just told her I

18  wasn't going to tolerate it.

19  Q.   I stopped her and told her to quit lying.

20  A.   I did.

21  Q.   That she knew very well that she had started rumors

22  about Alyss and attempted to start them with me regarding

23  her sexual orientation.  You see that?

24  A.   Yes.

25  Q.   The conversation pretty much ended with Pliska

1    denying it and telling me I was wrong?

2    A.    Correct.

3    Q.    So the conversation is now over?

4    A.    At that point, yes.

5    Q.    She then walked away from the group with Mike Gerard.

6          I take it "she" is Kerri Pliska, who also does not

7    like Alyss for reasons other than her sexual orientation,

8    and was speaking with him and not returning to the truck.

9    Do you see that?

10   A.    Yes.

11   Q.    You don't remember here what they were talking about,

12   do you?

13   A.    When I'm in the truck I don't know what they're

14   talking about.

15   Q.    So you didn't get out of the truck?

16   A.    Yes.  Because we're supposed to return to our posting

17   location.

18   Q.    I approached them.  They needed to stop conspiring

19   against her.  Do you see that?

20   A.    Yes.

21   Q.    If you don't know what they're talking about, how do

22   you know they're conspiring against her?

23   A.    Because when I walked up to them, I heard what they

24   were talking about.

25   Q.    And they were engaged in a conspiracy?

1    A.   The two of them were talking about her and how they

2    were going to continue propagating this dislike of her.

3    So I would consider that conspiring.

4    Q.   Okay.  I told Kerri that whatever her motivation, she

5    needed to stop harassing Alyss and I found it

6    unacceptable.

7        Alyss was not at the creamery that night, was she?

8    A.   No.  Kerri doesn't have the nerve to say things to

9    people's face.

10    Q.   I told her it was completely uncalled for and that

11    she is degrading her to others talking behind her back and

12    that I didn't appreciate your lying to me and everyone

13    else when called out on it.  Do you see that?

14    A.   Yes.

15    Q.   Had you ever filed an incident report prior to this

16    notifying AMR that Kerri Pliska was harassing Alyss

17    Langello?

18    A.   No, I tried dealing with her directly.

19    Q.   Kerri -- you told her in no uncertain terms that you

20    wouldn't tolerate them harassing her.  You then say,

21    second paragraph, Kerri and I then got back into the

22    truck.  She started yelling at me everyone talking crap

23    about everyone and that I didn't need to call her out in

24    public.  Do you see that?

25    A.   I do.

1    Q.   You testify in your direct that she called you a

2    bitch, correct?

3    A.   Yes.

4    Q.   Can you show me where in this incident report you

5    mention the word "bitch" or you say the word "bitch"?

6    A.   I think I told you I don't like to document the

7    language.

8    Q.   So you didn't say anything like she called me a

9    really inappropriate name?

10   A.   I put she was yelling at me and called me all kinds

11   of things.  I'm not sure --

12   Q.   You said, she called me all kinds of things?

13   A.   Yeah, she's --

14   Q.   Where did you say that?

15   A.   She started picking on me.  She started yelling at

16   me.  She started mocking me.  Like all of that is

17   inclusive of her attitude.  I certainly didn't write down

18   everything she said.

19   Q.   How is AMR supposed to know she called you a bitch if

20   you don't write it down?

21   A.   I told them.

22   Q.   Oh, because you're comfortable saying it, not writing

23   it?

24   A.   I'm more comfortable having a conversation with

25   Dwayne in private, yes, than putting it in a permanent

1    record, my saying those words.  And "bitch" to me was not

2    the bigger part of the conversation.  It was more that she

3    was harassing a lesbian.

4    Q.    But Alyss wasn't there.

5    A.    Does she have to be there?

6    Q.    My question was:  Alyss wasn't there?

7    A.    She wasn't there.

8    Q.    Thank you.

9          You then go on to talk about how apparently

10   Ms. Pliska calls Chris Chaplin?

11   A.    Yes, apparently she did.

12   Q.    And that you attempted to call him?

13   A.    I did.

14   Q.    You then state, and I've now gone down to the third

15   paragraph about fourth line down, he, being Chris Chaplin,

16   answered and I said, quote, I'm having a conflict with my

17   partner.  Given the situation I am in with Enfield EMS, I

18   do not feel safe working with her.  Do you see that?

19   A.    Yes.

20   Q.    He said -- by the way, so you didn't say, given how

21   she's harassing Alyss Langello, I don't feel comfortable

22   working with her?  That's not what you said?

23   A.    Correct.

24   Q.    He said he already had spoken to Kerri and asked what

25   I had to say.

1      Was it your impression he's trying to get your side

2  of the story?

3  A.   No.  He said:  What do you have to say for yourself?

4  Not what's your version?  Or it was not an "I'm open to

5  having a discussion with you" statement.

6  Q.   I'm sorry.  Here it doesn't say, what do you have to

7  say for yourself, does it?

8  A.   It says, what do you have to say?  It's fairly close.

9  Q.   I told him that -- you go on to tell him your side of

10  the story, correct?

11  A.   I tried to, yes.

12  Q.   I told him we had a conflict over him picking on

13  another employee because she was gay.  I told him I

14  confronted her on it and she went off on me telling me

15  that I deserve what I was getting with Enfield, et cetera.

16  I told him that I did not feel safe working with a partner

17  who would not back me up given the present situation.  He

18  said that we needed to get along and this conflict

19  wouldn't affect how we worked together on a call.

20      You've already testified you said, hey, I've arranged

21  a swap with the crews?

22  A.   Yes.

23  Q.   And he apparently calls you back?

24  A.   Yes.

25  Q.   And says that we can't switch partners even though

1    all of us were willing.  He stated that he told her -- and

2    here is he talking about Pliska?

3    A.   Yes.

4    Q.   He told her, as he was telling me, that we needed to

5    work together on calls and not to create any more issues.

6    Do you see that?

7    A.   Yes.

8    Q.   So is he retaliating here now or telling you and

9    Kerri the same thing?

10   A.   I believe he's retaliating in not letting me switch

11   partners.  It was an "I'm not going to accommodate you."

12   Q.   Going to the very bottom of AMR 48, I told him I

13   still did not feel safe working with her given her

14   comments -- and now going to the next page -- about my

15   deserving what I got from Enfield.  He stated, I was

16   changing my story again, just like the last time when I

17   wasn't getting my way.  This is the same issue he had with

18   me before, that I can't play the, quote, I don't feel safe

19   card, closed quote, with him again, et cetera.

20       I told him I didn't feel safe with a partner who

21   didn't have my back.  To this he wanted me to define,

22   quote, have my back, closed quote.  Do you see that?

23   A.   Yes.

24   Q.   So he's asking you to tell him why it is you don't

25   feel safe?

1  A.   In a way he was.

2  Q.   And that's what a supervisor should do if someone

3  says, I don't feel safe, you would want the supervisor to

4  say, why don't you feel safe, right?

5  A.   It was sarcastic though.  It wasn't really a

6  question.

7  Q.   You've written "sarcasm" in other incident reports.

8  I don't see the word "sarcasm" here.  Did you mean to put

9  it in there?

10  A.   I didn't put it in there at the time.  That doesn't

11  mean he wasn't.

12  Q.   You go on to say:  I told him in any way any partner

13  would support the other on a call.  I didn't feel that she

14  would be impartial in documenting any incidents that would

15  arise.  He stated that she didn't have to put her neck out

16  for anyone.  I told him that I didn't expect her to

17  physically back me up but to listen and document things

18  appropriately.  He said, fine, he had told her to work

19  with me and that we needed to get along on calls so that I

20  had to work with her.  I told him that since she sided

21  with Enfield, I didn't feel she would work with me

22  appropriately.  To which he responded, she can be friends

23  with whomever she wants.

24       And your response to this was to just go home?

25  A.   I said that I would switch partners, and if he

1    wouldn't switch partners with me, I do not feel safe

2    working with her, so I would be willing to go home, yes.

3    Q.   And so you wound up going home because of this?

4    A.   I told me, fine, go home, you're suspended.  So yes,

5    I ended up going home.

6    Q.   Going on down two more paragraphs, it's a paragraph

7    that starts "Chaplin then called me back."

8        This kind of conspiracy and games involving a

9    supervisor and the other employee in the conflict show a

10   direct partiality on the supervisor's part against me.  Do

11   you see this?

12   A.   Yes.

13   Q.   So this another conspiracy directed against you?

14   A.   This is him having Miss Pliska call him and tell him

15   everything that I'm doing or she's calling him and telling

16   him that she doesn't like something.  So then he calls to

17   discipline me about it.

18       It's clearly the two of them were, you know, working

19   with each other.

20   Q.   So you think that there was a conspiracy directed at

21   you?

22   A.   Sure.

23   Q.   Take a look at AMR Exhibit 51 and let me know when

24   you're ready.

25   A.   Yes.  It's in front of me.

1    Q.   This is an AMR incident report?

2    A.   It is.

3    Q.   But this is not one that you wrote?

4    A.   No.

5    Q.   It's one that appears to be by Robert Edwards?

6    A.   Yes.

7    Q.   Is there a Robert Edwards that works for AMR?

8    A.   Yes.

9    Q.   It appears to be written 5/30/2007.  Do you see that?

10   A.   Yes.

11   Q.   And this incident report purports to state Heather

12   Richards and myself were at the office eating dinner when

13   389 pulled into the driveway and Jessica Morel came out of

14   the ambulance looking very angry and upset.  Heather asked

15   her, quote, what happened now, closed quote.  To which

16   Jess stated, quote, Kerri is such a bitch.  She thinks

17   it's okay to make fun of someone because they are gay and

18   then lies about it.  I can't work with someone like that.

19   I'm calling the supervisor.

20        Do you see that?

21   A.   I do.

22   Q.   Did you call or did you refer to Kerri as a bitch

23   that night?

24   A.   No.

25   Q.   Take a look at AMR Exhibit 52.  This is your hotline

1    report that you testified to in your direct examination?

2    A.    It is.

3    Q.    And in this report you said that they've mixed up

4    some names regarding Chris Chaplin and Dwayne Drouin,

5    correct?

6    A.    Yes.

7    Q.    But you said, otherwise the facts that you relayed

8    were correct in this?

9    A.    I said it was a summary of what I related, yes.

10   Q.    So in the second paragraph under details of

11   information provided by caller --

12   A.    Okay.

13   Q.    -- you actually list several Enfield EMS individuals

14   have been instigating the harassing behavior towards you?

15   A.    Yes.

16   Q.    You testified earlier that the two you really had

17   problems with were Matt Mucci and Scott Schaub, correct?

18   A.    They were, correct.

19   Q.    But here you named a whole bunch of people, correct?

20   A.    Correct.  You had me read the reports earlier.

21   Q.    And you go on to say, Ms. Morel said the harassment

22   includes yelling and screaming at her on the scene and

23   standing over her in an attempt to be intimidated.  She

24   said often that the men would drive recklessly while she's

25   in the back of the ambulance in an attempt to throw her

1    around.

2         Did you tell AMR at this point that women had driven

3    recklessly while your were in the back?

4    A.   Not in a harassing behavior towards me.

5    Q.   Oh, because it's only when men drive you in that way

6    that it's harassing.

7    A.   The women weren't doing it consistently.  They did it

8    once or twice.

9    Q.   Go on and look at -- well, in the middle of the next

10   paragraph, say, Mr. Drouin told Ms. Morel to, quote, suck

11   it up and play nice in the sand box, is that correct?

12   A.   Yes.

13   Q.   Is that Mr. Drouin or Mr. Chaplin?

14   A.   That's Mr. Drouin.

15   Q.   Take a look at AMR Exhibit 53.  Can you tell us what

16   Exhibit 53 is?

17   A.   I emailed the Department of Health or Transportation,

18   I'm not sure which one it was, with my concerns about some

19   of the patient care that was occurring.

20   Q.   And you were reporting the Town of Enfield about

21   these concerns?

22   A.   I am, yes.

23   Q.   And take a look at AMR exhibit -- and you also

24   promised to provide the incident reports, correct?

25   A.   Yes.

1   Q.   Take a look at AMR Exhibit 59.  This is to a guy by

2   the name of Gary Wiemokly?

3   A.   Yes.

4   Q.   And in this you say he worked for the state of

5   Connecticut?

6   A.   Yes.

7   Q.   He's one of the ones you're emailing these incident

8   reports to?

9   A.   Initially, yes.

10  Q.   Said, I've recently been made aware of your

11  pre-existing relationship with members of Enfield EMS?

12  A.   Correct.

13  Q.   I'm forwarding these complaints to you in hopes that

14  your respect for the position you hold will allow you to

15  review them in an unbiased manner.

16       Did you have any reason to believe that Mr. Wiemokly

17  would not be impartial in reviewing your incident reports?

18  A.   Yes.  He was in charge of giving them medical

19  commands.  So any fault on their part would fall on him

20  legally liability-wise for giving them permission to

21  practice as paramedics.  So he has a stake in whether he

22  admits that they've done something wrong or not.

23  Q.   Part of a conspiracy?

24  A.   It's not a conspiracy, it's just a fact.

25  Q.   Take a look at Exhibit 62.  You have that in front of

1    you?

2    A.    Yes.

3    Q.    And this is an email that you drafted and sent?

4    A.    Yes.

5    Q.    You'll see that the second paragraph you state, the

6    second incident is with another Enfield employee named

7    Fritch had his tires vandalized in the Enfield office in a

8    manner such that it blew out on the highway.

9         You see that?

10   A.    Yes.

11   Q.    Jim Fritch is an AMR employee, correct?

12   A.    Yes, we already established that.  He's a male

13   paramedic.

14   Q.    Here you don't say that he said it.  You said it

15   happened, right?

16   A.    I wasn't in the vehicle with him when his tire blew

17   out.  So he said it.

18   Q.    Take a look at AMR Exhibit 71.  And this is the

19   letter that you wrote to Bob Zagami in your attempt to

20   document the results of his investigation.

21   A.    Yes.

22   Q.    And in the middle of the letter you wrote, you stated

23   that you would not be looking into my -- I'm sorry -- you

24   stated you would not be looking into my complaints without

25   pay because you could not find any union grievances filed.

1      I'm sorry, above that.  You also stated that you

2   would no longer be looking into the complaints of hostile

3   work environment because Enfield EMS was not cooperating

4   and we were not working with them anymore.

5      Do you see that?

6   A.   Yes.

7   Q.   Why didn't you write and say, but you know that's not

8   true?

9   A.   Because I was quoting what he said.  I wasn't trying

10   to argue with him.  I was just documenting what he said to

11   me.

12   Q.   And what was the source of your belief that AMR was

13   continuing to work in Enfield?

14   A.   Other employees at AMR.

15   Q.   Were you aware that AMR had lost the R5 license as of

16   July 1, 2007?

17   A.   I was aware they lost the R5 license, but I said

18   before they were providing back-up coverage and still

19   working in the town.

20   Q.   Were you aware of any decrease in the amount of work

21   that AMR was doing in Enfield after they lost the R5?

22   A.   No.

23   Q.   They weren't doing ALS anymore in --

24   A.   Yes, they were.

25   Q.   To the same extent?

1   A.   I have no idea how many crews Enfield had on, but

2   they did not have enough paramedics to cover all the

3   shifts.  That's why AMR was still in the town.

4   Q.   So they lost the R5, but you're not aware of any

5   decrease in the amount of work?

6   A.   I have no idea if it decreased or not.

7   Q.   Did you ask?

8   A.   I asked my friends who still worked at the company

9   and they said they were still responding to calls and

10  assigned to the town.

11  Q.   Take a look at AMR Exhibit 73.  This is a letter to

12  you from AMR?

13  A.   Yes.

14  Q.   And it's dated August 25, 2008?

15  A.   It is.

16  Q.   And the letter states that you need to complete a

17  corporate compliance training?

18  A.   Yes.

19  Q.   And it states that if your certificate has not been

20  received by myself or an operations supervisor by

21  September 13, 2008, you will no longer be eligible for

22  employment.  Do you see that?

23  A.   Yes.

24  Q.   You never completed the corporate compliance

25  training?

1    A.    Actually I did.

2    Q.    Why didn't you ever ask for a shift then?

3    A.    What does that have to do with completing the

4    compliance training?

5    Q.    I'm sorry.  Let me ask my question again.

6         If you went ahead and completed the corporate

7    compliance training, then why didn't you take the

8    initiative to also ask if you could do a shift?

9    A.    Because this issue wasn't resolved and we were still

10   going through a process to get it resolved.

11   Q.    In fact, you had already filed your complaint with

12   the Connecticut Human Rights Organization, correct?

13   A.    I did file a complaint with the Connecticut Human

14   Rights Organization, yes.

15   Q.    And you had done it prior to August 25, 2008?

16   A.    Absolutely.

17   Q.    If you take a look at AMR Exhibit 74 -- and this is a

18   letter to you from AMR?

19   A.    It is.

20   Q.    And this one's dated April 28, 2009?

21   A.    Correct.

22   Q.    And this is the one where AMR is terminating your

23   employment?

24   A.    Correct.

25   Q.    Did you write a letter back saying, I want to do a

1    shift?

2    A.   I was advised not to respond.

3    Q.   Because you see it says, it has been our

4    understanding for quite some time that you do not have any

5    intention of returning to work at American Medical

6    Response.  Your last shift at our location was in July of

7    2007.

8        Do you see that?

9    A.   I do see that.

10   Q.   And you didn't respond to this asking for a shift

11   because you were advised not to respond?

12   A.   I was advised that all communication was to go

13   through the Human Rights Organization investigation and

14   that I was not to contact AMR directly.

15   Q.   You could have told the Human Rights Organization,

16   yes, I would like a shift?

17   A.   No.  I told the Human Rights Organization they sent

18   me the letter.  I couldn't ask it for a shift through

19   them.  They said that I was not to be contacting them

20   because there was an active investigation going on.

21   Q.   I'm sorry, you had just testified that you were told

22   to only contact AMR through the CHRO.

23   A.   No, not through them.  I was not to contact them.  I

24   was only to contact the Human Rights Organization.

25   Q.   So you didn't think to contact them to say, hey, tell

1    AMR I do want to work a shift?

2    A.    That's not their responsibility.  They're involved in

3    the investigation of harassment.  They're not there to

4    schedule shifts.

5    Q.    If you take a look at AMR Exhibit 75, this is the

6    affidavit you filed with the CHRO?

7    A.    Yes.

8    Q.    This includes the details of your complaints of

9    discrimination?

10   A.    It includes a summary of them, yes.

11   Q.    And in fact, you filed an addendum, correct?

12   A.    I don't know.

13   Q.    You'll see the last three pages.

14   A.    Okay.

15   Q.    And you'll see this is your addendum, correct?

16   A.    Correct.

17   Q.    And you'll see on paragraph B of the addendum, which

18   is on the second page of the addendum, second to last page

19   of the exhibit, you'll see, I also reported receiving

20   phone calls on my personal phone from EEMS employees

21   harassing me and calling me a bitch, correct?

22   A.    Yes.

23   Q.    And so far we've only seen reports of one phone call

24   where somebody, as you've stated several years later,

25   called you a bitch, correct?

1   A.   Correct.

2   Q.   And there's no other mention of any specific foul

3   language in this affidavit?

4   A.   Same as before.  I don't really feel comfortable

5   documenting the foul language repetitively.

6   Q.   Take a look at AMR, and I'm sorry to go backwards but

7   AMR Exhibit 69.

8        If you take a look at the second page, this is the

9   actual email where you requested part-time employment?

10  A.   It is.

11  Q.   So this serves my official notice that I intend to

12  change my status to part-time in two weeks?

13  A.   Yes.

14  Q.   You were at medical school at this time?

15  A.   Yes.

16  Q.   Ms. Morel, when did you start developing the symptoms

17  you testified about that were caused allegedly by the

18  stress you endured at work?

19  A.   Are you talking about the inability to sleep and the

20  digestive problems?

21  Q.   Yes.

22  A.   They slowly started to develop from spring of 2006 to

23  2007 and they continued afterwards.

24  Q.   And you said, with the digestive, that every time you

25  ate, you got sick?

1   A.   Yes.

2   Q.   And you said that you lost weight?

3   A.   Yes.

4   Q.   If you could take a look at AMR Exhibit 100, please?

5   Do you have that in front of you?

6   A.   Yes.

7   Q.   You'll see in paragraph 3 you state, the very first

8   day I returned to work in the town of Enfield as a

9   paramedic.  After completing training in Hartford, I began

10  having problems with harassment, specifically by Scott

11  Schaub, an EMT on my first call.  Mr. Schaub was

12  approximately 5' 10" and 240 pounds.  I was 5' 5" and

13  120 pounds.  Do you see that?

14  A.   Yes.

15  Q.   If you could take a look at AMR Exhibit 81.  This is

16  part of the medical documentation that was filled out in

17  April 2007 prior to you going to medical school?

18  A.   Yes.

19  Q.   And here you say your weight's 132 pounds up at the

20  top?

21  A.   Rough estimate, sure.

22  Q.   125 less than or more than 132?

23  A.   Less than.

24  Q.   So you gained weight during this time you were

25  horribly sick?

1    A.    No.

2    Q.    Okay.

3    A.    This is my guessing.

4              THE COURT:  I'm sorry, I missed your answer.

5              THE WITNESS:  This is a guess.  It's paperwork

6    that I fill out.  I didn't literally weigh myself to fill

7    out this paperwork.

8    BY MR. BARR:

9    Q.    So you guessed you'd gained weight, you guessed you'd

10   gained 7 pounds?

11   A.    I guessed at what my weight was, yes.

12   Q.    If you could look at the second page of Exhibit 81,

13   and this is the page you filled out on March 22, 2007?

14   A.    Yes.

15   Q.    And here you say that you have digestive upsets which

16   is IBS, correct?

17   A.    Yes.

18   Q.    You don't check you have any difficulty sleeping.  Do

19   you see that?  There's no check by "difficulty sleeping"

20   right below "digestive upsets."

21   A.    Okay.  That's an oversight.

22   Q.    How about loss of weight?  Was that another oversight

23   right above digestive --

24   A.    Loss of weight, when you check it in this instance,

25   indicates cancer.  So I did not check that.

1    Q.   I'm sorry, I don't see that here.

2    A.   I have medical knowledge that's perhaps different

3    than yours.  So in my understanding, when I see "loss of

4    weight," it's an indication of cancer.

5         So, no, I did not have a significant loss of weight.

6    As far as when you check that on a physical exam, it's to

7    be 20 pounds or above over the course of a month or two.

8    So that's different.  It's a different usage, I guess is

9    what I would say.

10        If you slowly lose weight over time, it's not a

11   drastic -- you've lost a significant amount of weight this

12   month to make it like a red flag in a medical report.

13   Q.   Your stomach being upset, did it cause any cramping

14   or anything?

15   A.   Absolutely.

16   Q.   You'll see that by "abdominal cramps" you don't check

17   that either?

18   A.   Again my understanding of that is cramping as in

19   menstrual cramps, not cramping because -- there's

20   digestive problems, which would be digestive cramping and

21   upset, and then there's abdominal cramping, which I would

22   interpret as your menstrual cycle, something like that.

23   Q.   So when you're filling this out, what your

24   understanding is that what Lake Erie wants, is they want

25   to know if you have menstrual cramps when they say

1    abdominal cramps?

2    A.    Absolutely, yes.

3    Q.    Did you have diarrhea as a consequence of the stress?

4    A.    Yes.

5    Q.    I see that chronic diarrhea is not checked.  Did you

6    not have and chronic diarrhea?

7    A.    I had diarrhea when I ate.

8    Q.    You ate every day, right?

9    A.    No, I did not.

10   Q.    How often would you eat?

11   A.    Every couple of days, when I could.  Mainly when I

12   wasn't at work.

13   Q.    But you testified you were working six to seven days

14   a week.

15   A.    Yes.

16   Q.    So if you're eating mainly when you weren't at work

17   then when were you eating?

18   A.    Not very often.  That's why I lost weight.

19   Q.    Except that back then you estimated that you gained

20   weight.

21         We can move on.

22         Looking further on this document, "please describe

23   your general state of health now."  And you say healthy.

24   A.    Where?

25   Q.    Just on the same page.  Go down after the checklist.

1    "Please describe your general state of health now."

2    Do you see that?

3    A.   Yes.

4    Q.   And what word is that right next to there?  Could you

5    read --

6    A.   It's "healthy."

7    Q.   I'm sorry?

8    A.   "Healthy" is the word.

9    Q.   Did you interpret this with different medical

10   knowledge than I have?

11   A.   I interpreted it as I'm not diseased and I don't have

12   cancer and no heart problems, and that's how I interpret

13   for all intents and purposes.  Generally compared to other

14   people in the population, I would still say that I was

15   healthy.

16   Q.   So you're eating sporadically, you're losing

17   weight -- I want to make sure I understand -- you're

18   losing weight, you're having cramps, you're having

19   diarrhea, but you still think you're healthy?

20   A.   Comparatively, yes.  I view that as I wasn't sick in

21   the hospital, so I'm fairly healthy.

22   Q.   Did you get any medication from any doctor to help

23   you with your problems?

24   A.   I did.

25   Q.   What did you get?

1    A.    I got Solpadeine, which is Ambien, a sleeping

2    medication, from Dr. Garrity.  And he also prescribed,

3    slippery elm, which is a holistic medication for digestive

4    upset.

5    Q.    Can you take a look at Exhibit 82?  Do you have that

6    in front of you?

7    A.    I do.

8    Q.    And Dr. Garrity is your doctor that you just referred

9    to?

10   A.    He was my family practice at the time, yes.

11   Q.    And you'll see that this is a report he filled out on

12   June 20, 2007?

13   A.    Yes.

14   Q.    He says that there's no medications.  Do you see

15   that?

16   A.    Yes.

17   Q.    Okay.  Was there some different medical

18   interpretation he would have used other than the word

19   "medications"?

20   A.    No.

21   Q.    He says no change in bowel bladder.  Do you see that?

22   A.    Correct.

23   Q.    And he also has "no" for GI problems.  Do you see

24   that?

25   A.    I see that he has that.

1    Q.   Did he just not know about your GI problems?

2    A.   He knew about my GI problems.

3    Q.   This is a mistake on his part?

4    A.   Clearly he doesn't go through each question and

5    answer.  And you see there's a no and a line through it,

6    so --

7    Q.   Take a look on the next page -- or, I'm sorry, we

8    don't need to look at that.

9         When did Dr. Garrity first prescribe the sleeping

10   pills to you?

11   A.   I don't remember the date.  Specifically I can tell

12   you tomorrow when I look at the bottle.

13   Q.   Sure.  Why don't we take a look at AMR Exhibit 98.

14   Do you have that in front of you?

15   A.   I do.

16   Q.   And this is another set of interrogatory responses

17   that you filed in this case?

18   A.   Sure.

19   Q.   You'll look at the last page of AMR Exhibit 98 and

20   you'll see that you signed these under oath?

21   A.   Yes.

22   Q.   And this was April 2010?

23   A.   Yes.

24   Q.   And you of course reviewed them before you signed

25   them, right?

1    A.    Yes.

2    Q.    Take a look at interrogatory number 18, which you'll

3    find it in the upper right-hand corner there's a page 23.

4          Do you have that in front of you?

5    A.    Yes.

6    Q.    And here you state at the bottom, the plaintiff --

7    and that's you, correct?

8    A.    Yes.

9    Q.    The plaintiff had trouble sleeping and was given a

10   prescription for sleeping pills by Dr. William Garrity

11   commencing in the fall of 2005 to the summer of 2007.  Do

12   you see that?

13   A.    I do see that.

14   Q.    Did he know you were going to have problems starting

15   in 2006?

16   A.    That's my attorney estimating the dates that he

17   treated me.

18   Q.    I'm sorry.  You said you reviewed this before you

19   signed it, correct?

20   A.    Correct.

21   Q.    And then you signed it under oath, correct?

22   A.    Yes.  And those are the dates that he treated me as a

23   physician.  Those are not the dates of the length of the

24   prescription.

25               THE COURT:  Mr. Barr would this be a convenient

1    time to conclude?

2              MR. BARR:  Well, Your Honor, I'm going to have

3    some more questions, but this would be a convenient

4    breaking point.

5              THE COURT:  Thank you.

6              Members of the jury, we're going to adjourn for

7    the day.  I want to thank you very much for your service

8    today.  It's much appreciated.

9              Please leave the binders at your chairs and you

10   may leave your notepads there as well.  Terri will collect

11   the pads.

12             Please remember the rules that apply to your

13   service.  Please do not discuss the case or anything about

14   the case with each other, with anybody else.  And please

15   don't undertake any kind of research concerning any

16   matters relating to the case.  And please be back to

17   resume the trial tomorrow at 9:00.  And have a good

18   evening.

19             Thank you very much.

20                  (Whereupon, the jury left the courtroom.)

21             THE COURT:  All right.  I'd like to see counsel

22   in chambers, and I'd like Darlene to be present.  We'll

23   adjourn.

24                  (Proceedings adjourned at 4:25 p.m.)

25

1                   C E R T I F I C A T E

2

3                    In Re: Morel vs. AMR

4

5

6            I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15
                     /s/_____
16
                       DARLENE A. WARNER, RDR-CRR
17                       Official Court Reporter
                        450 Main Street, Room #223
18                     Hartford, Connecticut 06103
                            (860) 547-0580
19

20

21

22

23

24

25